**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| BOBBY BRUCE WHITE, | ) |
| | ) |
|      **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 24-3023-DDC-RES** |
| | ) |
| ANDREW PARKS, *et al.*, | ) |
| | ) |
|      **Defendants.** | ) |
| | ) |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**</u>
<u>**JUDGMENT**</u>

Defendants Andrew Parks, Evan Meredith, and Bruce Chapman ("Defendants"), by and through undersigned counsel, request that this Court grant them summary judgment under Fed. R. Civ. P. 56 and state the following in support:

**I.     Nature of the Case.**

Plaintiff Bobby Bruce White alleges that on July 12, 2023 – while incarcerated under the Kansas Department of Corrections (KDOC) at Lansing Correctional Facility (LCF) – Defendants denied White immediate medical care following an incident where another inmate attempted to strangle White. (Doc. 8 at 3-4; *see also* Doc. 10 at 5; *see also* Doc. 11 at 17 (treating Doc. 10 as part of the pleadings).) White alleges he told Defendants he needed medical care, which was allegedly initially denied. (Doc. 8 at 6; *see also* Doc. 10 at 5.) White also alleges Defendants failed to protect him from the other inmate prior to the incident. (Doc. 8 at 6-7; see also Doc. 10 at 15-18.)

White alleges that after the incident Defendant Parks conspired to have a false disciplinary report submitted against him in retaliation for filing complaints about drugs and tobacco at LCF. (Doc. 10 at 15). Plaintiff claims this disciplinary report was issued "because of Mr. Parks, in

retaliation and because Mr. Parks continued to put other prisoners in the same cell with [him]" after Plaintiff returned from KU Hospital. (Doc. 10 at 15).

White filed this lawsuit on February 12, 2024. (Doc. 1.) He filed his Second Amended Complaint on May 28, 2024. (Doc. 8.) On screening under the Prison Litigation Reform Act (PLRA), the Court dismissed White's due-process claims and all claims under 42 U.S.C. § 1985, 18 U.S.C. §§ 241, 242, and 1514. (Doc. 11 at 24.)

Defendants previously filed motions to dismiss, which the Court granted in part and denied in part. (*See generally* Doc. 64). All official-capacity claims and a retaliation claim were dismissed. (Doc. 64 at 8, 19.)

White has three remaining counts under § 1983. (Doc. 8 at 4-7; Doc. 11 at 24.) Count II alleges Eight-Amendment deliberate indifference to medical needs, and (as supplemented by Doc. 10) also includes a First-Amendment retaliation claim. (Doc. 8 at 4, 6; Doc. 11 at 14 (citing Doc. 10 at 5).) Court III alleges failure to protect under the Eighth Amendment. (Doc. 8 at 7.) Count I does not contain any allegations against the Defendants. (Doc. 8 at 4-5.) White seeks nominal, compensatory, and punitive damages. (Doc. 8 at 8.)

Following the Court's order on the motions to dismiss, the only remaining claims against Defendants Parks, Meredith, and Chapman are the following in their individual capacities: (1) an Eighth Amendment claim for failure to provide medical care against Defendants Parks, Meredith, and Chapman under Count II; (2) a First Amendment retaliation claim based on a false disciplinary report against Defendant Parks under Count II; and (3) an Eighth Amendment failure-to-protect claim against Defendants Parks, Meredith, and Chapman under Count III. (*See* Doc. 64 at 4.)

## II.    Statement of Uncontroverted Material Facts ("SUMF").

1.    Plaintiff is currently incarcerated at Larned State Correctional Facility (LSCF). *See* Docket (showing Plaintiff's address of record for purposes of service); (Exhibit A at 2-3.)[1]

2.    From January 12, 2016, to October 23, 2023, Plaintiff was incarcerated at Lansing Correctional Facility (LCF). (Exhibit A at 2.)

### *Segregation/Restricted Housing*

3.    Before Plaintiff was put into segregation on or around March 27, 2023, he had only expressed safety complaints or concerns "to other officers," but not Defendants. (Exhibit B at 43.)

4.    Plaintiff had no physical altercations with other prisoners from the time he entered segregation on or around March 27, 2023 until the alleged July 12th, 2023, incident. (Exhibit B at 87.)

5.    On or around June 9, 2023, Plaintiff told Defendant Parks to "not put [him] in with these drug abusers, drug dealers and drug abusers," because they are "the same people I'm asking you for protection from." (Exhibit B at 72-73.)

6.    Plaintiff stated that other inmates who are or were drug users, drug dealers, or drug and tobacco users were part of a group or class of people that "would automatically be a security concern" or risk for him to be housed with. (Exhibit B at 83.)

7.    According to Plaintiff, Defendants knew he was a "marked man" due to being "a snitch and a rat" regarding drug and tobacco use at LCF; because of this, Plaintiff "absolutely"

---

[1] The court can take judicial notice of the location history for Stauch in the Kansas Adult Supervised Population Electronic Repository (KASPER) report contained in Exhibit A. *United States v. Basher*, 629 F.3d 1161, 1165 & n.2 (9th Cir. 2011) (citing *Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009) and *United States v. Montgomery*, 550 F.3d 1229, 1231 n.1 (10th Cir. 2008)).

believed that Defendants knew he needed protection from drug and tobacco users. (Exhibit B at 88.)

8. Around the beginning of June 2023, Plaintiff was housed with Joshua Weeks, an alleged drug user, for around a couple of weeks, which did not result in any physical altercations. (Exhibit B at 75-76.)

9. After Mr. Weeks, Plaintiff was housed with an unnamed inmate who allegedly had an envelope containing meth; the unnamed inmate was moved to another cell despite there being no physical altercation between him and Plaintiff. (Exhibit B at 90.)

10. Both before and after the alleged incident with Jeremy Garza, Plaintiff was housed at some point with Mr. Simpson, an alleged drug addict; despite Simpson being an alleged drug addict, Plaintiff repeatedly said Mr. Simpson "was no threat to [Plaintiff]." (Exhibit B at 90-93).

11. On June 30, 2023, Plaintiff was seen by Chauncey Hester, MHP, for an onsite consult. (Exhibit C at 1-2.)

12. Plaintiff "denied current housing or security issues." (Exhibit C at 2.)

13. Plaintiff confirmed that, leading into July 12, 2023, he had requested protection from other unidentified inmates through grievances and Form 9's; however, Plaintiff did not remember which staff members specifically he sent these forms to. (*See* Exhibit B at 188-89.)

### *Garza as Cellmate*

14. After the unnamed inmate, Plaintiff was housed with Jeremy Garza for around a couple of weeks leading into the morning of July 12, 2023. (Exhibit B at 92-93.)

15. Plaintiff asserts that as soon as Garza entered the cell he began making veiled threats regarding Plaintiff being a snitch and a rat. (Exhibit B at 94.)

16.      However, Plaintiff elaborated that Garza "liked to talk," and "that was all part of his – his yak, you know. You don't know how much of this stuff to believe from people, okay. When somebody comes up and say [sic] they're going to beat you up and stuff like that, you know, you take it with a grain of salt, okay. How you [sic] going to get away with it, you know." (Exhibit B at 193-94.)

17.      No admissible evidence establishes that Mr. Garza explicitly threatened to kill Plaintiff at any time prior to the morning of July 12, 2023. (Exhibit G at ¶ 7 (saying Plaintiff lacks personal knowledge of Mr. Garza explicitly threatening to kill Plaintiff at any time prior to the morning of July 12, 2023).)

18.      Plaintiff explained that Garza "wasn't a threat to me, okay, personally until [Garza] was put in the cell with me and told me he was going to kill me." (Exhibit B at 190.)

19.      Plaintiff said what made Garza stand out as a threat was that Garza threatened to kill Plaintiff. (Exhibit B at 197.)

20.      Plaintiff did not think Garza was a threat to him before being housed with Garza, and, because of this, "it would be ridiculous to say that I warned Parks that – that Garza was a threat to me until he was put in the cell with me;" however, after Garza was put in the cell with Plaintiff, he did not know whether he "had any actual interaction with Parks." (Exhibit B at 190.)

21.      Further, before Plaintiff was housed with Garza, Plaintiff "didn't even really know" Garza. (Exhibit B at 197.)

22.      When asked whether Plaintiff ever told Defendant Parks about Garza making threats, Plaintiff stated he did not recall "any time that I had any interaction personally with Parks, from the time Garza was put in with me to the time that I left." (Exhibit B at 199.)

23.    When asked whether Plaintiff ever told Defendant Meredith about Garza making threats, Plaintiff stated he "probably [provided] generalized" warnings regarding Garza being "a threat" to him, that Garza was threatening him, and, in general, Plaintiff kept saying "you got to move me out of this facility." (Exhibit B at 200-01.)

24.    No admissible evidence shows that Plaintiff requested protection by Defendant Meredith specifically from Jeremy Garza before the alleged altercation on July 12, 2023. (Exhibit H at 31, 1-30 (discussing only generalized requests/duties before the incident and requests after the incident)[2]; *see also* Doc. 30-6 at 15-29 (the exhibits F-3 and F-4 that Plaintiff references); Doc. 126 (Defendant Meredith's job description that Plaintiff references); Exhibit I at 52-56 (copies provided by Plaintiff of disciplinary hearing records for case 2872 that Plaintiff references); Exhibit J (transcript of EAI interview that Plaintiff references)[3].)

25.    At first, when asked whether Plaintiff ever told Defendant Chapman about Garza making threats, Plaintiff stated he thought he "might have told Chapman pretty much, you know, the threats he made," but later Plaintiff alleged that, on some undefined date, he told Chapman that Garza had threatened to kill him. (Exhibit B at 198-202.)

26.    No admissible evidence shows that Plaintiff requested protection by Defendant Chapman specifically from Jeremy Garza before the alleged altercation on July 12, 2023. (Exhibit H at 1-30 (discussing only generalized requests/duties before the incident and requests after the incident); *see also* Exhibit J (transcript of EAI interview that Plaintiff references)[4].)

---

[2] With regard to Plaintiff's argument that his Requests for Admission were admitted, the Court has already ruled differently. (Doc. 135 at 4-5.)

[3] Defendants do not present Exhibit J for the truth of the matters asserted therein, but only to show it does not involve or discuss Plaintiff requesting protection specifically from Jeremy Garza prior to the alleged altercation on July 12, 2023.

[4] See footnote 3.

*Alleged Incident on July 12, 2023*

27.    On the morning of July 12, 2023, Plaintiff and Mr. Garza got into an argument regarding Plaintiff's television; the argument intensified and Mr. Garza allegedly told Plaintiff something to the effect of "I'm going to kill you," but first, Mr. Garza was going to break everything Plaintiff owned in the cell. (Exhibit B at 97-98.)

28.    Mr. Garza started walking towards Plaintiff's television and, in response, Plaintiff stood up, at which time a physical altercation ensued. (Exhibit B at 98.)

29.    Plaintiff eventually separated himself from Mr. Garza and began beating on the cell-door with his metal cane to get an officer's attention; although Plaintiff was unsure who arrived first, Defendant Meredith and Chapman came to the door. (Exhibit B at 98; *see also id.* at 71-72 (describing how Plaintiff would use his cane to beat on the door).)

30.    Either Defendant Meredith or Chapman asked Plaintiff what was happening, which Plaintiff responded, "this guy's trying to kill me," and told them they needed "to get [Garza] out of here." (Exhibit B at 98-99.)

31.    Plaintiff allegedly showed Defendants Meredith and Chapman his throat before saying that he would sign a PC waiver if it meant no longer being housed with Garza as Plaintiff was "not staying in here with this guy." (Exhibit B at 99.)

32.    Plaintiff alleges that Defendant Meredith went to get a PC waiver while Defendant Chapman stayed with Plaintiff to talk; Defendant Chapman asked for more details of what was going on and Plaintiff stated, "I need medical," because his "throat's getting sore" and he could "hardly talk." (Exhibit B at 99.)

33.     Plaintiff stated that Defendant Chapman told Plaintiff he wasn't going anywhere until he signed a PC waiver, at which time Defendant Meredith returned with the waiver. (Exhibit B at 99-100.)

34.     After signing the waiver, Defendant Meredith left and Defendant Chapman told Plaintiff "to turn around and cuff up;" however, Plaintiff refused and told Defendant Chapman—multiple times—to "cuff [Garza] up first," because Plaintiff did not want Mr. Garza to be left alone in the cell as Plaintiff believed he was "going to tear up [his] property." (Exhibit B at 100.)

35.     Defendant Chapman instructed Plaintiff to back up to the door to be cuffed and removed, but, again, Plaintiff refused saying, "I'm not leaving until" they get Mr. Garza "out of here first." (Exhibit B at 100.)

36.     At the same time as Plaintiff was actively refusing to be removed from the cell, he allegedly told Defendant Chapman multiple times that he needed medical. (Exhibit B at 100.)

37.     Eventually, Mr. Garza was removed from the cell and Plaintiff finally complied with being cuffed and removed. (Exhibit B at 100.)

38.     Defendant Chapman took Plaintiff to a holding cell and waited for Defendant Parks to return to the unit. (Exhibit B at 100-02.)

39.     Plaintiff clarified that Defendants Meredith and Chapman were "the first responders" to his cell after the incident, but Defendant Parks "wasn't there [and] didn't have anything to do with it," until he later met with Plaintiff. (Exhibit B at 109-10.)

40.     Plaintiff is unsure of how much time passed from the incident until his meeting with Defendant Parks, as he "didn't have a watch at the time." (Exhibit B at 110.)

41.     While waiting to meet with Defendant Parks immediately following the incident, Plaintiff said he was given a hot dog for lunch, which he took a bite of, but was unable to swallow. (Exhibit B at 116-17.)

42.     Plaintiff stated that, due to his sore throat, he missed one meal (lunch) on July 12, 2023. (Exhibit B at 211.)

43.     "[P]retty soon" after Defendant Parks returned, Plaintiff was taken into Parks' office and questioned about the incident. (Exhibit B at 102.)

44.     Plaintiff told Defendant Parks that he needed "some medical help," and Parks explained that they were moving him back to general population where he could "put in [a] sick call." (Exhibit B at 102.)

45.     After the meeting, Defendant Parks sent Plaintiff "right to general [population]." (Exhibit B at 103.)

46.     Despite Defendant Parks immediately transferring Plaintiff to general population where he could make a sick call, Plaintiff believes Parks denied him medical care because he "needed emergency medical care." (Exhibit B at 111.)

### General Population

47.     Once in general population, Plaintiff's neck started "bruising up." (Exhibit B at 104-05.)

48.     Plaintiff asked an officer for medical help, who at first told him he would "need to put in a sick call," but after Plaintiff "showed her [his] neck [and] bruise," the officer "called medical." (Exhibit B at 104-05.)

49.     The officer then asked Plaintiff if he could "make it over [to medical] all right by [himself]?" and Plaintiff answered, "yeah, fine." (Exhibit B at 105.)

9

*LCF Medical*

50.    Plaintiff walked over to medical, explained his situation to an officer, and was then seen by a nurse who examined him. (Exhibit B at 105-06.)

51.    Following the fight with Garza, Plaintiff was seen by Mariah Kalma, APRN, at Lansing's medical facility on July 12, 2023, at approximately 11:38 a.m. (Exhibit C at 3-7.)

52.    Plaintiff presented himself to the facility and reported that he was strangled around 10:00 a.m. (Exhibit C at 3.)

53.    Plaintiff further reported that "he had trouble swallowing his hotdog afterwards. Reports it is difficulty [sic] to speak and notes his voice is weaker. Denies issues [with] breathing. Reports the back of his neck is sore." (Exhibit C at 3; *see also* Exhibit B at 116-17, 211 (describing the same issue with eating a hot dog).)

54.    Plaintiff was noted as having hoarseness (dysphonia) issues and purple/red scratches on the sides of his neck bilaterally; otherwise, Ms. Kalma observed Plaintiff exhibited no acute distress, had a clear airway, exerted normal effort in breathing, and maintained a normal ability to communicate. (Exhibit C at 5.)

55.    Ms. Kalma's impression found: "No respiratory distress noted," and "Patient appears stable at this time, conversing w/ KDOC." (Exhibit C at 5.)

56.    At all times following the incident on July 12, 2023, Plaintiff maintained his ability to speak. (Exhibit G at ¶ 4.)

57.    Ms. Kalma decided that "[d]ue to the nature of the assault and reported symptoms patient [would be] sent to the ED via EMS for further evaluation/imaging." (Exhibit C at 5.)

58.    Hanna Taylor, LPN, also visited Plaintiff on July 12, 2023 at 12:04 p.m., to check his vital signs and complete assessments. (Exhibit C at 8-11.)

59.     Plaintiff reported that he "tried eating lunch but was only able to take 1 bite due to throat hurt to swallow." (Exhibit C at 9; *see also id.* at 3 (describing the same issue); Exhibit B at 116-17, 211 (same).)

60.     Plaintiff assessed his pain level as "4-5 Moderate." (Exhibit C at 9; *see also* Exhibit B at 222 (responding "I don't deny it" when asked if Plaintiff remembered reporting his pain level).)

61.     Neither KDOC medical professional that saw Plaintiff shortly after his incident prescribed or gave him pain medication as a result of his visit. (*See* Exhibit C at 6, 10 (showing the start and stop dates of various medications).)

### *KU Medical*

62.     Plaintiff took an ambulance to KU Medical. (Exhibit B at 105-06; Exhibit H at 32.)

63.     The KU medical records indicate the following care timeline for Plaintiff's treatment on July 12, 2023: Plaintiff arrived to the emergency department at 1:11 p.m.; Plaintiff had computed tomography ("CT") scans at 2:52 p.m., at which time he was also given 1000 mg's of acetaminophen; Plaintiff was discharged at 5:22 p.m. (Exhibit D at 3; *see also* Exhibit E at 8 (billing record for administered drugs).)

64.     The CT scans showed: "No evidence of acute arterial vascular injury within the neck." (Exhibit D at 9, 22, 32.)

65.     Plaintiff's after visit summary provided: Plaintiff's "scans were all negative for acute injuries;" Plaintiff was "able to eat and drink without complications while in the ER;" and recommended "tylenol and ibuprofen as needed for the pain." (Exhibit D at 11.)

66.     An earlier order for oxycodone dated September 20, 2022, remained in Plaintiff's KU medical records. (Exhibit D at 18-19.)

11

67.     Plaintiff ate a "sub sandwich" at KU Medical before returning to LCF. (Exhibit B at 117.)

### *Return to LCF*

68.     After being seen at KU Medical, Plaintiff returned to LCF later that night and was examined at LCF's medical clinic. (Exhibit B at 106; Exhibit C at 12-13.)

69.     Upon returning from KU Medical Center, Plaintiff was seen by Victoria Shimanovich, RN, at around 8:07 p.m. (Exhibit C at 12-13.)

70.     Ms. Shimanovich observed that: Plaintiff's breathing efforts were "even and non-labored;" Plaintiff "reported occasional pain with swallowing 5/10;" and Plaintiff "reports ability to drink water without difficulty." (Exhibit C at 13.)

71.     After examining Plaintiff, Ms. Shimanovich called KU's on-call doctor "to clarify [the] order for pain medication oxycodone," which resulted in the doctor discontinuing oxycodone medication for Plaintiff that night. (Exhibit C at 13.)

72.     Two weeks later, on July 26, 2023, Plaintiff was visited by Chauncey Hester, MHP, who observed that Plaintiff had clear speech with "no irregularities." (Exhibit C at 14-15.)

73.     Plaintiff claims he experienced pain, neck trauma, a sore throat, and trouble swallowing due to the alleged altercation on July 12, 2023. (Exhibit H at 32-33.)

### *Disciplinary Report*

74.     On September 26, 2023, Disciplinary Report Case No. 1138 ("Report") was written and issued to Plaintiff for an alleged policy violation (K.A.R. 44-12-304A Disobeying Orders Class I). (Exhibit F at 6; *see also id.* at ¶¶ 5-6.)

75.     The Report, drafted by COII Prentzler, states that Prentzler and COI Reyes took another inmate to Plaintiff's cell, but Plaintiff "refused to take a cellmate." (Exhibit F at 6.)

76.     Plaintiff asserted that he was unable to refuse a cellmate because he is a prisoner with "no control over who they put in" with him; however, he did clarify that when the officers "came in and asked [Plaintiff] if [he] was willing to take a [cellmate]," he "said no … I can't do that, because EAI said I was supposed to be in a cell by myself." (Exhibit B at 121, 123.)

77.     After a hearing regarding the Report on September 29, 2023, Plaintiff was found not guilty. (Exhibit F at 3, 8.)

78.     After being found not guilty, Plaintiff faced "no recorded sanctions," but did say that he was "being tormented and tortured" by Defendant Parks continuing to house Plaintiff with other inmates. (Exhibit B at 120.)

79.     Plaintiff admits to lacking personal knowledge regarding Park's motivations, saying, "I have no idea what – what motivated him, what caused him to continue to harass me." (Exhibit B at 148.)

80.     Plaintiff's "position" is that Defendant Parks told the officers to write the Report "out of retaliation, because [Parks] kept wanting to torment [Plaintiff]". (Exhibit B at 121.)

81.     Defendant Parks' name is found nowhere in the Report; the only references to Parks were during the testimony portion of the hearing, but Parks was not noted as being at the hearing and did not draft or file the Report. (*See generally*, Exhibit F; *see also* Exhibit G at ¶ 6 (saying Plaintiff does not have personal knowledge of who drafted or filed the disciplinary report).)

82.     No admissible evidence connects Defendant Parks to the drafting or filing of the Report.

83.     Plaintiff alleges that "the main" reason Defendant Parks retaliated against him was because he was a pro se plaintiff in underlying suits against them and other KDOC staff. (Exhibit B at 142-43.)

84.    Plaintiff says these suits include this current lawsuit and the state habeas action formerly numbered LV-2022-CV-323, now numbered PN-2024-CV-9. (Exhibit H at 35-37; Doc. 30-5 (the petition from the state habeas case).)

85.    The petition in the state habeas action was filed December 12, 2022, and it does not mention Defendant Parks. (Doc. 30-5 (the petition from the state habeas case).)

86.    No admissible evidence shows that Defendant Parks was aware of the state habeas action at the time of Disciplinary Report Case No. 1138.

87.    Plaintiff also stated that he previously complained about drug and tobacco problems at LCF, but said that was mostly from during his time in "BIB" (BIBR) groups back in 2020. (Exhibit B at 148-49, 151-53.)

88.    Plaintiff asserted that he has "been complaining about the drug and alcohol and tobacco use at LCF clear back as far as 2015." (Exhibit B at 154.)

89.    When asked if the Report being issued caused Plaintiff to stop engaging in any activities, Plaintiff responded "yes, 'cause I no longer was protected, okay, because I wasn't being protected and EAI had to send me [to LSCF]." (Exhibit B at 138.)

90.    Plaintiff further said that because of the alleged retaliation, his access to the courts was somehow denied. (Exhibit B at 140-41.)

### *Administrative Remedies*

#### *Grievance AA2023056*

91.    Plaintiff filed a grievance numbered AA2023056 on October 5, 2022. (Exhibit B at 8; see also Doc. 8 at 8 (referencing this grievance); Doc. 30-5 at 13; Doc. 30-6 at ¶¶ 4-7.)

92.    In that grievance and its appeals, Plaintiff complains about Gary Spillman and BIBR but not about Defendants. (Doc. 30-2 at 8-9, 3-6; Doc. 30-5 at 13, 15-19.)

14

93.     The grievance was denied by: the unit team on October 6, 2022 (Doc. 30-2 at 8; Doc. 30-5 at 13); by the warden on appeal on October 10, 2022 (Doc. 30-2 at 8, 10; Doc. 30-5 at 13-14); and by the Secretary of Corrections on appeal on November 3, 2022 (Doc. 30-2 at 1; Doc. 30-5 at 12).

*Grievance AA2024081*

94.     Plaintiff filed grievance AA2024081 on October 1, 2023. (Doc. 30-3 at 6; see also Doc. 8 at 8 (referencing this grievance); Doc. 8-1 at 22; Doc. 30-6 at ¶¶ 8-11.)

95.     In that grievance, Plaintiff complains about noise in his cellhouse. (Doc. 30-3 at 6; Doc. 8-1 at 22.)

96.     The grievance was denied by the unit team on October 10, 2023 (Doc. 30-3 at 6; Doc. 8-1 at 22), and by the warden on appeal on February 5, 2024 (Doc. 30-3 at 5-6; Doc. 8-1 at 21-22).

97.     When Plaintiff appealed to the Secretary of Corrections, he added, for the first time, some allegations regarding Defendants and regarding the July 12, 2023, incident. (Doc. 30-3 at 2-4; Doc. 8-1 at 19-20.)

98.     The Secretary of Corrections ignored the additional allegations and denied the appeal on March 8, 2024, finding that the warden's response was correct. (Doc. 30-3 at 1; Doc. 8-1 at 18.)

*Grievance AA2024082*

99.     Plaintiff filed grievance AA2024082 on September 27, 2023. (Doc. 30-4 at 5; see also Doc. 8 at 8 (referencing this grievance); Doc. 30-6 at ¶¶ 12-15.)

100.    In that grievance, Plaintiff complains about not receiving library books. (Doc. 30-4 at 5.)

101. The grievance was denied by the unit team on October 10, 2023 (Doc. 30-4 at 5), and by the warden on appeal on February 6, 2024 (Doc. 30-4 at 4-5).

102. When Plaintiff appealed to the Secretary of Corrections, he added, for the first time, that Defendant Parks should fix the book problem. (Doc. 30-4 at 2-4.)

103. The Secretary of Corrections denied the appeal on March 8, 2024, finding that the warden's response was correct. (Doc. 30-4 at 1.)

*Unnumbered Grievance dated April 25, 2023*

104. Plaintiff allegedly filed an unnumbered grievance on April 25, 2023. (Doc. 30-6 at 17; see also Doc. 8 at 8 (referencing this grievance); Doc. 30-6 at ¶¶ 21-24.)

105. In that grievance, Plaintiff complains about Gary Spillman and BIBR but not about Defendants. (Doc. 30-6 at 17.)

106. The grievance was allegedly never responded to by the unit team or the warden. (Doc. 30-6 at 17.)

107. On appeal to the Secretary of Corrections, Plaintiff complained that Defendants Parks and Meredith did not handle Form 9's and grievances correctly. (Doc. 30-6 at 16, 18-23.)

108. The Secretary responded to the alleged appeal as merely an "informal letter" on June 22, 2023, noting that there was no evidence that Plaintiff had filed a grievance at the unit-team or warden levels. (Doc. 30-6 at 15.)

*Emergency Grievance dated June 9, 2023*

109. Plaintiff sent an emergency grievance to the Secretary of Corrections dated June 9, 2023. (Doc. 30-6 at 26-29; *see also id.* at ¶¶ 25-28.)

110. In that emergency grievance, Plaintiff complained that he was in segregation and that he had drug dealers and users as cellmates. (Doc. 30-6 at 26-29.)

16

111. The Secretary of Corrections denied the grievance as "invalid" on June 26, 2023, because it was grieving the classification decision-making process. (Doc. 30-6 at 25.)

*Emergency Grievance dated December 21, 2023*

112. Plaintiff filed an unnumbered grievance on December 21, 2023, marked as an "emergency grievance." (Doc. 30-6 at 39, 47; *see also id.* at ¶¶ 33-36.)

113. In that grievance, Plaintiff complains of his segregation status at LSCF. (Doc. 30-6 at 39, 41-43, 47-50; *see also* Exhibit A at 3); *see also* KDOC, LSCF History (June 21, 2023), https://www.doc.ks.gov/facilities/lcmhf/history ("The name of the facility was officially changed on April 27, 2023 from Larned Correctional Mental Health Facility to the Larned State Correctional Facility.").

114. It was returned by the unit team without a response on December 22, 2023. (Doc. 30-6 at 37, 45.)

115. Plaintiff immediately appealed it directly to the Secretary of Corrections, and it was received on January 2, 2024. (Doc. 30-6 at 37-38, 45-46.)

116. The grievance was denied as invalid by the Secretary of Corrections on January 4, 2024, because it was grieving the classification decision-making process. (Doc. 30-6 at 36, 44.)

*Grievance IA003367*

117. Plaintiff filed grievance number IA003367 on December 27, 2023, marked as an "emergency grievance." (Doc. 30-6 at 57; *see also id.* at ¶¶ 37-40.)

118. In that grievance, Plaintiff complained about meal trays at LSCF. (Doc. 30-6 at 57; *see also* Exhibit A at 3.)

119. It was responded to and denied by the warden's designee on January 10, 2024. (Doc. 30-6 at 56-57.)

17

120.     When White appealed to the Secretary of Corrections, he added, for the first time, some allegations regarding the alleged July 12, 2023, incident but does not mention Defendants. (Doc. 30-6 at 53-55.)

121.     The Secretary of Corrections denied the appeal on February 6, 2024. (Doc. 30-6 at 52.)

*Grievance IA003368*

122.     Plaintiff filed grievance number IA003368 on December 31, 2023, marked as an "emergency grievance." (Doc. 30-6 at 75; *see also id.* at ¶¶ 41-44.)

123.     In that grievance, Plaintiff complains of an LSCF officer knocking on his door. (Doc. 30-6 at 75-76; *see also* Exhibit A at 3.)

124.     It was responded to and denied by the warden's designee on January 10, 2024. (Doc. 30-6 at 74-75.)

125.     When Plaintiff appealed to the Secretary of Correction, he added, for the first time, some allegations regarding the alleged July 12, 2023, incident, but does not mention Defendants. (Doc. 30-6 at 71-73.)

126.     The Secretary denied the appeal on March 15, 2024. (Doc. 30-6 at 70.)

*Personal-Injury Claim*

127.     Plaintiff allegedly filed a personal-injury claim on October 9, 2023. (Doc. 8 at 8.)

128.     But Plaintiff never appealed the personal-injury claim to the Secretary of Corrections. (Doc. 30-6 at ¶ 49.)

*Property-Loss Claims*

129.     Plaintiff allegedly filed a property-loss claim on December 11, 2023. (See Doc. 30-6 at 81-82; *see also id.* at ¶¶ 45-48.)

18

130.    Plaintiff filed a later property-loss claim on January 29, 2024. (Doc. 30-6 at 82.)

131.    This claim was returned unprocessed by the facility as untimely, and the facility's reasoning pointed out that the earlier alleged property-loss claim would also have been untimely. (Doc. 30-6 at 81.)

132.    Plaintiff appealed the ruling to the Secretary of Corrections (Doc. 30-6 at 78-80), and the Secretary of Corrections denied the appeal on October 4, 2024, finding the facility's response was correct. (Doc. 30-6 at 77.)

*Letters*

133.    Plaintiff also complained about Defendants in a letter to the Secretary of Corrections dated May 5, 2023, and in a letter to the Governor dated September 21, 2023. (Doc. 30-6 at ¶¶ 16-20 29-32, pgs. 8-14, 30-35.) But these were not grievances.

*Emergency Grievance dated July 14, 2023*

134.    Plaintiff claims that he submitted an emergency grievance on July 14, 2023. (Exhibit H at 1.)

135.    Plaintiff's copy of that grievance discusses the alleged altercation on July 12, 2023, incident, and alleges failure to protect by "Mr. Parks and the A1 Unit Team members." (Exhibit H at 9-12 (what appears to be Plaintiff's handwritten copy of that grievance).)

136.    Plaintiff never appealed that grievance to the Secretary of Corrections. (Doc. 30-6 at ¶ 49.)

*Other*

137.    White did not file any other grievance, personal-injury-claim, or property-loss-claim appeals to the Secretary between January 2022 and December 10, 2024, regarding Andrew

Parks, Bruce Chapman, Evan Meredith, Gary Spillman, or the alleged strangling incident involving Jeremy Garza on July 12, 2023. (Doc. 30-6 at ¶ 49.)

138.   No admissible evidence shows that Plaintiff filed any grievances regarding any retaliation by Defendant Parks with regard to disciplinary case number 1138. (*See* Exhibit I at 1, (requesting copies of any grievances regarding disciplinary case number 1138), 5-6 (Plaintiff says he instead provided appeals of disciplinary case numbers 23-1785 and 2872), 25-56 (the documents Plaintiff provided regarding appeals of those other separate and unrelated cases).)

139.   No admissible evidence shows that prison staff failed to pick up or deliver Plaintiff's grievances to the Secretary of Corrections. (Exhibit H at 34, 1 (complaining of *delays* in the grievance process, including a 1-day delay in picking up a grievance, not a total failure to pickup or deliver).)

140.   No admissible evidence establishes that prison officials thwarted Plaintiff's attempts to exhaust administrative remedies with regard to the claims in this case.

## III.   Standards.

### a.   Summary Judgment.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When there is no genuine dispute of material fact on an essential element of the nonmovant's

claim, then summary judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be identified by reference to affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. Relying on mere pleadings without supporting facts in the record is not enough. *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (citation omitted). What is more, "while courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also McCoy*, 887 F.3d at 1044 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

### b.     Qualified Immunity.

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation.

21

*Id.* "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The clearly-established right must be clear from applicable case law, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019), and must be defined with specificity, *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019).

## IV.    Arguments.

Plaintiff has three active claims against Defendants in their individual capacities. However, Plaintiff has failed to exhaust his administrative remedies, which demands dismissal of all claims. Alternatively, for the Eighth Amendment claims of failure to protect and failure to provide medical care, Defendants are entitled to qualified immunity. Plaintiff's retaliation claim against Defendant Parks must also fail on the merits as he completely fails to provide any causal connection between Defendant Parks and the disciplinary report at issue.

### a.    Exhaustion of administrative remedies is mandatory for all claims.

The Prison Litigation Reform Act (PLRA) requires an inmate to exhaust all available administrative remedies before bringing a § 1983 claim about prison conditions. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 520 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "An inmate properly exhausts a claim by utilizing each step the prison holds out for resolving the claim internally and by abiding 'with an agency's deadlines and other critical procedural rules.'" *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) (quoting *Woodford*, 548 U.S. at 90). "In other words, a prisoner must comply with

22

procedural 'rules that are defined not by the PLRA, but by the prison grievance process itself.'" *Williams v. Hill*, 422 F. App'x 682, 684 (10th Cir. 2011) (quoting *Bock*, 549 U.S. at 218).

In a suit governed by the PLRA, failure to exhaust is an affirmative defense, and the defendant has the burden regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007). "The issue of Plaintiff's failure to exhaust his available administrative remedies before filing his lawsuit must be determined before reaching the merits of his lawsuit." *See Bateast v. Orunsolu*, No. 22-3093-JWL, 2023 WL 3072669, at *5 (D. Kan. Apr. 25, 2023) (citing *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010)).

The KDOC Grievance Procedure for Inmates is set forth in K.A.R. § 44-15-101 *et seq.*, and applies "to a broad range of matters that directly affect the inmate, including . . . [c]omplaints by inmates regarding policies and conditions within the jurisdiction of the facility or the department of corrections; and . . . actions by employees and inmates, and incidents occurring within the facility." K.A.R. § 44-15-101a(d)(1). Here, this regulation applies to Plaintiff's § 1983 claim because his Complaint involves the alleged actions of LCF employees. *See Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021).

An inmate must take four steps to complete the grievance process: (1) attempt an informal resolution with unit team members; (2) submit a grievance to an appropriate unit team member; (3) submit a grievance to the warden; and (4) appeal to the secretary of corrections. *Lindsey*, 2021 WL 483855, at *2; K.A.R. §§ 44-15-101(b), (d), 44-15-102(a)-(c). Step two must occur within 15 days of discovery of the issue, not counting weekends or holidays. *See* K.A.R. § 44-15-101b. If the inmate does not receive a response at steps two or three within ten days, the inmate can move to the next step in the process but must do so within three days of that deadline. *Lindsey*, 2021 WL 483855, at *3; K.A.R. § 44-15-102(a)(2), (b), (b)(3)(A)(ii), (G), (c)(1).

23

As the Tenth Circuit has recognized, grievances under K.A.R. § 44-15-101 *et seq.* (Article 15) and personal-injury claims under K.A.R. § 44-16-104a (Article 16) are "separate" and "distinct." *Brown v. Schnurr*, No. 22-3183, 2023 WL 5163987, at *1 to *5 (10th Cir. Aug. 11, 2023). Exhaustion for § 1983 constitutional claims is accomplished through Article 15 grievances, and exhaustion for personal-injury claims is separately accomplished through Article 16 claims for personal injury. *Id.*

Here, Defendants have outlined Plaintiff's attempts at administrative remedies in their Statement of Uncontroverted Material Facts (SUMF). SUMF ¶¶ 91-140. And Defendants did not thwart Plaintiff's attempts to exhaust administrative remedies with regard to his claims in this case. SUMF ¶ 140.

### i. None of Plaintiff's grievances satisfy the exhaustion requirement under the PLRA for his § 1983 claims.

The alleged emergency grievance dated July 14, 2023, may have addressed failure to protect by Defendant Parks, but it was never appealed to the Secretary of Corrections. (SUMF ¶¶ 134-136); *see* K.A.R. 44-15-106 ("The same external review provisions that apply to regular grievances shall apply to emergency grievances."). None of the other grievances were timely filed within 15 days of the alleged incident on July 12, 2023. The emergency grievance dated June 9, 2023, was denied as an "invalid" use of the emergency grievance procedure, and it did not go through the proper grievance steps. (SUMF ¶¶ 109-111); *see* K.A.R. 44-15-106 ("If the person at the corrective action level determines that the grievance is not an emergency . . . [t]he grievance may then be processed from that point on as a regular grievance."). Although several of the other grievances or appeals happen to mention the alleged July 12, 2023, incident, none of them alleged all the way through all grievance steps failure to provide medical care by Defendants, failure to protect by Defendants, or retaliation by Defendants.

24

### ii.   None of Plaintiff's personal-injury claims satisfy the exhaustion requirement under the PLRA for his § 1983 claims.

As the Tenth Circuit has recognized, grievances under K.A.R. § 44-15-101 *et seq.* (Article 15) and personal-injury claims under K.A.R. § 44-16-104a (Article 16) are "separate" and "distinct." *Brown v. Schnurr*, No. 22-3183, 2023 WL 5163987, at *1 to *5 (10th Cir. Aug. 11, 2023). Exhaustion for § 1983 constitutional claims is accomplished through Article 15 grievances, and exhaustion for personal-injury claims is separately accomplished through Article 16 claims for personal injury. *Id.* Therefore, Plaintiff's possible personal-injury claims on October 9, 2023 (SUMF ¶¶ 127-128), and his possible property-loss claims on December 11, 2023, and January 29, 2024 (SUMF ¶¶ 129-132), do not satisfy the exhaustion requirement for his § 1983 constitutional claims here. Regardless, all of these were also untimely under the relevant time limits. *See* K.A.R. § 44-16-104a(a) (setting a 10-calendar-day time limit for personal-injury claims); K.A.R. § 44-16-102(b) (setting a 15-working-day time limit for property-loss claims); (*see also* Exhibit F at 77, 81 (discussing the untimeliness of Plaintiff's property-loss claims).

### iii.   Conclusion for Failure to Exhaust Administrative Remedies

For the above reasons, the Court should grant summary judgment to the Defendants on all claims because Plaintiff failed to exhaust administrative remedies under the PLRA.

### b.   Eighth Amendment claim for failure to provide medical care (Parks, Meredith, and Chapman).

Deliberate indifference is the general standard for "serious medical needs" claims, *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022). Deliberate indifference has both an objective component and a subjective component. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the objective component of "serious medical needs" claims, Plaintiff must show that his medical need was "sufficiently serious." *Id.* (citing *Farmer*, 511 U.S. at 834). "A medical

25

need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* However, in situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that Plaintiff suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted); *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (noting when "a prisoner claims that harm was caused by a delay in medical treatment, he must show that the delay resulted in substantial harm in order to satisfy the objective prong") (internal quotation marks omitted); *Olson v. Stotts,* 9 F.3d 1475, 1477 (10th Cir. 1993) ("[D]elay in medical care only constitutes an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm") (internal quotation marks omitted). Substantial harm includes "lifelong handicap, permanent loss, or considerable pain." *Beauford*, 35 F.4th at 1262.

The *subjective* component requires showing that the prison official had a culpable state of mind. *Id.* at 1262 (citing *Farmer*, 511 U.S. at 834). Plaintiff "must adduce sufficient facts to show the defendant knew of and disregarded 'an excessive risk to inmate health or safety.'" *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1173 (10th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). Plaintiff "must show that a prison official disregarded the specific risk of harm actually claimed." *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1200 (D. Kan. 2012); *see also Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (requiring

plaintiffs to show deliberate indifference to specific risk of suicide, not merely general risk of intoxication). Thus, under Tenth Circuit precedent, the question is: "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).

Additionally, even if both the objective and subjective prongs are met, "a constitutionally legitimate justification" may still be shown. *Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010). This should be determined, not with the benefit of hindsight, but based on what the official reasonably knew at the time. *See Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (saying in the context of the deliberate-indifference standard that "courts do not judge the constitutionality of particular actions 'with the 20/20 vision of hindsight'"). Prison officials have a "legitimate penological interest of maintaining control and discipline in the prison facility." *Evans v. Cawthorn*, No. 16-3095-DDC, 2019 WL 5787952, at *8 (D. Kan. Nov. 6, 2019).

Here, Plaintiff does not offer any admissible evidence demonstrating that any delay in medical care by Defendants caused substantial injury or otherwise exacerbated his alleged injuries. When Defendants Meredith and Chapman arrived at Plaintiff's cell, he told them that Garza was trying to kill him and they needed to get Garza out of the cell. (SUMF ¶¶ 29-30.) After Defendant Meredith left to get a PC waiver, Plaintiff told Defendant Chapman that he needed medical because his throat was getting sore and he could hardly talk. (SUMF ¶¶ 31-32.) However, when Defendant Chapman instructed Plaintiff "to turn around and cuff up" so that he could be removed from the cell, Plaintiff repeatedly refused and insisted that Garza be removed first—all while continuing to say he needed medical. (SUMF ¶¶ 34-36.) Because of this, any initial delay in removing Plaintiff

27

from the cell can be attributed to Plaintiff being more concerned with Garza potentially tearing up his property instead of leaving the cell and getting help. (SUMF ¶ 34.)

After Garza was removed, Plaintiff finally complied and was taken to a holding cell where he attempted to eat a hotdog, but was unable to swallow. (SUMF ¶¶ 37-38, 41.) Once Defendant Parks returned to the unit, he discussed the situation with Plaintiff before sending him "right to general [population]," which is where Plaintiff could call for medical care. (SUMF ¶¶ 43-46.) After entering general population, Plaintiff was allowed to walk over to the LCF medical center. (SUMF ¶¶ 48-50.) Plaintiff was seen by a nurse at approximately 11:38 a.m., so about 90 minutes had passed since the reported strangulation at around 10:00 a.m. (SUMF ¶¶ 51-52.) Importantly, Plaintiff did not receive any medication for pain during his initial visits with LCF's medical staff. (SUMF ¶ 61.) Because of this, any perceived delay Plaintiff experienced would have had no effect on him receiving pain relief sooner. Indeed, the first time Plaintiff received anything (acetaminophen)[5] for his pain was at 2:52 p.m., after he had been at KU Medical for around 90 minutes. (SUMF ¶ 63.)

Moreover, Plaintiff's medical providers continually observed that he exhibited no acute distress, had a clear airway, exerted normal effort in breathing, and maintained his ability to communicate normally. (SUMF ¶¶ 54-55, 58, 64-65, 68-70, 72.) Plaintiff reported his pain level as "4-5 Moderate." (SUMF ¶ 60.) Plaintiff ended up missing one meal due to the incident as he was able to eat a sandwich at KU Medical. (SUMF ¶¶ 42, 67.) And while Plaintiff took an ambulance to KU Medical, this was due to the "nature of the assault and [Plaintiff's] reported

---

[5] KU medical records showed an order for oxycodone from September 20, 2022, but his discharge paperwork did not show that he was given any oxycodone on July 12, 2023 and, after an LCF nurse called KU's on-call doctor, the order for oxycodone was discontinued. (SUMF ¶¶ 66, 71.)

symptoms;" rather than being based on anything found by LCF staff while evaluating Plaintiff. (SUMF ¶¶ 57, 62.)

Based on this evidence, Plaintiff does not satisfy either the objective or subjective prong of deliberate indifference. Plaintiff rated his own pain as "moderate" and, at all times following the incident on July 12, 2023, maintained his ability to speak (and breathe). (SUMF ¶ 56.) Plaintiff said that his neck began bruising when he entered general population, which Defendants Chapman and Meredith did not see when they first responded to his cell after the incident. (SUMF ¶¶ 39, 47.) Plaintiff has provided no evidence illustrating how any delay in medical care by Defendants resulted in his alleged pain, neck trauma, sore throat, or trouble swallowing. (SUMF ¶ 73); *see also Sealock*, 218 F.3d at 1210 (noting "not every twinge of pain suffered as the result of delay in medical care is actionable."). Accordingly, Defendants should be granted summary judgment on Plaintiff's failure to provide medical care claim.

Alternatively, it was not clearly established that any delay by Defendants under these circumstances violated the Constitution, so Defendants are entitled to qualified immunity and should be granted summary judgment.

**c.    First Amendment retaliation claim based on false disciplinary report (Parks).**

For the First Amendment retaliation claim, Plaintiff must demonstrate: (1) he "was engaged in constitutionally protected activity"; (2) a state official named as a defendant caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the state official's "adverse action was substantially motivated as a response to [an inmate's] exercise of constitutionally protected conduct." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). To satisfy the third prong, Plaintiff "must prove that 'but for' the retaliatory motive, the incidents to which he refers … would not have taken place." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (internal quotation marks omitted). Because of this,

mere allegations of retaliatory motive are insufficient to defeat summary judgment. *Mollie v. Ward*, 106 F.3d 414, 1997 WL 22525, at *1 (10th Cir. 1997).

Courts "have consistently held that temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the causal nexus for a retaliation claim." *Strope v. Cummings*, 381 F. App'x 878, 883 (10th Cir. 2010). If so, "litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness." *Id.* "Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity." *Peterson*, 149 F.3d at 1144. "[E]ven outside the prison context, temporal proximity per se is insufficient to show that the stated explanation for a challenged action is pretextual." *Strope*, 381 F. App'x at 883 (citing *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009)). Rather:

> The "but for" requirement may be satisfied when an inmate's complaint alleges that the defendants were aware of his protected activity, that the inmate complained of their actions, and the retaliatory action was in close temporal proximity to the protected activities.

*Wilson v. Wallace*, No. 23-3030-EFM, 2023 WL 6849227, at *4 (D. Kan. Oct. 17, 2023) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010)). "The Tenth Circuit has held that if an adverse action occurs more than three months after the constitutionally protected activity, it is insufficient to independently support a finding of causation." *Id.* (citing *Lauck v. Campbell Cnty.*, 627 F.3d 805, 815-16 (10th Cir. 2010)).

Here, Plaintiff has failed to allege, let alone demonstrate, specific, objective facts showing a causal connection between any protected activity and Parks' purported retaliation. Plaintiff does not claim to have personal knowledge of Park's motivations. (SUMF ¶ 79.) And Plaintiff does not allege that he engaged in protected speech complaining of actions by Parks as would support a

30

claim of First-Amendment retaliation. He says that Defendant Parks conspired to have a false disciplinary report submitted against him in retaliation for a habeas corpus case he filed (in Leavenworth County case number 2022-CV-323), in retaliation for this *current* lawsuit, and for generic complaints about the "drug and tobacco smoke problem at LCF." (SUMF ¶¶ 80, 83-84, 87-90.) But the Petition in the habeas case does not even mention Parks. (SUMF ¶ 85.) This present lawsuit raising the retaliation claim obviously occurred after the alleged retaliation, and so could not have motivated the alleged retaliation. And Plaintiff does not claim that he complained of drug or tobacco smoke issues caused by Defendant Parks. Plaintiff has also failed to allege or establish that Defendant Parks was aware of the habeas case at the time of the disciplinary report. (SUMF ¶ 86.)

What is more, there was no sufficient temporal proximity between the habeas Petition (which was filed December 12, 2022, SUMF ¶ 85) and the alleged retaliatory conduct (the disciplinary report dated September 26, 2023, SUMF ¶ 74) to support causation. Or between his generic complaints about drugs (which date back to 2020 and 2015, SUMF ¶¶ 87-88) and the alleged retaliatory conduct (the disciplinary report dated September 26, 2023, SUMF ¶ 74) to support causation. As the adverse action occurred more than three months after the constitutionally protected activity, it is insufficient to independently support a finding of causation.

Plaintiff also fails to establish the purported retaliatory actions by Parks at all. This point is demonstrated by the fact that Parks' name is not referenced anywhere in the disciplinary report. (DSOF ¶ 81). And Parks did not draft or file the disciplinary report. (DSOF ¶ 81.) The record does not show that Parks was involved at all with the disciplinary report. (*See* DSOF ¶¶ 74-82.).

Accordingly, for these reasons, the Court should grant Defendant Parks summary judgment on Plaintiff's retaliation claim.

31

### d.    Eighth Amendment failure-to-protect claim (Parks, Meredith, and Chapman).

Deliberate indifference is the general standard for "failure to protect" claims. *See Farmer*, 511 U.S. at 831, 834. For the objective component of "failure to protect" claims, Plaintiff "must show 'that the conditions of his incarceration present an objective substantial risk of serious harm.'" *Bellamy v. McCollough*, No. 20-3229-DDC, 2022 WL 612447, at \*5 (D. Kan. Mar. 1, 2022) (quoting *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018)). "Often, courts have found this objective prong met 'where prison officials disregard repeated warnings of danger to a particular prisoner and continually refuse to make the situation safer.'" *Id.* (quoting *Grimsley v. MacKay*, 93 F.3d 676, 681 (10th Cir. 1996)).

The *subjective* component requires showing that the prison official had a culpable state of mind. *Id.* at 1262 (citing *Farmer*, 511 U.S. at 834). This is only met if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### i.    Objective component.

Here, Plaintiff's conditions of incarceration did not pose a substantial risk of harm such that the objective prong is satisfied. Although the attempted strangulation was a serious action against Plaintiff, the fact of an injury alone "is not nearly enough to satisfy" the objective prong of a failure to protect claim. *Grimsley v. MacKay*, 93 F.3d 676, 682 (10th Cir. 1996); *see also Farmer*, 511 U.S. at 834 (explaining that "not … every injury suffered by one prisoner at the hands of another … translates into constitutional liability for prison officials responsible for the victim's safety"). And Plaintiff has not provided any admissible evidence that there was a substantial risk of serious harm—before—he got into a physical altercation with Garza.

While Plaintiff believed drug users, drug dealers, and drug and tobacco users were a class of people that "would automatically be a security concern" for him to be housed with due to him being a "snitch," Plaintiff had previously been housed with drug users, which did not result in any physical altercations. (SUMF ¶¶ 6-10.) Further, Plaintiff had no physical altercations with other inmates from the time he entered segregation on or around March 27, 2023 until the alleged July 12th, 2023 incident. (SUMF ¶ 4.) Indeed, on June 30, 2023, Plaintiff "denied current housing or security issues" during an onsite consult. (SUMF ¶¶ 11-12.)

Moreover, Plaintiff "didn't even really know" Garza before they were housed together for around a couple of weeks leading into the morning of July 12, 2023. (SUMF ¶¶ 14, 21.) Rather, Plaintiff explained that Garza "wasn't a threat" to him until Garza was put into the cell with him and threatened to kill him. (SUMF ¶¶ 18-19.) As explained by Plaintiff, while Garza made veiled threats to him upon entering the cell, this was part of his "yak," as Garza "liked to talk" and Plaintiff did not "know how much of this stuff to believe from people," so he had to take threats "with a grain of salt." (SUMF ¶¶ 15-17.) And, as discussed further in the next section, there is no admissible evidence demonstrating that Plaintiff requested protection by Defendants specifically from Garza. (SUMF ¶¶ 22, 24, 26.) Likewise, the record contains no objective evidence from which a reasonable jury could conclude that Plaintiff faced a substantial risk of serious harm before he got into an altercation with Garza.

### ii.  Subjective component.

Next, Plaintiff also fails to demonstrate Defendants' deliberate indifference to a substantial risk of harm. While Plaintiff had, at various times, expressed safety complaints "to other officers" regarding other unidentified inmates, he has failed to demonstrate Defendants possessed the necessary culpable state of mind concerning Garza for deliberate indifference. (SUMF ¶¶ 3, 13.) However, without evidence "isolat[ing] the allegedly unconstitutional acts" of Defendants,

Plaintiff cannot establish an Eighth Amendment violation against them. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Because of this, Defendants are entitled to qualified immunity.

Here, when asked whether Plaintiff ever told Defendant Parks about Garza making threats, Plaintiff stated he did not recall "any time that I had any interaction personally with Parks, from the time Garza was put in with me to the time that I left." (SUMF ¶ 22.) While Plaintiff had previously told Defendant Parks to not house him with drug dealers and abusers, this does not support Defendant Parks having subjective knowledge of Garza being a legitimate threat to Plaintiff. (SUMF ¶¶ 5, 20.) Similarly, Plaintiff only provided generalized warnings to Defendant Meredith; but, more importantly, Plaintiff provided no admissible evidence illustrating that he requested protection by Defendant Meredith specifically from Garza before the physical altercation on July 12, 2023. (SUMF ¶¶ 23-24.) Regarding Defendant Chapman, Plaintiff did allege that, on some undefined date, he told Chapman that Garza had threatened to kill him; but, again, Plaintiff has identified no admissible evidence showing he requested protection by Defendant Chapman specifically from Garza. (SUMF ¶¶ 25-26.)

Accordingly, Defendants are entitled to summary judgment on Plaintiff's failure to protect claim. Alternatively, it was not clearly established that placing an inmate opposed to drugs in a cell together with drug dealers or users was a per se violation of the Constitution. *See Bateast v. Orunsolu*, No. 22-3093-DDC, 2024 WL 3756261, at *12 to *13 (D. Kan. Aug. 12, 2024) (holding that qualified immunity applied when it was not clearly established law that protective-custody inmates could not be double-celled with inmates classified as "other security risk"). Therefore, the Defendants are entitled to qualified immunity as a matter of law on Plaintiff's failure-to-protect claims, and they should be granted summary judgment on those claims.

34

## V.    Punitive Damages.

Lastly, even if Plaintiff states a claim that survives summary judgment, Plaintiff is not entitled to punitive damages against Defendants for want of the requisite subjective intent. A § 1983 plaintiff claiming punitive damages must prove defendants' conduct either "is shown to be motivated by evil motive or intent" or "involves reckless or callous indifference to" his federal constitutional rights. *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Barring pleading and proof that a defendant "either acted with malice or knew [his] actions were unconstitutional," a § 1983 plaintiff cannot pursue a claim for punitive damages. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992).

Here, Plaintiff has not alleged or provided any evidence that any of the Defendants acted with the required maliciousness, evil motive, or with reckless indifference to Plaintiff's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. As a matter of law, Plaintiff cannot receive punitive damages. Therefore, even if Plaintiff states a claim that survives summary judgment, the Court should grant partial summary judgment[6] to Defendants on those claims.

## VI.    Conclusion.

For these reasons, Defendants request that the Court grant them summary judgment on Plaintiff's claims against them.

---

[6] Rule 56 of the Federal Rules of Civil Procedure allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense."

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Scott G. Nading*
Scott G. Nading, KS No. 29665
Assistant Attorney General
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave.
Topeka, Kansas 66612-1597
scott.nading@ag.ks.gov
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorneys for the Defendants*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of March, 2026, the foregoing document was filed with the clerk of the court by using the CM/ECF system, with a copy to be served on the 30th day of March, 2026 – along with courtesy copies of Doc. 30-2, Doc. 30-3, Doc. 30-4, Doc. 30-5, and Doc. 30-6 – by means of overnight FedEx, postage prepaid, addressed to:

Bobby Bruce White #76983
Larned State Correctional Facility
1318 KS Highway 264
Larned, KS 67550-9304
*Plaintiff, pro se*

I further certify that copies of the same documents will also be served on the 30th day of March, 2026, by means of first-class mail, postage prepaid, addressed to:

Gary Spillman
105 Elm St., Lot #3
Overbrook, KS 66524
*Defendant, pro se*

/s/ Matthew L. Shoger
Matthew L. Shoger
Assistant Attorney General