

EXHIBIT PL#24

13 pages

RESIDENT COPY

Attachment E, IMPP 11-119
Effective: 12-11-13

## KANSAS DEPARTMENT OF CORRECTIONS

### DISCIPLINARY APPEAL TO THE SECRETARY
### CLASS I & II

| Inmate Name: Bobby White | No: 76983 | Case No: 2872 |
|---|---|---|

| Date of Filing Appeal: 10-9-2023 | Facility Hearing DR: Unknown / was not allowed to participate |
|---|---|

| Date Received Copy of Disposition 10-9-2023 | Returned Appeal to Facility: With this form on: 10-31-2023 |
|---|---|

**I Am Appealing the Decision of the Hearing Officer Because:**

I "Bobby Bruce White" Resubmit this appeal because the LCF Unit Team and disciplinary Administrator refused to provide me the /this form when I asked for it numerous times as the record clearly shows. Also, see this appeal pages (pages paragraph #15, and page ② of Attachment L2, IMPP 11-119)

I obviously did submit it to the Unit Team and disciplinary administrator that is why you have received it the first time. The LCF Unit Team and disciplinary administrator at LCF have failed to properly serve and Follow KAR 44-13-703 in a timely manner and failed to sign and do their duty to follow procedure "... The Unit team shall ensure ... properly log and forward ..." See included 18 pages of Appeal.

(Attach Additional Sheet(s) If Necessary)

rest not returned to B.W. 12-6-2023

| Inmate Signature: Bobby White | Date: 10-31-2023 |
|---|---|

Received By: Date 10/31/23 Time 0500 Initials MV    Date 11/8/23 Time 0877 Initials GK

Unit Team M-Ckeel Vandrock    Disciplinary Officer

**Facility Legal Counsel Responsive Argument:** _____

Signature: _____    Date: _____

**Your Appeal Has Been Reviewed and it is found that:**

☒ Substantial compliance with Departmental and Facility Standards and Procedures
☒ Hearing Officer's decision was based on some evidence
☐ The Penalty imposed was appropriate and proportionate to the offense.
☐ Guilty plea or no contest, no showing 44-13-708(d)(1)(2)(3)

**Secretary's/Designee's Final Decision:**

☒ Approve the decision
☐ Reinstate dismissed charges; remand new hearing
☐ Amend charges (44-13-202)
☐ Disapprove/Dismiss
☐ Reduce the penalty _____
☐ Suspend sentence
☐ Remand new hearing
☐ Remand for clarification of record
☐ Reduce to summary judgment
  - restriction from privileges up to 10 days
  - fine not exceed $10
  - extra work w/o incentive pay not more than 2 hrs/day no more than 5 days
  - work w/o incentive pay not to exceed 5 days
  - restitution not less than $3.00 nor more than $20.00
☐ Remand with Instructions

RECEIVED
NOV 08 2023
DOC Facility Management Area

**Comments:** _____

Secretary's/Designee's Signature: Jim T. Keogh    Date: 11.16.23

Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.

Received 12-6-2023 B.W. only this page rest was not returned The following 14 pages were from me received B.W. 12-6-2023

Page 1

Front & Back

P-1528g

Attachment E1, IMPP 11-119
Effective: 07/2007

KANSAS DEPARTMENT OF CORRECTIONS
DISCIPLINARY OFFICE

## DISPOSITION OF DISCIPLINARY APPEAL ACKNOWLEDGEMENT

TO: White       76983       DATE: 11/16/23

INMATE NAME       NUMBER

CASE NO: 2872

ATTACHED IS THE DISPOSITION OF YOUR APPEAL OF YOUR DISCIPLINARY CASE
REFERENCED ABOVE

### SIGNATURE ACKNOWLEDGES RECEIPT OF APPEAL RESPONSE ONLY

Received

12-6-2023
DATE

_____
INMATE SIGNATURE

_____
DATE

_____
STAFF SIGNATURE

### RETURN TO DISCIPLINARY OFFICE

RESIDENT COPY

INMATE COPY

page 2



INMATE REQUEST TO STAFF MEMBER

Appeal DR. Case # 2872

To: ~~LCF Warden~~ /S.O.C Jeff Zmudu        Date: 10-9-2023
(Name and Title of Officer or Department)

_____
Unit Team, Detail, or Cellhouse Officer's Signature        plus. 12 pages Exhibits        **To be retained by inmate**

Appeal DR. Case #2872 to S.O.C. 6 pages plus. 12 pages Exhibits

**Form 9**
For Cellhouse Transfer                                              White
Work Assignment _____                          **Last Name Only**
Interview Requests

official "Appeal" not given and been
**KANSAS DEPARTMENT OF CORRECTIONS**

Appeal DR Case # 2872   denied by LCF/Disc. Staff        76983
**INMATE ~~REQUEST~~ TO ~~STAFF MEMBER~~**  APPEAL   S.O.C.        **Number**

To: S.O.C. Jeff Zmudu                        Date: 10-9-2023
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)
APPEAL OF DR CASE #2872 to S.O.C

I Bobby Bruce White #76983 Appeal for the S.O.C. Jeff Zmudu to dismiss
this disciplinary case as not legally or properly served, due process denied, per
KAR and White was denied the factual resolution given through grievance number
AA 2023056, by Secretary of Corrections Designee Darcie Holthaus; LCF Deputy
Warden James Skidmore (on: S.O.C 11-3-2022, DW 10-10-2022) and Unit Team Manager
Potter on 10-6-2022.  Also see: follow-up grievance #N/A submitted on 4-25-2023

Work Assignment: None                    Living Unit Assignment: A4-116

Comment: _____   Detail or C.H. Officer: _____

                                                        (Continued page 2)
════════════════════════════════════════════

Disposition: _____

_____

_____

_____


To: _____        Date: _____
        (Name & Number)


Disposition: _____

                        Page 3

_____

_____


_____
        Employee's Signature                        **To be returned to inmate.**

P-0009

APPEAL 2872

, which was also sent to the Leavenworth District Court Case No: 2022 CV 323 and mailed to the S.O.C as legal service, because it went unanswered by both the LCF Unit Team and LCF Warden. (Also see: resently legal service of the "Motion to Amend to Add Issues" and Exhibits A, B, C, D, E. This shows that grievance N/A was properly submitted to the Unit Team and LCF Warden by the properly signed receipts (grievance receipt Exhibit E) and pursuant to KAR 44-15-101, 44-15-101a and 44-15-102.

## FACTS:

1.) Pursuant to grievance #AA 2023056 the final response, was that White had not been removed from BIBR participation and Pod B5 the BIBR participation pod.

2.) White was suppose to be re-assigned to the next group 66.

3.) White was removed/kicked out of group 65, by BIBR/Gary Spillman, when White to him for help, because White could not approve of drug use and the manufacturing, because of White's religious belief. (see: Exhibit C pages 1 & 2).

4.) White requested protective custody because of the threats by Mr. Gary Spillman and drug users and dealers.

5.) The KDOC/LCF officials have allowed Mr. Spillman, Mr. Dave Johnson, and Mr. C.J. Hughes (BIBR/KDOC staff) to retaliate against White in violation of KAR 44-15-104, Reprisals prohibited. This when they allowed Mr. Spillman to kick White out of the BIBR program and Pod B5, in opposion to grievance #AA 2023056 resolution made by the S.O.C.; because White had submitted the aforementioned grievance and the K.S.A. 60-1501 habeas corpus (conditions of incarceration) in the Leavenworth County District Court Case No: 2022 CY 323, violating the terms of the S.O.C. grievance response.

6.) White was then put in danger by the attempted forced move into a (4) four man cell with drug and tobacco users, which because of White's age and physical health, he can not tolerate. The State of Kansas and Federal Law requires that the KDOC provide a drug, tobacco/smoke and alcohol free environment and facility to prisoners.

7.) Drugs, tobacco and alcohol use is rampant here at LCF and the KDOC/LCF officials and officers are doing nothing to protect non-users from being threatened, physically assaulted and prayed upon by gang members, drug users and dealers. Because of my being placed in the position, to protect myself, I have become a marked man by these drug users and dealers, because of my complaints. (See: Exhibit C pages 1 and 2, also Administrative Restrictive Housing Report No: 01 23-1875 dated 3-28-2023)

8.) At the 1st DR Hearing White requested a witness form, gave the names of individual as witness's, but, never received the witness request form. I asked for an investigation of the facts pursuant to KAR 4-13-201 [i], which was denied by H/O Lechliter, therefore steps [2], [3], [4] and [5] were not done and denied White for the record.

9.) Since, all the above issues were already before the Leavenworth County

page 4

4/4

District Court, they had subject matter jurisdiction, so White requested a postponement of the hearings pursuant to KAR 44-13-402 [2] "... a delay to await determination of whether the case will go to trial in a court of law" or to await the outcome of a trial.", was also, summarily denied by H/O Leichliter, when I asserted, the Court had subject matter of these issues, needed to be properly investigated and as a Constitutional right to due process, and protection, whereas the LCF officials/officers were denying me protection IMAP 20-108 D Protective Custody (actual/true protection) (not punishment hold under disciplinary segregation conditions/status) But again H/O Leichliter, again continued to deny me the delay and right to defend/to be heard and record for the record.

10) But, then H/O Leichliter, took it upon himself to speak to my requested witnesses outside the hearing setting and White's presence in violation of KAR 44-13-403 [I] (1). This when at the 2nd hearing session; H/O Leichliter informed me he was denying me witnesses; and then proceeded to tell me he had spoken to my witnesses and I was beat. H/O Leichliter said that Mr. Gary Spillman had told H/O Leichliter, that he had kicked me out of BIBR, because I filed the legal action against him and BIBR, in the court. H/O Leichliter seemed to think this was an OK reason, but, I asked him to please include that in the record. But, he refused.

I then told H/O Leichliter to please remember that statement, because I would want him to testify to what Mr. Spillman told him, in court. (See: Exhibit C, Pages 3, 4, and 6.) I assert I have a Constitutional right to access the courts and redress grievance. Pursuant to KAR 44-15-104 reprisals are prohibited for invoking the grievance procedure.

Then, because he refused to make a complete log of the disciplinary process in violation of KAR 44-13-101 (i) and to record Mr. Spillman's statement, H/O Leichliter ejected me from the hearing process and falsely accused me of not participating in the hearing, when he demanded that I sign for statement that were obviously not true and not allowing me the time to read and understand what he was demanding I immediately sign.

11.) From that point H/O Leichliter; refused to allow me to represent myself, in violation of KAR 44-13-101 [2] to be present at the hearing, [3] to present documentary evidence (grievance response from S.O.C.); [4] to testify on the inmates own behalf; [5] to have witnesses called to testify on the inmate's behalf; [6] to confront and cross-examine witnesses against the inmate; KAR 44-13-307 [C], the denial of the request for witnesses was not documented, and [e] there was no summons issued because the request was not documented. Yet, H/O Leichliter wrongly chose to question my requested witnesses outside the hearing and White's presence.

12) Pursuant to KAR 44-13-403 [d] White asserts he was never disruptive or refuses to be present for the hearing. H/O Leichliters comment that I refused to participate in his hearing is just not true; as his reason

page 5



that White stated; "I know my right to appeal"... Unit Teams have previously back dated forms, I want the appeal form now and then I'll sign the forms." Clearly shows, I answered H/o Leichliters question and was prepared to sign the places he indicated for me to sign. But, I assert, his implying that I must sign for the right to appeal, before giving me a final ruling of guilt or not guilt and denying me an appeal form, (which I still haven't received after several month) seems my right to read and understand what I'm signing was justified. To demand my signature to untrue, false, misleading is nothing but extortion. I was never disruptive nor did I refuse to participate, as my statement "I'll sign the forms" clearly shows. The fact is that H/o Leichliter had me guilty before the hearing therefore he was not impartial in violation of KAR 44-13-101 [i] "... and a fair hearing by an impartial hearing officer,"

I was prejudically excluded by H/o Leichliter who wrongly excluded me from participation. No where in the record is it recorded that I was disruptive or refused to be present for the hearing as required by KAR 44-13-403 [d].

13) When Mr. Meredith UTS was supposely assigned to be my proxy by H/o Leichliter by absentia, I had never met, spoken too, or even knew who Mr. Meredith was. How could he possibly fairly and intelligently represent me? He couldn't possibly know or represent me, my issues and the facts. When I did finally discovered he was assigned to represent me at hearing,- I did send a form 9 telling him my concerns, in which he informed me it was too late. (See: Exhibit C, page 5) The short nature of the hearing record clearly shows the lack of representation and defense by Mr. Meredith.

14.) White has been wrongly denied to be present at all stages of the disciplinary hearing in violation of KAR 44-13-404 (a); (B) A complete written record has not been made of all the disciplinary hearing by the hearing officer in violation of KAR 44-13-502 a; (c); Further, KAR 44-13-502 a (5) witnesses, (6) and (7); (d) have not been included.; (e) Preparation of the record was not done in the required 10 working days and the reason for the delay was not attached in writing and delivered to the inmate pursuant to KAR 44-13-506. The first White was given anything regarding this DR hearing decision was on 10-9-2023 by A4, Unit Team Ms. Hall UTS. This was only after my complaint to EAI Officer Tomilson on 10-2-2023 and to H/o Snodgrass at another DR hearing #1138 issued on 9-26-2023 for the same issues, but where H/o Snodgrass found me not guilty at the DR Hearing on Friday 9-29-2023. (Continuing harassment)

Further; KAR 44-13-701 Administrative Review was not done nor delivered within (7) seven working days after preparation of the record; So that White could make a timely Appeal of this DR to the S.O.C, KAR 44-13-701 clearly states; "(c) The inmate shall be notified by the Warden of the

page 6

results of the review by way of service of a copy of the disciplinary case record, without unnecessary delay, but, in no case later than seven working days after review of the record..." As can be clearly seen, supposedly the Warden approved the sanctions on Apr 28, 2023, but had a 1st issue on 4-28-2023, 2nd issue 7-18-2023, 3rd issue 9-29-2023 but not given to White until the 4th issue on 10-4-2023. I believe that's clearly not within seven working days. This denial to timely due process and Administrative Wardens review was merely so they could (LCF officials/Mr. Parks UTM) keep me in an illegal and unreasonable disciplinary segregation hold status, putting me in further danger by the continuing to put disciplinary seg. (OR issued violent) prisoners.

15) This inordinate delay and denial to due process also violated White through KAR 44-13-703 right to make a timely appeal to the S.O.C.; and White still being denied the appeal forms, to be provided by the Unit Team pursuant to KAR 44-13-703(b)

16) White has no idea what the sanctions were that were placed on him, nor has anyone told him what;?? Sanctions 304a-15 P/R(?) c/s-imp (?), 5$ c/s imp is suppose to mean, The only thing, I assume is 5$ means the 5 dollars the LCF officials have wrongfully taken from White's personal (property) money account on 4-25-2023 DR Fine 2023-03-02822. I can not read the hearing officers writing, nor do I recognize or know who made the Warden's signature (name).

17.) Since, my being placed in Restrictive housing on 3-28-2023, I have been denied (actual) protective custody, been repeatedly extorted/coerced/ attempted force to sign a PC waiver to get out of disciplinary seg. status. I have been assaulted and battered/attempted murder by strangulation by inmate Jeremey Garza on 7-12-2023. This was 106 days of being held in disciplinary segregation and still being held under disciplinary segregation "A typical" deprived status in violation of KAR 44-12-1305 "...shall not exceed 60 days." (disciplinary seg.) Yet, as of today 10-9-2023 White is still being held under disciplinary seg. status for now 195 days continuously, with no property, clothes, shower shoes, dayroom, or medical help/care for my skin cancer and need testicular cyst surgery needed. Further, (b) has been violated because (as far as I know) there has been no review of my issues, "Emergency Grievances" answered by the LCF Warden.

18.) I still continue to be denied actual protection, the attempted murder of White by Jeremey Garza and I had to submit, yet another "Emergency Grievance" on 9-30-2023 when they (LCF officials) place another inmate with me in the cell, who had just been written-up on a weapons possession charge. I continue to be harassed and coerced into signing a PC waiver through extortion, violent tactics by continuing to put violent drug users, smokers and dealers, BIBR members in the cell with me. Jeremey Garza, was one such inmate, who fit all the factors I've asked for protection. White has submitted (3) Emergency Grievances, about

page 7

these issues, which have gone unanswered and not returned and there is no valid investigation being done according to EAI officer Tomilson.

19.) White did not disobey a direct order, from Lt. Brixter. But, I was doing my best to protect myself from physical injury/death threats which is my human, legal and Constitutional right, because I was and have not been getting help from the LCF officials, BIBR staff, or the officers, who are required to provide a drug, tobacco, smoke and alcohol free invironment/facility. How could I, or should have been found guilty of disobeying an order that was not given to me, to move out of Pod B5; when grievance #AA 2023056 Appeal from the KDOC S.O.C. Designee and LCF Deputy Warden states I was not removed from BIBR/Pod B5 and would be re-assigned to the next program group. B5 pod is the BIBR Pod (see: Exhibit C page 5)
   White will be eligible for parole in a little over 3 years and has the right to program credits for eligibility consideration and a prisoners right to re abilitation equal to all other State prisoners. White had a right, and vested interest in the program credits he rightfully worked for and earned and these unreasonable, un-warranted DR harassments have no valid penological interest. The LCF officials would be better served to use these DR's to stop the unlawful use of drugs, tobacco and alcohol users, rather than har-assing and discriminating against State prisoners, who follow, the rules and doing everything they can to stay safe and alive.
   (see: Exhibit C page 5)

        White Prays and Requests.
   The S.O.C. Jeff Zmudu to summarily dismiss DR 2872 for denial to due process, and strike this disciplinary report from White's official record pursuant to: KAR 44-13-704(4) and KAR 44-13-508 and order the LCF officials to transfer White (preferably to Winfield) for White's protection, health, and safety, back to general population, and until such time as LYCO 2022CY 323 habeas corpus ruling can be judged and finalized by the court. Plus the return of the $15.00 fine taken from White's personal money account plus lost monthly state pay. Respectfully Submitted; Bobby White #76983

        Dated: 10-9-2023                    Bobby White #76983
                                            Lansing Correctional Facility
        DR # 2872 Appeal to: S.O.C.        P.O. Box 2
                                            Lansing, Kansas 66043

                        page 8

*Please sign and return this receipt. Thank you*

INMATE REQUEST TO STAFF MEMBER

To: Ms. Hall UTS / A4 Unit Team
(Name and Title of Officer or Department)

CO Hopkins evening

Date: 10-10-2023

_____ 10.10
Unit Team, Detail, or Cellhouse Officer's Signature

To be retained by inmate

I need to be signed for and picked up for processing (1) 2nd attempt Personal Injury Form, (2) DR#2872 service form signed by me (3) my Appeal of 18 pages to be copied and mailed to S.O.C. (4) 4th Emergency Grievance - falsification of official state document - Admin Seg. Review for which I did not attend.

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

White
**Last Name Only**

## KANSAS DEPARTMENT OF CORRECTIONS

76983
Number

### INMATE REQUEST TO STAFF MEMBER

To: Ms. Hall UTS/A4 Unit Team        Date: 10-10-2023
(Name and Title of Officer or Department)

State completely but briefly the problem on which you desire assistance. (Be specific.)

I need to be signed for and pick-up for processing: the following (1) The returned (for my initial) a Personal Injury Claim Form; (2) DR#2872 (signed copy) to go back to Discipl. Administrator (3) My Appeal to S.O.C for DR#2872 that needs to have one copy made, copies mailed to S.O.C and the originals returned back to me, see AR and addressed envelope included. (4) "Emergency Grievance" regarding falsification of state document of a Admin seg. review, for which Mr. Parks is in and barred from participation by KAR 44-15-101a(f).  Thank you.

Work Assignment: None                Living Unit Assignment: A4116

Comment: _____        Detail or C.H. Officer: _____

Disposition: _____

*Never answered never returned by Unit Team*
*R.W. 12-10-2023  R.W.*

To: _____                Date: _____
(Name & Number)

Disposition: _____

*page 9*

_____
Employee's Signature

To be returned to inmate.

P-0009

☐ Witness(es) Sworn In/Affirmed _____ _____

_____ _____ _____

Witness(es) Testimony / Cross Examination  (Attach Testimony)

Closing Statement(s):  (Attach Arguments)

If applicable include inmate's testimony/ arguments on restitution

Sanction(s): _30 Yc!. 15 P/R C/s Inp, 5 $ F C/s Inp_____

Reason for Sanctions: _See Hearing notes_____

_____

Disposition of Evidence: _N/A_____

☒ Inmate advised of right to Appeal,  Have Inmate Initial ☒ _____

HEARING OFFICER SIGNATURE _CSL P. Inn_____  DATE _4-24-23_

FINAL ACTION BY FACILITY WARDEN:
☑ APPROVED
☐ REINSTATE DISMISSED CHARGES; REMAND NEW HEARING    ☐ REDUCE TO SUMMARY JUDGMENT
☐ AMEND THE CHARGE                                   - restriction from privileges up to 10 days
☐ DISAPPROVE/DISMISS                                 - fine not exceed $10.00
☐ REDUCE THE PENALTY                                 - extra work w/o incentive pay for no more
☐ SUSPEND ALL OR PART OF SENTENCE                         than 2 hrs/day no more than 5 days
☐ REMAND NEW HEARING                                 - work w/o incentive pay not to exceed 5 days
☐ CLARIFICATION OF RECORD                            - restitution not less than $3.00
                                                        or more than $20.00
Comments: _____

WARDEN/DESIGNEE SIGNATURE          APR 2 8 2023
                                   DATE

I received a Copy of the Hearing Record and understand I have 15 days to Appeal this decision.

_Bobby White_  #76983                              _10-9-2023_
INMATE SIGNATURE _No Appeal Form's provided by_        DATE
I served a copy of the Hearing Record _Unit Team pursuant to KAR 44-13-703(b)_
_Not served in the (7) seven working days; pursuant to KAR 44-13-701 (c)_

_____                                    _____
STAFF SIGNATURE                                     DATE

Technical and clerical errors in the writing and/or processing of the Disciplinary Report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to prove. Pursuit to K.A.R 44-13-707. Harmless error; Plain error.

 

Page | 1

White, Bobby #76983
Case # 2872
R/O: CSI Barter
H/O: CSI Lechliter
Date: April 24, 2023
Time: 15:44

## **TESTIMONY**

Inmate refused to participate in his hearing. Inmate White #76983 was asked if he wanted to perticiapte and he stated "I know my right to appeal, Unit Teams have previously back dated forms. I want the appeal form now and then I'll sign the forms." UTS Meredith was assigned as Proxy and asked Curls if he had any statements, questions or Closing arguments. He is answer was the same as above. Due to Inmate White refusing to sign any of the acknowledgemt forms, H/O found it necessary to hold the hearing inabsentia.

UTS Meredith is assigned as I/M Proxy.

Statement by Proxy ~ "I know my right to appeal, Unit Teams have previously back dated forms. I want the appeal form now and then I'll sign the forms."

H/O holds this hearing in absentia.

H/O enters a plea of not guilty on behalf of I/M.

H/O verifies that the time limits have been met on the DR and summons.

I/M has no witnesses or staff requests for assistance.

H/O reads DR in to record.

R/O Sworn in.

Proxy to R/O: Nothing Further

H/O to R/O: How many orders were given to the Inmate?
    R/O to H/O: only one.

H/O to R/O: Was it a Direct order?
    R/O to H/O: Yes.

H/O to R/O: Nothing further.

R/O closing statement: Nothing Further





White, Bobby #76983
Case # 2872
R/O: CSI Barter
H/O: CSI Lechliter
Date: April 24, 2023
Time: 15:44

Findings: Based on the provided testimony, report, and evidence concerning the violation of KAR 44-12-304a Disobeying Orders Class I, it is more likely true than not that inmate White #76983 is Guilty of the Violation.

Sanctions: 304a- 15 P/R C/S IMP, 5 $ F C/S IMP

 NOTE ~ I/M IS ADVISED OF HIS RIGHT TO APPEAL UPON RECEIPT OF THE DISPOSITION AND THIS WRITTEN HEARING NOTE.

Attachment G, IMPP 11-119
Effective: 10-15-07

# DISCIPLINARY REPORT

LCF-Central
( FACILITY)

| Case No. **2872** | Date of Alleged Violation:3-28-23 | Time: 0630 (A.M.) P.M. |
|---|---|---|
| Date This Report Written: | 3-28-23 | Time: 1400 A.M. /(P.M.) |

Name of Inmate: White        Bobby        B No.76983    Cell No: A2-206  *No Start restriction* *(Medical restriction to later*
                LAST        FIRST        MI

Duty Assignment: Pending Investigation

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-304 Disobeying orders class 1

FACTS: On the above date and approximate time Reporting Officer (CSI Barter) told Offender White that he needed to move to B8. He told me that he would not move and wanted to go to segergation. I informed the Captain's office, and they sent two members of the sort team and took him to A2. Offender White not moving after being given a direct order places him in violation of 44-12-304  Disobeying Orders, a class 1 offense.  End of Report

(Attach Additional Sheet(s) if necessary)

Staff Witnesses:_____ (Signature) _CSI W_____

_____ _CSI Barter_____

Report                                    Printed Name and Title of Employee Writing

_____

                                          Approved by: _Lt. Jeffrey Barter_____

                                          (Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on _3/28/2023_        Signature _CSI W_____

I received a copy of this report on 3/29/23  2335 , Refused to Sign, Copy gin..
                                    (Date)      (Time)        (Inmate Signature & No)

I served a copy of this report 3/29/23  2335 , _____
                                (Date)    (Time)        (Signature of Officer or Unit Team Manager &

Title)

*Technical and clerical errors in the writing and/or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

WRONG
Given Thursday) 3-30-2023
morning
page 13    at 12:30 A.M. [13]
                    or 0050

Exhibit PL#23

19 pages

# IN THE DISTRICT COURT OF LEAVENWORTH Co.; KANSAS

| | |
|---|---|
| Bobby White #76983 | CASE No: 2020-CV-243 |
| Plaintiff | |
| V | K.S.A. 60-1501 |
| Warden Meyer et.al | Habeas Corpus |
| Defendant | |

## PETITION FOR WRIT OF HABEAS CORPUS
### (Pursant to K.S.A. 60-1501)

COMES NOW, Plaintiff, Bobby White #76983, pro se and respect- fully represent, that he is unlawfully deprived of his liberty and humane treatment by the above named Defendants - Warden Meyer et.al of the Lansing Correctional Facility, Lansing, Leavenworth County, Kansas That the cause or pretense of his restraint, to the best of his know- ledge and belief, is his conviction in Butler County, Kansas in Case No: 2002-CR-118. White has been denied humane treatment, because of age and disability discrimination, retaliation and reprisal because of his use of the grievance procedure, and White has been assaulted and battered by Officer Gardner on 7-27-2020 at approximately 10:55 AM at B6-111, that caused excruciating pain because of a medical condition, for which White has been requesting medical help, since 4-15-2020. This at Lansing Correctional Facility; Lansing, Kansas - new prison facility.

Because Plaintiff appears pro se, the court "reviews his pleadings and other papers liberally and holds them to a less string- ent standard than those drafted by attorneys." Trackwell v. United States 472 F.3d 1242, 1243 (10th Cir 2007)

## BACKGROUND

1. On 3-25-2020 White applied for Executive Clemency. (see; Exhibit 1 (pages 8,9)

1.

2. On 4-15-2020, White's first reported to medical of enlarged testical.

3. On 4-21-2020, White was moved to new prison

4. On 4-28-2020, White tested positive for Covid 19 and put in quarantine.

5. On 5-21-2020, White was moved back to general population, was in quarantine for 23 days.

6. (a) On 5-29-2020, submitted Grievance# AA 2020 0264 to Unit Team.

(b) On 6-10-2020, Resubmitted above grievance as an (Emergency Grievance direct to Warden, which became grievance #AA 2021 0002. (Because I was wrongfully being held in segregation and it was being held by the Unit Team over the required 10 calendar days.)

(c.) On 6-16-2020, White received back from the Unit Team grievance #AA 2020 0264 — White forward it on to the Warden on 6-17-2020, but Warden has it indicated as received on 6-24-2020, which White received back from the Warden on 8-10-2020

(d.) On 6-30-2020, White received back from the Unit Team, grievance (Emergency Grievance) #AA 2021-0002, from the Unit Team, which was suppose to go direct to the Warden, — On 7-1-2020, White forward it, on to the Warden, and White received it back from the Warden, also on 8-10-2020.

(The total time from submission to the return from the Warden was 73 days for #AA 2020 0264 and for #AA 2021 0002 was for 61 days, which for both should not have been more than 27 days each. (see: Exhibit 2 (23 pages))

7. On 6-9-2020, White was issued (Disciplinary Report) DR# 5568.

8. On 6-9-2020, White transfered from B7-226 to A2-106 segregation.

9. On 6-12-2020, White was transfered from A2-106 to B6-111 general population. (see: Exhibit 3 (4 pages))

10. On 6-26-2020, White went to first sick call to see Dr. Williams regarding my enlarged testical, Dr. Williams ordered an ultrasound/saunnagram for a diagnosis. (see: Exhibit 5 (4 pages))

11. On 7-21-2020, Appellate Court had Leavenworth County Court Case No: 2019-CV-144, reversed and remanded with direction for transfer of White's K.S.A. 60-1507 to Butler County Court now Case No: 2020-CV-132. (see: Exhibit 4 (6 pages))

12. On 7-27-2020, White was assaulted and battered by Officer Gardner.

2.

13. On 7-27-2020, White was issued DR #0310

14. On 7-27-2020, White was transfered from B6-111 to A2-106 segregation.

15. On 8-11-2020, White was transfered from A2-106 to A3-100 general population. (see: Exhibit 6)

16. On 9-2-2020, White was transfered from A3-100 to A4-110 for long term Covid 19 quarantine. (KDOC Covid Unit)

17. On 9-11-2020, White was transfered from A4-110 to A3-108 but, still on lockdown/quarantine.

18. As of 10-8-2020, lockdown/quarantine was ended, this session lasted 36 days.

19. Currently, White is scheduled for diagnosis and ultra sound / saunnagram to be done on 10-12-2020. (see: Exhibit 5 (page 4)

## STATEMENTS OF ISSUES

I. The KDOC/LCF Unit Teams, correctional counselors, Ms. Wilson; Mr. Thompson; Ms McCown; Ms. Hagedorn; Ms. Wagner, Ms. Howlett, and Warden Meyer are denying White the due process time limit requirement set out by KAR for the processing, and answering, and returning, of form 9's, grievances and appeals, and failing to give the Finding of facts, conclusions drawn and the reasons for the conclusions, and the action taken. Thus, causing there to be no administrative remedy for the specific issues of White's grievances and appeals of the administrative process.

II. Ms. McCown (UTS); Ms. Hagedorn cc; Ms. Wildermuth (UTM); and Ms. Wagner (UTM); and Ms Howlett (UTM) violated White's medical restrictions of "No Stairs and Bottom Bunk only" and denied him a job because of his age and disability; done with deliberate indifference, to White's safety or abilities.

3.

III. Ms. McCown (UTS) wrongfully issued White a disciplinary report #5568, which was beyond White's physical means and would result in White violating his medical restriction and beyond White's control to obey.

IV. B6 Unit Officer Gardner assaulted and battered White on 7-27-2020 at approximately 10:50 AM causing excruciating pain, then wrongfully issued White a disciplinary report #0310; to cover-up his own violent action; which he unnecessarily initiated.

## ARGUEMENTS AND PLEADINGS
### ISSUE I

I. The KDOC/LCF Unit Teams, correctional counselors, Ms. Wilsons, Mr. Thompson; Ms McCown; Ms. Hagedorn; Ms. Wagner; Ms. Howlett; and Warden Meyer are denying White the due process time limit requirement set out by KAR for the processing, and answering, and returning, of form 9's, grievances and appeals, and failing to give the Finding of facts, conclusions drawn and the reasons for the conclusions; and the action taken. Thus, causing there to be no administrative remedy for the specific issues of White's grievances and appeals of the administrative process.

Pursuant to: KAR44-15-101 (b); (c); (d)(2); (f); KAR 44-15-101a — (d)(1); (A); (B); (f); KAR44-15-102 (a)(2); (3)(a)(i); (ii); (B); (G); (c)(3); and KAR44-15-104 Reprisals prohibited.

(A)(1) White has been moved around and locked down so, often, because of the move to the new prison and Covid 19 quarantines, that White, most of the time, does not know who to address his form 9's, grievances etc.; See: Exhibit 1 (page 1) where Ms. Howlett utm doesn't even know, or else there was no-one assigned to help White, and on (page 2) Ms. Wagner utm doesn't even address any part of my form 9, and then; (page 3) Ms. Howlett utm, failed to even answer

4.

to the issues of Ms. Wilson and Mr. Thompson refusal to sign and return my grievance receipt or even answer to it in the required 10 calendar days. As I've previously mentioned after 21 days, I had to resubmit it directly to the Warden pursuant to KAR 44-15-102 (a)(2) on 10-6-2020. (see: Exhibit 8 (2 pages)

(2)(a.) Grievance #AA2020 0264 took 73 days to move from the submission, to the Warden, and back. Per KAR this should not of taken any more than 27 days. Even then there is no real response from the unit team, regarding: ① Why are so many form 9's gone unanswered; ② job?; ③ deliberate indifference to White's medical restriction need; ④ violations of the requirement time limits; and ⑤ discrimination of accommendations of job and housing, because of age and disability. I was told personally by Ms. McCown that they didn't have any jobs, I could do; because of my cane. Yet, it is the responsibility of the Unit Team to make all job placements.

(b.) I should n't have ever, had to resubmit this grievance, to have the resulted change to grievance #AA 2021 002, direct to the warden, which took 61 days to get back to me. It shouldn't have taken no more than 15 days as an "Emergency Grievance." (see: Exhibit 2)

(c) Then, there is also, the grievance that White had to resubmit on 10-6-2020. (It'll be just like the grievance #AA 2020 0264).This recent one is in regard to Mr. Thompson refusing to sign and return the grievance receipt and it has gone unanswered by the Unit Team. This grievance was submitted to Mr. Thompson on 9-14-2020. (see: Exhibit 8)

(3) KAR - Kansas Administrative Regulations are rules which govern administrative agencies, including the KDOC. These rules are given direct authority of law through the K.S.A. which authorizes them. As they are direct extension of Kansas statutes, they have the force of law. They must be followed

5.

and they cannot be over ruled by any other rule or regulation. These KAR's have created certain rights that have been intended by the Kansas Legislature. The Secretary of Corrections has adopted these regulations and has agreed to enforce them as the Head Administrator of the Kansas Prison System.

In; Stewart v State 30 Kan. App. 2d 380, 42 P. 3d 205 (2001) (A court, or in this case') The KDOC boiler plate (journal entries) or rubber stamped generic replies do not comply with Kan. Sup. Ct. R. 183 (j); K.S.A. 60-1507/1501, or KAR 44-15-102 (3)(B) or (c)(3). The requirement of finding of facts; conclusions made and action taken in the KAR's is far from a technicality, and was adopted to ensure that justice shall be administered according to facts and laws. Further, the word "shall" included through out KAR 44-15-102 Procedures indicates a clear directive to the warden and S.O.C/KDOC to address the specific issues in the grievance, citing the facts and how the investigator came to that conclusion and how the administrator plan's to correct the issues.

If the language is plain and unambiguous, the court must give effect to the language as written without determining what the law should or should not be. State v Gordon, 275 Kan. 393, 397, 66 P.3d 903 (2003). Or, stated another way when a statute is plain and unambiguous, the appellate courts will not speculate as to the intent behind it and will not read such a statute so, as to add something not readily found in it. 275 Kan. at 397
(a.) KAR 44-15-102 (a)(2) "If an inmate does not receive a response from the unit team within 10 calendar days, a grievance report may be sent to the warden without the Unit Team signature or signatures." and
(b.) KAR 44-15-101 (f) "No staff member shall refuse to sign, date, and return an inmate grievance form, or a grievance receipt slip showing that the inmate came to that person for assistance." and
(c.) KAR 44-15-102(3)(ii) "Each inmate grievance shall be returned to the inmate, with an answer, within 10 working days from the date of receipt."

6.

[4] (B) "Each answer shall contain finding of fact, conclusions drawn the reason for those conclusions, and the action taken by the warden..."

All these KAR's are in plain and unambiguous language, and the word "shall" is a clear directive, not disgressionary one.

An agency may not violate it's own rules, and where it fails to follow the rules that it has promulgated, its orders are unlawful. When the KDOC determines to disregard the KAR's, it is estopped on appeal from arguing that the failure of a litigant to observe the same procedural rules. McMillan v McKune, 35 K.A. 2d 654, 661, 135 P. 3d 1258 (2006)

Thus a court reviewing the sufficiency of a complaint presumes all of the plaintiffs factual allegations are true and construes them in the light most favorable to the plaintiff. Hall v Bellmon, 935 F. 2d 1106, 1110 (10th Cir 1991)

In White's 18½ years of incarceration, White never received any offer of relief, investigation, or offer to correct a complaint from the KDOC. The KDOC, unit team, correctional counselors, Warden and S.O.C. always gives the same boiler plate entries; "that it was determined the response provided by the Unit Team is appropriate." Even, when the Unit Team makes it's cookie cutter responses, such as "Job placement is a classification decision." (see: Exhibit 2 (page 1)), or makes claims that are blantantly untrue (page 15), that does not have anything to do with the complaint, but uses the platform for reprisal against the people who dares to use the grievance process. Such as; White was "given multiple orders to move", and "you had been disrespectfull toward staff."

White held a porter position while being housed at "Primewood" Q-Unit and was the prisoner who held that position longer than any other person in that unit, without any complaints from any staff member. I worked my way up from .45 cents a day to $1.05 a day or $21.00 every 4 weeks, in about 2 months and held the position approximately a year and one half. I had been DR free for over 3 years until our move to the new prison. Those are the facts and are a matter

7.

of record. Ms Howlett has made up these comments in the Unit Team response in grievance #AA 2021 0002, or they were given to her from here say by another staff member. (see: Exhibit 2 (pages 1, and 15)). Either way its prejudicial to me personally and socially and a falsification of a state record and does not address the issues.

The KDOC does not provide any administrative remedy in it's administrative process. Therefore, it's a waste of time and resources and mearly a run-around for a prisoner to, have to, and attempt exhaustion of the process, when there is no administrative remedy and the State /KDOC controls all the paper work the prisoner needs as proof of the exhaustion.

## ISSUE II

II. Ms McCown uts, Ms. Hagedorn cc, Ms. Wildermuth utm, and Ms. Wagner urm, Ms. Howlett utm. violated White's medical restrictions of "No Stairs and Bottom Bunk Only" and denied him a job, because of his age and disability, done with deliberate indifference.

The Unit Team and Warden Meyer cited above have violated White's 14th Constitutional Amendment right to be free of discrimination, because of age and disability, when Ms McCown told me personally that they didn't have a job, I could do, because of my care.

Also, the Unit Team have failed to tell White who authorized White for the use of one flight of stairs. It certainly wasn't medical and they are the only ones with medical training to make those medical restriction decisions.

White has clearly shown through Exhibit 2 (pages 5,6) that the Health Services Administrator on 4-21-2020 and Dr. Williams on 5-11-2020 claim that Pulhex classification dated 8-13-2019, stated "Bottom Bunk and No stair" climbing. Futher, Dr. Williams claims he "contacted the B7 Unit team to verify for them on 5-11-2020. (see: Exhibit 2 (pages 5,6))

8.

Yet, Ms McCown asserts that I had no such restriction and so, she provides Exhibit 2 (pages 8,9). But, these pages tell White a different story and I hope the court agrees.

① Both pages 8 and 9 were logged on by "Ms Cown 1" (top. right hand corner); — ② (pages 8,9) gives the same date on copies of 5-29-2020. This is 18 days after Dr. Williams states the restrictions were recorded to be there on his viewing. (top. left corner); ③ But, the time stamp of page 8 gives it for (9:25:07) and page 9 gives it for (9:31:46). That makes for a 6 minute, 39 seconds between page call-up for page/screen printing.

I submit that it appears to White, as his opinion, that Ms. McCown first changed the data to show up on the screen as page 8. Screen prints it out, showing the time as (09:25:07). Then she changes the data back as is page 9 on the same day at (09:31:46), 6 minute and 39 seconds later. Also, notice she also changes the classification date on both pages. But that doesn't match up to what the Health Services Administrator and Dr. Williams claim when viewed the screen, long after the 02-17-2020 recorded classification date. Dr. Williams also, specificly mentions the Pulhes classification was dated 8-13-2019, on 5-11-2020.

It's clear to White, as his opinion, that Ms. McCown or some other non-medical staff have modified/altered a state of Kansas record official record to illegally and prejudically falsify a state record for fraudulent reason. This could be or would be in White's opinion a violation of KAR 44-15-105 Records, KAR 44-15-104 Reprisal prohibited and possibly K.S.A. 2607(i) "A person who intentionally aids, abets, advices, counsels or procures another to commit a crime, may be prosecuted in any county where any such acts were performed or in the county where the principal crime was committed." As well as possibly many other state and federal statutes, to defraud the court exhibit document.

All this occurred by the LCF/Unit Team along with other prejudical and false statements, such as in grievance # AA 2021 0002, Exhibit 2, page 15; regarding that I've "been disrespectful to ward staff," and the implication that I didn't work with staff. "These are all

9.

prejudical comments recorded in state records that could have a negative impact and prejudically devestating to my resent request for Executive Clemency and/or to my current K.S.A. 60-1507 Habeas Corpus in the Butler County Court Case No: 2020-CV-132. All these acts and comments has nothing to do with White's grievance issues and only included as reprisal from the Unit teams.

This all done mearly because of discrimination because of White's age and disability and because I had the nerve to stand up for my right in the use of the grievance process.

## ISSUE III

III. Ms McCown wrongfully issued White a disciplinary report #5568 which was beyond White's physical means and would result in White violating his medical restriction and beyond White's control to obey.

After, White submitted grievance# AA2020 0264 on 5-29-2020 and had to make many request questions to the Unit team, regarding my medical restrictions, on 6-9-2020; I was informed by the unit porter, that I was being moved across to Unit B6 from B7. I went to the unit officer and asked him about it, and whether it was on the ground floor with a bottom bunk available. He checked his computer and told me that 'Yes' it was on the ground floor, but 'No' there was no bottom bunk available. I told him that they were then, going from one violation to another. There was no way, I could climb up to the top bunk. He agreed and told me to go ahead and lockdown, because he'd leave that up to the unit team.

On 6-9-2020, I was in my 2nd floor cell B7-226 and Ms. McCown u.t.s. came in and told me I needed to move all my property to the Unit across the hall. She asked, if that was all my property, indicating the pile of things stacked in the middle of the floor, that I had already gathered for the move. I asked, if she was going to get me some box's, and help, and why am I moving from one problem to another, if there is no bottom bunk available. She seem to have an attitude and told me, 'White, I'm not going to argue with you. You have 5 minutes to get

10.

X

moved.' 'I told her, thats not going to happen and you may as well go ahead and cuff me up, because I can't get moved in 5 minutes.' She then stomped out of the cell and slam/locked the door shut. A short time later she came in again, but, this time, with officers, who cuffed me up and took me to segregation and Ms McCown issued me a (DR) disciplinary report #5568. (see: Exhibit 3 (5 pages).

I submit her order was impossible to obey, therefore not a direct order. White opinions that Ms. McCown's bad attitude was caused, because I, submitted grievance #AA 2020 0264; and repeatedly requested to be moved to a ground floor cell, and questioning why it was not being answered. This order from Ms McCown and her attitude was in fact a form of reprisal in violation of KAR 44-15-104 Reprisals prohibited. She didn't like my complaint, over this injustice. Even, many of the pod officers kept telling her, she needed to get me into one of the ground floor cell. There were several cells available and empty.

Ms McCown uts order was unreasonable and impossible for me to obey, for the following reasons:

(1) IF I had out right refused to move, why then, did I have all my property piled in the middle of the floor, waiting to be boxed?

(2) When Ms McCown left my cell, she closed the cell door, locking me in. I couldn't move any where, except around in the cell.

(3) Ms McCown didn't ever provide me with box's to put my property into, to be moved.

(4) I also, not only have a "No stair, Bottom Bunk Only" medical restriction, but also a weight lift limit. I currently have a medical condition, of an enlarged testical, that limits me because of the possibility of a rupture or hernia.

(5) When I was moved into the cell B7-226, the unit team had the porters carry all my property up to the cell. Even after I was taken to segregation, they had the officers to pack-up and move my property out of the cell. So, why couldn't they provide some one to help me move to B6?

11.

(6) I wasn't even suppose to be on the stairs, much less carry heavy box's down them.

(7) The unit team/Ms McCown has never explained to me, how I was even suppose to safely go up and down the stairs even to shower. How was I suppose to hold on to the stair hand rail, with one hand holding my cane, and the other hand holding clothes and shower hygiene products? (see: Exhibit 2 (page 2) 1st paragraph)

(8) Even if it was possible for me to run and get my things moved in 5 minutes. I would still be violating KAR 44-12-505 Restriction: "No inmate shall avoid, break, or violate the terms of a restriction, which has been imposed upon him or her." and KAR 44-12-505b Medical restriction: "In order not to aggravate any injury, illness, or other medical condition, no-inmate shall participate in any work or recreational activities, or partake of food items, in violation of a documented restriction that the inmate has received."

The word "shall" use in this KAR gives me the right to refuse any order given me, that would violate these two KAR's. That is if I had really, out right, refused to move. The KDOC has no right or authority to be selective of the rules and laws it may choose to enforce or follow.

(9) Just for the Unit Team to "intentionally advice" me to use the stairs. They have in effect violated K.S.A. 22-2607(i), to commit the crimes in violation of KAR 44-12-505 and KAR 44-12-505b. (see: last paragraph on page 9 of this document)

I certain should have the human right to know when I may be injured or aggravate a medical condition and refuse.

Even the LCF Hearing Officer thought it was ridiculous and only left me in segregation for only 2 days. This all shows the deliberate indifference the KDOC, Unit Team and Warden has shown for their prisoners medical and disability issues in their custody. Ms. McCown's direct order was impossible, illegal, arbitrary and capricious and Warden Meyer should have dismissed the entire incident.

12

I request this DR #5568 be totally removed from Whites KDOC/KASPER and all other possible records and repair any prejudice that may have caused a negative inpact on Whites request for Executive Clemency and Butler County Court Case No. 2020-CV-132 K.S.A. 60-1507 Habeas Corpus.

## ISSUE IV

IV B6 Unit Officer Gardner assaulted and battered White on 7-27-2020 at approximately 10:50 AM causing excruciating pain, then wrongfully issued White a disciplinary report #0310, to cover-up his own violent action, which he unnecessarily initiated.

On 7-27-2020 the B6 Unit Officer Gardner electronichy opened my door of cell 111. I thought it was day room for me, so I went to check the JPay. Co Gardner confronted me, and told me it was not my day room. I said OK and went back to my cell. About 10 minutes later, Co Gardner once again electronichy opened my door. I went out and started to walk around. Again, Co Gardner confronted me, telling me, it's not my dayroom. I did as told, but first I stated my complaint regarding the unit, and asked to have the captain called. Co Gardner refused. Again, I asked Co Gardner to please call the captain. But, again he refused.

First, I never seem to know my day room time schedule, beause it was controled at the disgression of the Pod Officer. Some would follow the schedule, som would'nt. We were seldom let out at the same time.
The conversation, I had with Co Gardner was in regards to the two other people who, also bunked in cell 111. They were both unit porters. One was a laundry porter. The other, I did'nt have any idea, what he did because I never saw him do any thing.
I complained, that it seems every 10 to 15 minutes Co Gardner as well as some of the other officers were electronichy popping open the cell door, to let them in or out of the cell. They were hardly

13

ever working, but just making their rounds to hustle and deal and trade for their drugs. That was all bad enough, but he was also, letting in and out other prisoners, who didn't even live in the cell. At, one time there was 5 people in the cell smoking K2 and I was forced to stay in the cell smelling the crap. I had been threatened many times, about telling on them. I had taken it as long as I could. (Note: The names of the two porters are identified in my disciplinary appeal #0310 dated 9-21-2020 - see: Exhibit 6)

Once that I know of, the laundry porter was given a disciplinary report for making alcohol (hooch). Yet, he never lost his job and he continued to make his alcohol. During the same week he was caught twice making alcohol by officers, who took and disposed of it. A couple of days later, he was at it again, but the fourth time he was not caught. It was just more stock for his drug trade business.

I asked him, how he kept getting caught, but not being written up. He told me that the gangs here at Lansing had an understanding with the officers. They would not burn down the new prison, and they could sell and smoke their K2. At that time, it seem to me, to be the case.

Co Edmonds (a goodman and officer) was one of the officers who disgarded, one of the alcohol makings. I don't know the names of the other officers. Please let me be clear and repeat Co Edmonds is a good officer. I would never believe Co Edmonds had any such agreement with anyone or even that he would even know of any such agreement. It was all out of my control to get it stopped.

Co Gardner got mad and told the porter to get anything he needed out of the cell, because he wouldn't be opening it again. About 10 minutes later, Co Gardner manually key opened the door and held it opened, wide open. It being almost 11:00 AM, I thought it was lunch time. I grabbed my cane and I went out as the porter came in. I got about half way out the door and Co Gardner started yelling "get back in the cell, get back in the cell." I paused and Co Gardner pushed the cell door into me, with half my back against the wall, with my spinal area, along the door frame, pinning me with the door. My cane ended up between my legs and was pressing on my enlarged testical. Co Gardner was pushing

14

so hand, I was in exscruciating pain. It hurt so bad, I had to slip out from behind the door, to stop the pain.

It all happened so fast, I was in shock and thought of only ending the pain. It seems odd now, when I paused and looked at Co Gardner, when he stopped yelling, I looked up and Co Gardner had a big grin on his face and he had his radio in his left hand, holding it by the thumb and index finger, moving it back and forth, seeming as a taunt. I also, thought it odd, porter who came in as I was leaving seemed to be laughing at me.

After, I was outside the door, another officer, standing up by the front of the officers station, came walking up and cuffed me up and took me to segregation.

I now believe it all was some kind of a set-up to get me out of the cell and off the unit. In a way, I'm glad I'm out of that situation, but, the assault and battery by Co Gardner, was intentional, but not necessary, nor was the pain I suffered.

A. (1) I question why was this not investigated, or if it was, why didn't I receive any relief or administrative remedy?

(2) The KDOC should have asked Co Gardner, why did he open the cell door III, if it was not to let me out for lunch?

(3) Who and why was the second officer, there already to cuff me up?

(4) This is a new prison, why are there camera blind spots?

(5) Why was there no security camera footage of the incident? According to the Hearing Officer it was inconclusive. (see: Exhibit 6 (page 12))?

(6) Why was the KDOC putting White in danger, by housing him in an unsecured cell III?

(7) Why didn't Co Gardner ~~but~~ call the captain when I asked?

B. (a) KAR 44-13-201 (c)(1) states: "If an alleged violation is based upon uncertain facts an appropriate investigation shall be initiated within 24 hours of the time the allegation is made and shall be completed without unreasonable delay."

It seems to White that, "inconclusive" security camera footage

15

should certainly be an "alleged violation based upon uncertain facts". White also told this same story to the officer in the clinic when they were taking me to segregation. This should have warranted an "appropriate investigation". The appropriate investigation, should then, be from an outside source, other than members of the KDOC and totally impartial to either party. White would certainly welcome speaking to an unbias investigator.

C. KAR 44-13-409 Standard of proof: "No finding of guilty shall be made in a disciplinary proceeding unless the institution or facility has produced evidence and testimony sufficient to show guilt of the inmate by a preponderance of the evidence. "Preponderance of the evidence" shall be that standard of proof by which a factual preposition is shown to be more likely true than not."

The KDOC/LCF Hearing officer is not an unbias third party investigator. The Hearing Officer did not see any evidence or hear any testimony that was capable to sway the guilt either way for any unprejudice third party. How can it be impartial to state he takes the word of the officer, rather than mitigating facts of White and his testimony. This again shows there is no KDOC administrative relief or remedy in the KDOC administrative processes. The nightly recent news telicasts has shown numerous incidents to show that some officers cannot be trusted. Only coming to the light after a third party provides video footage of the truth.

Let's exam only the facts and recorded mitigating factors
(1) On the KDOC side, you have only Co Gardner testimony that White battered him. There is no security camera and so it's inconclusive.

(2) On White's side: (a) I have a known/recorded severe medical condition in the groin area; (b) White uses a cane for ambulation; (c) White is 68 years old, senior citizen and not in the best of health; (d) White questions whether it's an approved and trained

16

method, of assaulting and battering a prisoner, only because he's exiting a cell that an officer has opened; (e) White is in the process of requesting an Executive Clemency, and the notice has been published in the Eldorado, Kansas newspaper; (f) White recently had his K.S.A.-60-1507 habeas corpus, reversed and remanded with directions and tranfered from Leavenworth County Court Case No: 2019-CV-144 on 7-21-2020 now Butler County Court Case No: 2020-CV-132; (g) The KDOC at RDU in 2003 intake has classified White as a genius, so obviously White is not stupid; (h) White has been fighting for relief from his incarceration now for 18½ years; (i) White had not had a DR issued to him for well over 3 years, until DR's #5568 and #0310 Since, the move to the new prison; (j) Why should White be penalized and have his testimony questioned, just because the KDOC has failed to provide White with some personal security camera footage.

I believe the weight of the truth should sway over to White's side under the "proponderance of the evidence". Why would any one believe, I've intentionally do the things that has caused me to be issued two DR's and now recorded in the KDOC records. I'm in no shape to be battering any one, much less an officer. I now have two chances of some incarceration relief, and no-one in their right mind would want this liablious and prejudical reports on their KDOC record. These for White is much more than a simple disciplinary infractions, but the kind of things that could potentially keep him from a release from incarceration.

## RELIEF SAUGHT

1. Any cost I've had for this action, to include attorney fee's; should the court appoint White legal counsel.

2. Removing both recent disciplinary reports #0310 and #5568 from Whites KDOC/KASPER, or any other possible record and repair any prejudice that may cause a negative impact

17

on White's clemency Request and Butler County Court Case No: 2020-CV-132.

(3) White request the KDOC security camera footage of the incident causing #0310 DR as well as any investigative report of the incident done on 7-27-20 at approximately 10:50 AM.

(4) White requests $25.00. The approximate cost to replace two personal items that were lost (a clock) and that was destroyed by Co Brazeal (a combination lock) at pack-out by KDOC/LCF officers, (see: Exhibit 7)

(5) At the court disgression, White requests any back-pay White should have and would have received had White been given a job, or been not placed on restriction, in segregation.

(6) Any other damage's the court feels are applicable.

## IN CONCLUSION

White prays the court recognizes the issue of importance, that White feels that these disciplinary reports may have. The negative impact that these reports could have on White's request for relief of incarceration are not justified. White had no control in these incidents and White did not do what is reported or White had mitigating factors that the KDOC failed to consider. White is 68 years old, and been incarcerated now for over 18½ years. White needs to do whatever he can to make up for the lost time with his children and grand children. White is no threat to himself or other and not very likely to ever be, because of his health as as the first 50 years had shown before his arrest. White prays the court gives White protection from these unjust and untrue reports.

18.

Respectfully Submitted, by/ Bobby White #76983

Executed on: 11-6-2020

## AFFIRMATION

The undersigned affirms and declares under penalty of perjury that he is the petitioner in this habeas corpus petition pursuant to K.S.A. 60-1501, and that the information contained therein is true and correct per his own knowledge, information, beliefs, records and documentation.

Executed on: 11-6-2020   by/ Bobby White #76983

Bobby White #76983
Lansing Correctional Facility
P.O. Box 2
Lansing, Kansas 66043

19

ELECTRONICALLY FILED
2024 Jul 30 PM 3:44
CLERK OF THE PAWNEE COUNTY DISTRICT COURT
CASE NUMBER: PN-2024-CV-000009
PII COMPLIANT





Exhibit PL #22

filed 7/30/24

| | |
|---|---|
| **Court:** | Pawnee County District Court |
| **Case Number:** | PN-2024-CV-000009 |
| **Case Title:** | Bobby Bruce White #76983  vs. Jeff Zmuda, et al |
| **Type:** | ORD: Order Originated by Judge Order |

SO ORDERED,

/s/ Honorable Bruce Gatterman, Chief
District Judge

Electronically signed on 2024-07-30 15:44:49          page 1 of 5

THE STATE OF KANSAS
TWENTY-FOURTH JUDICIAL DISTRICT
Serving
Edwards, Hodgeman, Lane, Ness, Pawnee & Rush Counties

IN THE DISTRICT COURT OF PAWNEE COUNTY, KANSAS

| | | |
|---|---|---|
| Bobby Bruce White #76983, | Petitioner, | ) |
| | | ) |
| v. | | ) Case No. PN-2024-CV-000009 |
| | | ) |
| Jeff Zmuda, *et al*, | Respondent | ) |

## ORDER

**NOW** on this date, as reflected by the electronic filestamp hereon, the above matter

comes on before the Court for review pursuant to K.S.A. 60-1501.

This is an action filed by Bobby Bruce White (White), self represented, in the District Court

of Leavenworth County, Kansas, on December 12, 2022. White alleged he was wrongfully

imprisoned and principally that he had suffered discrimination on the basis of age, religion,

disability, and/or freedom of speech when expelled from Brothers In Blue Re-Entry "BIBR". From

his allegations, BIBR is alleged as a contracted party with the State of Kansas and Kansas

Department of Corrections to accrue program credits through a re-entry program for favorable

treatment by the Kansas Parole Board in evaluation of parole eligibility. The record reflects that

White exhausted his administrative remedies and timely filed his Petition for Writ of Habeas

Corpus in Leavenworth County, Kansas.

No substantive action occurred in the Leavenworth County case for a number of months.

White continued to file voluminous pleadings concerning his current housing, a need for

*page 2 of 5*

protective custody, and associated grievances, including an emergency grievance. As to these documents, there is no alleged proof of exhaustion of administrative remedies by White.

Ultimately, Honorable Clinton W. Lee issued a Writ of Habeas Corpus on August 11, 2023, directing the Kansas Secretary of Corrections to file an Answer within twenty (20) days of service of the Writ. The Court file is unclear as to whether the district court ever secured service of the Writ, and no response has been filed by the Kansas Secretary of Corrections. Eventually, James Floyd, Attorney at Law, was appointed as counsel for White by order filed November 7, 2023. By this time, White had already been transferred to Larned State Correctional Facility on October 23, 2023. Venue was ultimately transferred to the District Court of Pawnee County, Kansas on March 22, 2024. The Court file from the District Court of Leavenworth County, Kansas does not reflect that any substantive hearing concerning the underlying Petition for Writ of Habeas Corpus filed by White was at any time undertaken.

This Court will issue a separate Writ of Habeas Corpus for service upon Jon D. Graves as legal counsel for the Kansas Department of Corrections accompanied by a copy of this Order. The Clerk of the District Court of Pawnee County is requested to provide an electronic filestamped copy of this Order to Mr. White at the address shown for him in Court records in the District Court of Pawnee County, Kansas.

**This Order is effective as of the date and time on the signature page attached by the Court.**

page 3 of 5

THE STATE OF KANSAS
TWENTY-FOURTH JUDICIAL DISTRICT
Serving
Edwards, Hodgeman, Lane, Ness, Pawnee & Rush Counties

IN THE DISTRICT COURT OF PAWNEE COUNTY, KANSAS

Bobby Bruce White #76983,   Petitioner,   )
                                          )
v.                                        )   Case No. PN-2024-CV-000009
                                          )
Jeff Zmuda, et al,          Respondent    )

## ORDER FOR WRIT OF HABEAS CORPUS

TO:   Jeff Zmuda, Warden, Secretary
      Kansas Department of Corrections
      714 SW Jackson, Suite 300
      Topeka KS  66603

      Jon D. Graves, Legal Counsel
      Kansas Department of Corrections
      P.O. Box 1568
      Hutchinson KS  67504-1568

This Order for Writ of Habeas Corpus is issued pursuant to K.S.A. 60-1501 et. seq. It has been alleged that you have Bobby Bruce White in the custody of the Kansas Department of Corrections and that said restraint is wrongful and unlawful. You are hereby required to file your Answer to the Petition with the Court within twenty-one (21) days from the date of the electronic filestamp hereon.

A copy of the Order of the Court entered on this date accompanies this Order for Writ of Habeas Corpus.

The Clerk of the District Court of Pawnee County, Kansas, is requested to provide an electronic filestamped copy of this Order for Writ of Habeas Corpus by First Class Mail to Jeff Zmuda, Secretary, Kansas Department of Corrections; and to Jon D. Graves, Legal Counsel, Kansas Department of Corrections, at their respective mailing addresses shown above.

**This Order for Writ of Habeas Corpus is effective as of the date and time on the signature page attached by the Court.**                    Page 4 of 5

ELECTRONICALLY FILED
2024 Jul 30 PM 3:56
CLERK OF THE PAWNEE COUNTY DISTRICT COURT
CASE NUMBER: PN-2024-CV-000009
PII COMPLIANT



**Court:**        Pawnee County District Court

**Case Number:**  PN-2024-CV-000009

**Case Title:**   Bobby Bruce White #76983   vs. Jeff Zmuda, et al

**Type:**         ORD: Order Originated by Judge Order for Writ
                  of Habeas Corpus

SO ORDERED,

/s/ Honorable Bruce Gatterman, Chief
District Judge

Electronically signed on 2024-07-30 15:56:16        page 1 of 2

page 50f5

| Exhibit AL #21-1 | INMATE REQUEST TO STAFF MEMBER

To: Mr. Merdith CC /AI Unit Team                    Date: 5-17-2023
(Name and Title of Officer or Department)

Unit Team, Detail, or Cellhouse Officer's Signature        To be retained by inmate

Where are my Unit Team Response to my (3) submitted grievances.

Form 9
For Cellhouse Transfer
Work Assignment _____        White
Interview Requests                               Last Name Only

## KANSAS DEPARTMENT OF CORRECTIONS

76983
Number

## INMATE REQUEST TO STAFF MEMBER

To: Mr. Merdith CC /AI Unit Team     Date: 5-17-2023
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I received back today the form I, I sent you on 5-4-2023, reminding you that the grievance, I submitted regarding Mr. Spillman and Hearing Officer (saying "I was taken out of BIBR and Pod B3 was because I filed legal action) was due back on 5-5-2023. I did in fact also submitted (2) Form 9's as proof and it was clearly indicated on the grievance. They were answered by the Unit Team Manager Ms. Latzke (both), but you didn't keep them with the grievance, but returned them back to me with your note "noted" but no grievance on the Friday 5-5-2023. You were not here that day. I went in to see Mr. Parks, but he said he didn't return them back - You did. Also, He informed

Work Assignment: Retired          Living Unit Assignment: A1-717

Comment: me he had no grievances from me. He should of in fact have had three. At any rate you invalidated the grievance on the Unit Team side because you did not and have not answered the grievance in the 16 calendar days required to. therefore

Detail or C.H. Officer:

Disposition: pursuant to KAR 44-15-102a(a)(2) direct to the Warden, by U.S Mail, witnessed and signed for by the Unit officers. What has happened to the (3) three grievances, I submitted and why have they not been answered and returned by the Unit Team. Mr. Parks knows nothing about them. Who did you give them too?? Thank you.
P.S. you also notarized all this in the "Affidavit" I sent to the court for the OR hearing and you had first hand knowledge of all this because you represented me for the OR hearing

To: _____     Date: _____
(Name & Number)

Disposition: Grievances submitted without informal resolutions are invalid. Any valid grievance is answered by the UTM.

Received back 5-26 B.W. (2) two Form 9's were submitted with grievance

Employee's Signature                    To be returned to inmate.

P-0009

Unit Officer Please sign and return this receipt. Thank you.

| Exhibit PL #21-2 | INMATE REQUEST TO STAFF MEMBER |

To: Mr. Merdith CC / Unit Team                                    Date: 5-4-2023
(Name and Title of Officer or Department)

Cc1 Ellis
Unit Team, Detail, or Cellhouse Officer's Signature          **To be retained by inmate**

Grievance submitted 4-25 due back answered by Unit Team by 5-6-2023

---

**Form 9**
For Cellhouse Transfer
Work Assignment
Interview Requests

White
**Last Name Only**

### KANSAS DEPARTMENT OF CORRECTIONS

76983
Number

### INMATE REQUEST TO STAFF MEMBER

To: Mr. Merdith CC / Unit Team          Date: 5-4-2023
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Just a reminder the grievance [and (attached two form 9s)] regarding Mr. Gary Spillman telling the DA Hearing Officer he kicked me out of BIRA and BS because I filed legal action in the court, will be due back answered by the Unit Team (which I submitted on 4-25-2023) by Saturday 5-6-2023 and returned to me, so that if necessary, I can forward on to the Warden pursuant to: KAR 44-15-102(2) and (b) / violation of KAR 44-15-104 and KAR 44-12-306(h). Thank You.

Work Assignment: Retired                    Living Unit Assignment: A1-117

Comment: _____          Detail or C.H. Officer: Cc1 Ellis

---

Disposition:

The Grievances are answered by the Unit Team Manager, however an informal resolution must be sought out beforehand otherwise the grievance is not valid.

To: _____
(Name & Number)

Received back WS 5-17-2023 7:00PM B.W.

Disposition: _____

Informal resolution where included but returned back without grievance so it was re-copied and sent direct to Warden pursuant to: KAR 44-15-102(b)?

Employee's Signature                              **To be returned to inmate.**

P-0009

Form 9
For Cellhouse Transfer
Work Assignment
Interview Requests

Exhibit PL#21-3

White
**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

76983
**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: _Mr. Parks UTM_      Date: _5-9-2023_
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I have a document I need notarized (affidavit) for the Leavenworth
District Court Case No: 2022-CV-323. As-soon-as-possible
Thank You

Work Assignment: _Retired_      Living Unit Assignment: _A1-117_

Comment: _____      Detail or C.H. Officer: _____

Disposition:
Your UT is a notary. See them

Recieved back
2023 B.W.
Unit officer please sign and return receipt.
Thank You

**INMATE REQUEST TO STAFF MEMBER**

To: _Mr. Parks UTM_      Date: _5-9-2023_
(Name and Title of Officer or Department)

_____
Unit Team, Detail, or Cellhouse Officer's Signature      **To be retained by inmate**

Need Notarized for affidavit Case No: 2022-CV-323

*Exhibit PL #21-4*

INMATE REQUEST TO STAFF MEMBER

To: _LCF - A1 UNIT TEAM / Mr. Parks UTM / Mrs. Merdith CC_    Date: _5-10-2023_
(Name and Title of Officer or Department)

_____
Unit Team, Detail, or Cellhouse Officer's Signature    **To be retained by inmate**

Meter for Legal Mail postage and mail out "Affidavit" LYCO 2022-CV-323

**Form 9**
For Cellhouse Transfer
Work Assignment _____    _White_
Interview Requests    **Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

_76983_
**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: _LCF-A1 Unit Team / Mr. Parks UTM / Mr. Merdith CC_    Date: _5-10-2023_
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Please meter these two envelopes for postage cost and mail them out
for me. See: the two (2) included AWR's to cover postage cost.

For "Affidavit" Filing with the Leavenworth County District Court
and Legal Service to KDOC Jeff Zmuda - "Legal Mail"
LYCO Case No: 2022-CV-323    Thank You.

Work Assignment: _Retired_    Living Unit Assignment: _A1-117_

Comment: _____    Detail or C.H. Officer: _____

Disposition:

_Done_

_Received back_
_5-17-2023_
_B.W._

To: _____    Date: _____
(Name & Number)

Disposition: _____

_____

_____

_____
Employee's Signature    **To be returned to inmate.**

P-0009

Signed in as **Kansas Department of Corrections.**

Lexis®    $Exhibit\ PL\#20$    $Page\ 1\ of\ 3$

$(3\ pages)$

Document:    State v. Spillman, 2005 Kan. App. Unpub. LEXIS 165

 Go to ⌄  Page  *Page #*  ⌃ ⌄   Search Document 🔍

# ◈ State v. Spillman, 2005 Kan. App. Unpub. LEXIS 165

**Copy Citation**

Court of Appeals of Kansas

April 29, 2005, Opinion Filed

No. 92,590

**Reporter**

**2005 Kan. App. Unpub. LEXIS 165 ***

STATE OF KANSAS, Appellee, v. GARY LEE SPILLMAN, Appellant.

**Notice:** NOT DESIGNATED FOR PUBLICATION.

PLEASE CONSULT THE KANSAS RULES FOR CITATION OF UNPUBLISHED OPINIONS.

**Subsequent History:** Reported at <u>State v. Spillman, 110 P.3d 447, 2005 Kan. App. LEXIS 405 (Kan. Ct. App., 2005)</u>

**Prior History:** [*1] Appeal from Brown District Court; JOHN L. WEINGART, judge.

**Disposition:** Affirmed.

## Core Terms

sentence, severity, district court, retroactively, departure, felony, manufacture of methamphetamine, controlled substance, illegal sentence, plea agreement, direct appeal, manufacturing, durational, cases

**Counsel:** Korey A. Kaul, assistant appellate defender, for appellant.

*Page 2 of 3*

Benjamin T. Cook, assistant county attorney, and Phill Kline, attorney general, for appellee.

**Judges:** Before RULON, C.J., HILL and WAHL, JJ.

# Opinion

MEMORANDUM OPINION

*Per Curiam*: Gary Lee Spillman appeals the district court's denial of his motion to correct an illegal sentence based upon *State v. McAdam*, 277 Kan. 136, 83 P.3d 161 (2004). He argues that he should be resentenced as a severity level 3 offender for his conviction of manufacturing of methamphetamine. His crime was classified as a severity level 1 drug felony on the date of sentencing. The district court correctly denied his motion because the rule in *McAdam* is not to be applied retroactively to cases not pending on the date the decision was filed.

In January 2003, Gary Lee Spillman entered a plea of no contest to manufacture of methamphetamine, a violation of K.S.A. 65-4159; in exchange, the State agreed to dismiss another charge and support Spillman's request for a durational departure sentence. The district court granted Spillman's motion for departure and imposed a downward durational departure sentence of 120 months' **[*2]** imprisonment. There was no appeal, so Spillman's direct criminal proceedings were final prior to January 30, 2004, when *McAdam* was decided.

In *McAdam*, our Supreme Court held that compounding a controlled substance under K.S.A. 65-4161(a), a severity level 3 drug felony, was equivalent to manufacturing a controlled substance under K.S.A. 65-4159(a), a severity level 1 drug felony. The court held that McAdam could be sentenced only to the less severe penalty prescribed by the two statutes. 277 Kan. at 146-47.

According to *State v. Barnes*, 278 Kan. 121, 123-24, 92 P.3d 578 (2004), Spillman's sentence was not illegal since he was validly charged under K.S.A. 65-4159 with unlawfully manufacturing methamphetamine and duly convicted of that offense after entering into a favorable plea agreement. The sentence imposed contained no ambiguity, and the district court properly possessed jurisdiction to sentence the movant. See also *State v. McCoin*, 278 Kan. 465, 468, 101 P.3d 1204 (2004) (McCoin's sentence under K.S.A. 65-4159[a] was not illegal as it conformed with the penalties for a severity level 1 offense). Under *Barnes* and *McCoin*, the trial court did not err by denying Spillman's motion to correct **[*3]** an illegal sentence.

Spillman urges this court to proceed as though this appeal was a direct appeal from his sentence, briefly suggesting that an *Ortiz (State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 [1982]) exception could excuse his failure to file the appeal in a timely manner. Spillman's mere suggestion that an *Ortiz* exception may apply to the filing

requirements of an appeal is inadequate to raise the issue before this court. See _State Page 3 of 3 v. Van Cleave_, 239 Kan. 117, 119-20, 716 P.2d 580 (1986) (appellant seeking relief from denial of appeal right must raise issue before district court to provide proper factual record or request that appellate court remand case for creation of such record). Under the present circumstances, consideration of this matter as a direct appeal is improper. Consequently, we construe Spillman's motion as a collateral attack on his sentence.

_Wilson v. State_, 31 Kan. App. 2d 728, 733, 71 P.3d 1180, _rev. denied_ 276 Kan. 974 (2003), instructed that state courts have no constitutional duty to apply their criminal decisions retroactively. Here, Spillman's sentence was final prior to January 30, 2004, the date _McAdam_ was decided. McAdam did riot establish a new constitutional [*4] rule of criminal procedure or indicate that Spillman could not be convicted of the crime set forth in his plea agreement. See _Barnes_, 278 Kan. at 124. Moreover, there is no constitutional right to the lesser penalty when two statutes proscribe identical conduct. 278 Kan. at 123 (citing _United States v. Batchelder_, 442 U.S. 114, 60 L. Ed. 2d 755, 99 S. Ct. 2198 [1979]).

In _State v. Singleton_, 33 Kan. App. 2d 478, 104 P.3d 424, Syl. ¶ 1, 104 P.3d 424 (2005), this court held that _McAdam_ would not be applied retroactively to those cases which were final as of the date _McAdam_ was filed. That rule applies in this case.

Affirmed.

LexisNexis    Privacy Policy    Terms & Conditions    Copyright © 2025 LexisNexis.    RELX™

ELECTRONICALLY FILED
2024 Nov 06 PM 3:05
CLERK OF THE PAWNEE COUNTY DISTRICT COURT
CASE NUMBER: PN-2024-CV-000009
PII COMPLIANT

IN THE TWENTY-FOURTH JUDICIAL DISTRICT

PAWNEE COUNTY, DISTRICT COURT, KANSAS

*1 of 10*

Bobby Bruce White #76983  vs. Jeff Zmuda, et al

Exhibit PL#19

Appellate Case Number:  128298

District Court Case Number: PN-2024-CV-000009

TABLE OF CONTENTS
RECORD ON APPEAL

Volume Number: 1

| Document | Date | Page Number |
|---|---|---|
| PETITION FOR WRIT OF HABEAS CORPUS | 12/12/2022 | Page 1 - Page 28 |
| POVERTY AFFIDAVIT-INMATE | 12/12/2022 | Page 29 - Page 30 |
| INMATE ACCOUNT STATEMENT | 12/12/2022 | Page 31 - Page 31 |
| CORRESPONDENCE FROM PLAINTIFF | 12/12/2022 | Page 32 - Page 41 |
| CORRESPONDENCE FROM PLAINTIFF | 01/06/2023 | Page 42 - Page 43 |
| NOTICE OF DEFICIENT PLEADING | 01/09/2023 | Page 44 - Page 44 |
| CORRESPONDENCE FROM CLERK TO PLAINTIFF | 01/09/2023 | Page 45 - Page 45 |
| CORRESPONDENCE FROM PLAINTIFF | 02/06/2023 | Page 46 - Page 46 |
| MOTION FOR A COURT ORDER | 02/06/2023 | Page 47 - Page 50 |
| MOTION FOR SUMMARY | 04/19/2023 | Page 51 - Page 59 |

| JUDGEMENT | | |
|---|---|---|
| CORRESPONDENCE FROM PLAINTIFF | 06/05/2023 | Page 60 - Page 61 |
| CORRESPONDENCE FROM PLAINTIFF | 06/09/2023 | Page 62 - Page 62 |
| AFFIDAVIT FOR SUPPORT OF MOTION FOR SUMMARY JUDGEMENT (SIC) | 06/09/2023 | Page 63 - Page 67 |
| LETTER TO COURT CLERK | 06/09/2023 | Page 68 - Page 77 |
| CORRESPONDENCE FROM PLAINTIFF | 06/14/2023 | Page 78 - Page 79 |
| CORRESPONDENCE FROM PLAINTIFF | 06/22/2023 | Page 80 - Page 80 |
| EMERGENCY GREIVANCE | 06/22/2023 | Page 81 - Page 85 |
| CORRESPONDENCE FROM CLERK TO PLAINTIFF | 06/26/2023 | Page 86 - Page 86 |
| CORRESPONDENCE FROM PLAINTIFF | 08/04/2023 | Page 87 - Page 92 |
| CORRESPONDENCE FROM STEVE CROSSLAND TO PLAINTIFF | 08/04/2023 | Page 93 - Page 93 |
| WRIT OF HABEAS CORPUS ISSUED JEFF ZMUDA | 08/11/2023 | Page 94 - Page 95 |
| Correspondence from Plaintiff | 10/13/2023 | Page 96 - Page 97 |
| Correspondence from Plaintiff | 10/13/2023 | Page 98 - Page 100 |
| Certificate of Service | 10/13/2023 | Page 101 - Page 101 |
| Correspondence from Plaintiff Inmate Request to Staff Member | 10/13/2023 | Page 102 - Page 142 |
| Order Appointing Counsel | 11/07/2023 | Page 143 - Page 143 |

should have been assigned as "Motion to Amend" Not just Correspondence

| Correspondence from Plaintiff | 12/04/2023 | Page 144 - Page 144 |
|---|---|---|
| Motion for Change of Venue from Plaintiff | 12/04/2023 | Page 145 - Page 148 |
| Correspondence from Plaintiff | 12/21/2023 | Page 149 - Page 149 |
| Correspondence from Plaintiff | 12/21/2023 | Page 150 - Page 194 |
| Correspondence from Plaintiff | 12/26/2023 | Page 195 - Page 197 |
| Exhibit Filing Request & Certificate of Service | 01/17/2024 | Page 198 - Page 212 |
| Correspondence from Plaintiff | 01/26/2024 | Page 213 - Page 213 |
| Motion for Order Protection | 01/26/2024 | Page 214 - Page 239 |
| ORDER TRANSFERRING VENUE | 03/22/2024 | Page 240 - Page 241 |
| Correspondence from B White to Judge | 07/25/2024 | Page 242 - Page 244 |
| Order | 07/30/2024 | Page 245 - Page 247 |
| Order for Writ of Habeas Corpus | 07/30/2024 | Page 248 - Page 249 |
| Motion for Summary Judgment Hearing w/ Cert of Service | 08/01/2024 | Page 250 - Page 254 |
| Respondents' Motion to Dismiss | 08/01/2024 | Page 255 - Page 274 |
| Petitioners Prayer For Courts Denial of Repondents Motion to Dismiss | 08/20/2024 | Page 275 - Page 295 |
| Letter to Court From B White with Exhibit SSS | 09/10/2024 | Page 296 - Page 303 |
| Memorandum Decision and Order | 09/26/2024 | Page 304 - Page 308 |
| Notice of Appeal | 09/27/2024 | Page 309 - Page 316 |
| Notice of Appeal | 10/07/2024 | Page 317 - Page 319 |
| Order - Indigent | 10/07/2024 | Page 320 - Page 320 |

| Correspondence to Clerk from BW | 10/07/2024 | Page 321 - Page 321 |
| Court of Appeals Docketing Notice | 10/24/2024 | Page 322 - Page 322 |

**Total Pages**: 322

5 of 10

IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS

Bobby White #76983

vs

Jeff Zmudu, et al.

Case No: 2022 CV 323

Pursuant to K.S.A. 60-1501

FILED LEAVENWORTH CO. KS 2023 OCT 13 PM 4:34 CLERK OF DIST COURT

## MOTION TO AMEND TO ADD ISSUES

COMES NOW, the plaintiff, Bobby B. White #76983, requests to add the issues and / Counts applicable to his, change of conditions of incarceration that has developed, because of and after White's Filing of this "Petition for Writ of Habeas Corpus." This is made necessary because of discrimination, harassment, reprisal, extortion and attempted murder/failure to protect White, by the KDOC staff/officers of LCF which includes Ms. Opliger UTM; Mr. Parks UTM; Mr. Meredith CC; OIC Chapman; coll Prentzler; LSI Coy; Lt. Jawraski; EAI officers: (a) Gill, (b) West, (c) Gift, (d) Tomilsonand inmate Jeremey Garza. These KDOC/LCF officers have denied White "actual", protective custody and protection. Rather illegally and unconstitutionally chosing to hold White under a disciplinary segregation status, under deprived of property and "Atypical" condition of confinement for new, over 6 months and allowed White to be seriously physically injured by strangulation by Jeremey Garza; attempted to cover-up the assault and denied White immediate medical care for the resulting neck/throat injuries, which were sufficiently serious, that when White was finally allowed to go to medical; White had to be sent by ambulance to KU Hospital for medical care.

White has done nothing wrong to deserve this mistreatment and life threatening condition of abuse, confinement and punishment of an elder person in violation of K.S.A. Supp. 21-5417. White merely chose to invoke the grievance process and his (State and Federal) Constitutional right to redress these grievances in the court.

These additional issues are for the applicable time after White submitted this "Petition for Writ of Habeas Corpus" on 12-12-2022 and the present and caused because of the inordinate delay of the Shawnee County Sheriff to make legal service of the petition to the defendant; S.O. C Jeff Zmudu; the failure of the LCF/KDOC Central Bank to timely submit/issue the $15.00 service fee check as instructed by White and the courts, instruction order; and the KDOC/LCF attempt to avoid and eliminate the prosecution of this case, through attempted denial to White to access the court. This all will show a continuing pattern of Un-Constitutional abuse of White by the KDOC and State of Kansas. White is being denied medical care and tortureous constant daily, intermittan, loud radio noise being blasted into my cell. Mr. Meredith CC failure to send Whites previously sent Exhibits to this court that was given to him in a 9"x 11" manila envelope. See: Exhib.it "C" page 11

These issues are in violation of:

1) K.S.A. 21-5402 "Murder in the first degree": (c) As, used in this section, an "inherently dangerous felony" means..., (i)(xv) mistreatment of a dependent adult or mistreatment of an elder person; as defined in [K.S.A. 2017 Supp. 21-5417].

1.

6 of 10

2) K.S.A. Supp 21-5417(a) mistreatment of a dependent adult or an elder person is knowingly committing one or more of the following acts.
  1) Infliction of physical injury, unreasonable confinement, or unreasonable punishment upon a dependent adult or an elder person.
  (A) Undue influence, coercion, harassment, duress, deception, false representation, false pretense or without adequate consideration to such dependent adult or elder person.
  3) Omission or deprivation of treatment, goods, services, that are necessary to maintain physical or mental health of such dependent adult or elder person.
  (e)(3) "Elder person" means a person 60 years of age or older.
  [Note: Assertion: White is a 71 year old elder person with physical disabilities applicable to the ADA and a dependent adult as a prisoner under the care and protection of the State of Kansas, under the care and custody of the Kansas secretary of corrections Jeff Zmudu. Yet, White is being held under disciplinary seg. when having done nothing in violation, being denied due process making the implementation of IMPP 20-108D Protective Custody as disciplinary status illegal and unconstitutional. Further, White has been told he will not be taken off, this disciplinary seg. status and "Atypical" conditions of deprived confinement unless I sign a PC waiver. That is extortion by Mr. Parks and the LCF Unit Team and Warden.]

3) K.S.A. 22-2607(1); also see: KAR 44-12-1001 (violation of statutes, other regulation or order), KAR 44-12-1101 (Attempt, conspiracy, assessory, sollicitation; liability for offenses of another.) [What does Protective Custody have to do with disciplinary seg. status and conditions denying a Constitutional right to property, my coffee, tea, salt, TV, clothes, hygiene, shower shoes, medical care, legal papers and research materials needed for access to the court, for a Pro Se prisoner.]

4) KAR 44-12-1308 Disciplinary segregation limits; "... shall not exceed 60 days" [White has been held for over 6 months, without any form of due process or review.]

5) KAR 44-12-209 Entering into contracts, incurring finacial obligation, [White asserts this rule, disqualifies, White (unless forced under duress) from being required, coerced, forced to sign a PC waiver, to get out of a "Atypical" condition of unreasonable confinement and punishment (torture) of an unreasonable disciplinary segregation status when you are suppose to be only under and protected by the custody of the S.O.C Jeff Zmudu, by the courts sentencing. Denial to "Protection" makes for an illegal sentence.

6) KAR 44-12-306 Threatening or intimidating any person

7) KAR 44-12-323 Assault and KAR 44-12-324 Battery

8) KAR 44-12-325 Security threat group; inmate activity; limitation.

9) KAR 44-12-505 Restriction and KAR 44-12-505b Medical restriction

10) KAR 44-15-104 Reprisal prohibited

11) KAR 44-15-106 Emergency procedures

12) Any and all "Attempted Murder" statutes and charges I've asked to be filed against Jeremey Garza and Central Monitor, Impp 12-125D, I've asked to be set against Mr. Garza and Mr. Parks UTM, Mr. Meredith CC, OIC Chapman and Mr. Gary Spillman, which has been denied White. [Note: after Mr. Garza attacked me, he was awarded by Mr. Parks UTM with day room privilages and access to my cell door to continue to harass me.]

13) U.S and State of Kansas Constitutional Amendments and Bill of Rights applicable as stated in the original petition on page 4, to include 1st, 5th, 6th,

2



1 of 10

due process; 8th medical care, cruel and unusual punishment and 14th. [Note "Assertion" - No one in the KDOC are enforcing or seeing that all statutes and rules are strictly obeyed and followed; there Kansas prisoners must rely on the courts to assure that the KDOC staff/officers follow and obey the laws themselves. They have no right or authority to pick or chose what they want to enforce, nor can they be trusted to police themselves, when they themselves chose to violate the law and the human rights. As members of law enforcement their motto is "To protect and serve"; not "To torture and abuse"]

White has also written letters for help, regarding these issues and charges, I wish for the district prosecutor to press, for White's protection on 9-21-2023 to: a) Kansas Governor Laura Kelley; b) Shawnee County Sheriff; c). Leavenworth County District Attorney; and d) General Manager/KARE-TV/ ("ABC" News); and sent form 9's to LCF/EAI Officers, Gill, West; Gift and Tomilson on (7-15 a copy of an "Emergency Grievance"/Incident Report;) 7-21; 7-28; 9-21, 9-27, 9-29 and on 9-30 yet, another "Emergency Grievance", but I've received no response or investigation on any of my requests or grievances.

White has been denied the ability to do legal research or access to the law library and my own personal research books, court rules and procedures and other legal papers used for reference, because of this illegal unwarranted and unreasonable disciplinary confinement and punishment, when I've done nothing wrong. (Note) (Finally met with EAI Tomilson on 10-1-2023 while waiting to get this motion copied for service.) D.W.

14) White has submitted (12) twelve grievances to the KDOC/LCF Unit Team, LCF Warden, and KDOC S.O.C. Jeff Zmuda; applicable to this Writ and during the time of the filing and legal service on the KDOC/S.O.C. Jeff Zmuda from 10-5-2022 to 10-1-2023, which include (3) three "Emergency Grievances", which include (the court Exhibit copy filed and served on the S.O.C. on 6-22-2023); 7-14-2023 and on 9-30-2023, all gone unanswered and unreturned.

The only grievances returned back to White as exhausted are the originally petition grievance #AA 2023056, which White submitted on 10-5-2022 and (1) one other submitted on 4-25-2023, which is in reference in White's "Affidavit for Support of Motion for Summary Judgement", filed on 6-9-2023. This was regarding, witness H.O. Leibliter telling me, when he spoke to Gary Spillman (BIBR), that Mr. Spillman told him he kicked me out of BIBR and Pod B5, because I filed this legal action against him and BIBR. See: Exhibits "E", proof by grievance receipts of administrative process. This returned grievance, has failed to address the issues of the grievance, failed to assign a unique serial number, and failed to send White extra copies as required. The response was simply; "...It appears you are or have addressed this matter with the court, if you have, you will need to address this with our legal office." Exhibit B"

Therefore, we must assume the KDOC has no intentions to answer or return any of my submitted grievance, so it is futile to, and unfair to expect me to provide proof of exhaustion that the KDOC/State of Kansas must provide. Therefore, I request a ruling by the court, that all administrative processes have been exhausted by White and any further attempts would be futile.

<u>IN CONCLUSION:</u>

3.



White prays the court gives him his requested Summary Judgement and immediate release from incarceration and custody of the KDOC/S.O.C. and orders Whites release for his safety, protection and so that he can get the medical help need. This and/or allows White to Add all the cited issues and violations to this "Petition for Writ of Habeas Corpus" to show a continuing pattern of Constitutional abuses.

Respectfully Submitted; Bobby White #76983
                                              Pro Se
Date: 10-3-2023

## CERTIFICATE OF SERVICE

I, Bobby White #76983 certifies that he sent a copy of this "Motion to Amend to add Issues" 4 pages; plus copy of grievance #AA2023056/S.O.C Appeal exhaustion, 11 pages; EXHIBIT "A"; plus copy of grievance N/A/S.O.C Appeal exhaustion 9 pages- EXHIBIT "B"; plus copy of 12 pages of misc answered form '9's showing repeated demands to sign PC waiver etc. EXHIBIT "C"; plus copy of 6 pages of Health Services Requests requesting pain relief etc. EXHIBIT "D"; plus 3 pages of 11 grievance receipts, to show good faith attempt of Exhaustion of Administrative process, EXHIBIT "E", for a total of 43 pages.; by U.S. mail, 1st class, postage prepaid on this ___9th___ day of ___October___ ,2023 to:

1) Kansas Department of Corrections; % Secretary of Corrections, Jeff Zmudy; 714 S.W. Jackson; Suite 300, Topeka, Kansas 66603.

2) Julie Clemens, Clerk of the District Court; Leavenworth Justice Center; 601 South Third Street; Suite 3051; Leavenworth, Kansas 66048-2868

Date: 10-9-2023        by s/ Bobby White #76983
                                              Pro Se

            Bobby White #76983
            Lansing Correctional Facility
            P.O. Box 2
            Lansing, Kansas 66043

Addenum: At White's meeting with EAI Tomilson on 10-2-2023, he asked for my permission to record the meeting- I readily agreed and pray the court to "Order the KDOC/LCF Warden/S.O.C. Jeff Zmudy to make the recording available to the court as evidence of White's many attempts to get medical help, protection and other relevant issues for my futile attempts at exhaustion of Administrative Remedy. Bobby White #76983 Pro Se.
4.

# Kansas Department of Corrections
## Account Withdrawal Request
(Complete One Request per Form)
**Attach letter and addressed/stamped envelope when required**

9 of 10

| Bobby White | 76983 | LCF | A4-116 | 10-6-2023 |
|---|---|---|---|---|
| Printed Name | Number | Facility | Unit/Cell Location | Date |

Please pay the following and charge to my account:

## Outgoing Funds/Donations

Payable To:

_____
Name

$ _____
Check Amount

_____
Address

_____
City, State, Zip

_____
Purpose/Inmate Benefit Fund Group

| Title of Publication* |
|---|
| Frequency – (Circle One) |
| Yearly  Monthly  Weekly  Daily  Other |
| Number of Issues _____ |
| Expiration Date _____ |
| Publication Price _____ |
| *Book, Magazine or News Paper (Per IMPP 11-101) |

I request the use of Forced Savings as provided in IMPP 04-103, for:
(Documentation Required)

☐ Community Identification
☐ Civil Filing, Transcript or Subpoena Fees
☐ Reentry into the Community (Warden's Approval Required)

| (To Be Completed by Mailroom) | **Postage** – (To Be Completed by Inmate) |
|---|---|

Julie Clemens-Clerk of the District Court

$ 3.57
Postage Amount

To: Leavenworth Justice Center
Name

☐ Postage

601 South Theodore, Suite 3051
Address

☒ Legal/Official Postage
(Per K.A.R. 44-12-601)

Leavenworth, Kansas 66048-2868
City, State, Zip

_____ Verified By

☐ Certified
(Only if Funds are Available)

Motion to Add 2nd Exhibits A, B, C, 4 E,
file a Court - LVCV-2022-CV-323
Reason

| Bobby White | 10-6-2023 | | DTS R H Lee | 10/10/23 |
|---|---|---|---|---|
| Inmate Signature | Date | | Unit Team Approval | Date |

| _____ | _____ | | _____ | _____ |
|---|---|---|---|---|
| Handicraft Approval (If Applicable) | Date | | Religious Approval (If Applicable) | Date |

☐ Applies to Outgoing Funds Limit
☐ Does Not Apply to Outgoing Funds Limit
☐ Use of Forced Savings Approval as requested above

Exception Approval _____ Date

This withdrawal request is being returned for the following reason(s):

___ Insufficient Funds
___ Signature Missing
___ Exceeds Spending Limit
___ Incentive Level
___ Envelope/Order/Stamp Missing
___ Unauthorized Per IMPP/KAR _____

___ Payee Missing
___ Insufficient Address
___ Amount Missing
___ Name/Number – Do Not Match
___ Illegible Information
___ Other _____

_____        _____        _____
Account Processor             Date Withdrawn              Acct. Use

1504a

# Kansas Department of Corrections
## Account Withdrawal Request
(Complete One Request per Form)
**Attach letter and addressed/stamped envelope when required**

*1 o of 10*

_Bobby White_     _76983_    _LCF_    _A4-116_   _10-6-2023_
Printed Name       Number      Facility     Unit/Cell Location    Date

Please pay the following and charge to my account:

## Outgoing Funds/Donations

Payable To: _____
         Name

$ _____ _____
Check Amount    Address

_____
City, State, Zip

_____
Purpose/Inmate Benefit Fund Group

| Title of Publication* |
| Frequency – (Circle One) |
| Yearly  Monthly  Weekly  Daily  Other |
| Number of Issues _____ |
| Expiration Date _____ |
| Publication Price _____ |
| *Book, Magazine or News Paper (Per IMPP 11-101) |

I request the use of Forced Savings as provided in IMPP 04-103, for:
(Documentation Required)

- [ ] Community Identification
- [ ] Civil Filing, Transcript or Subpoena Fees
- [ ] Reentry into the Community (Warden's Approval Required)

---

(To Be Completed by Mailroom)

$ _3.27_
Postage Amount

_[signature]_
Verified By

**Postage** – (To Be Completed by Inmate)

- [ ] Postage
- [x] Legal/Official Postage (Per K.A.R. 44-12-601)
- [ ] Certified (Only if Funds are Available)

To: _Kansas Secretary of Corrections_
_℅ Jeff Zmuda_
Name _Kansas Department of Corrections_
_714 S.W. Jackson, Suite 300_
Address
_Topeka, Kansas 66603_
City, State, Zip _Legal Service "copy" Motion to Add and_
_sons Exhibit A, B, C, D, E, For Court_
Reason _LYCO - 2022-CV-323_

_Bobby White_ _10-6-2023_
Inmate Signature    Date

_[signature]_ _10/10/23_
Unit Team Approval    Date

_____ _____
Handicraft Approval (If Applicable)   Date

_____ _____
Religious Approval (If Applicable)   Date

- [ ] Applies to Outgoing Funds Limit
- [ ] Does Not Apply to Outgoing Funds Limit
- [ ] Use of Forced Savings Approval as requested above

_____ _____
Exception Approval      Date

---

This withdrawal request is being returned for the following reason(s):

____ Insufficient Funds
____ Signature Missing
____ Exceeds Spending Limit
____ Incentive Level
____ Envelope/Order/Stamp Missing
____ Unauthorized Per IMPP/KAR _____

____ Payee Missing
____ Insufficient Address
____ Amount Missing
____ Name/Number – Do Not Match
____ Illegible Information
____ Other _____

_____    _____    _____
Account Processor      Date Withdrawn      Acct. Use

1504a

*Exhibit PL#18* 6pages,

# KANSAS DEPARTMENT OF CORRECTIONS

| **DOC** **LCF** **GENERAL ORDERS** | SECTION NUMBER **13,102** | PAGE NUMBER 1 OF 3 |
|---|---|---|
| *A Safer Kansas Through Effective Correctional Services* | SUBJECT: MEDICAL AND HEALTH CARE SERVICES:  Offender Access to Medical | |
| Approved By: Shannon Meyer Warden | Original Date Issued:          01/17/97 | |
| | Current Amendment Effective:    12/23/19 | |
| | Replaces Amendment Issued:     12/28/18 | |

## POLICY

Offenders shall be provided with unimpeded access to medical services through either regular sick call for non-emergency requests or the twenty-four hour per day availability of emergency sick call.

## DEFINITIONS

Detoxification:   The process by which an individual is gradually withdrawn from a drug or alcohol dependency.

Health Authority:   The contract physician, health administrator, or agency responsible for the provision of health care services.

Sick Call:   An organized forum through which offender health problems and care needs are determined.

Treatment Protocols:  Written treatment protocols for specific illness or injuries approved by the Health Authority to be used by mid-level staff in the care and treatment of offenders.

## PROCEDURES

### I.  Access to Medical Services

A.      The Health Authority or designee shall communicate verbally and in writing to each offender, upon arrival to the facility, the policies and procedures for access to health care and for processing complaints regarding health care.

B.      Offenders shall be informed of the assessment of specific fees to offenders for medical services rendered per KAR 44-5-115. A portion of these fees shall be paid to the Crime Victims Compensation Fund and the balance to the Department of General Fee Fund.   Offenders having questions regarding this regulation should consult with their unit team.

OAG000288

1 of 6

C.    All Restrictive housing offenders requesting medical/behavioral health treatment shall be visited daily and required to submit a Healthcare Request Form (Attachment A) to the Health Authority or designee.

D.    All general population offenders requesting medical, optical, dental and/or behavioral health treatment shall submit a Healthcare Request Form (Attachment A) to the Health Authority or designee.

E.    All orientation information regarding, access to and treatment provided by, the clinic shall be set forth in language clearly understood by each offender.

## II. Medical Care Services

A.    LCF Central and E Dorm shall provide medical care for all offenders in accordance with the Health Authority's policy.

B.    Any assessment or additional treatment needs beyond those covered by treatment protocols shall be referred to a Health Authority physician or designee on an appointment basis.

## III. Special Medical Needs

A.    Lansing Correctional Facility shall make available chronic and convalescent care to all offenders requiring such care.

## IV. Emergency Sick Call

A.    Emergency sick call shall be available twenty-four hours per day to all offenders.

    1.    Any employee who has reason to believe an offender is in need of emergency care shall immediately notify the medical staff.

    2.    The medical staff shall evaluate the complaint or situation and take the appropriate actions.

    3.    Emergency care by corrections staff shall follow guidelines set forth by the Health Authority (Attachment B).

    4.    Restrictive housing emergencies shall follow the same guidelines as general population.

## V. Offender Complaints

A.    Each medical or health care inquiry shall be carefully evaluated by the clinic staff.

B.    Offenders may address health care complaints through the Department of

2 of 6

OAG000289

Corrections grievance procedure outlined in KAR 44-15-101 et. seq.

Page 3 of 3, LCF 13,102
Effective: 12/23/19

**NOTE:** The General Orders set forth herein are intended to establish directives and guidelines for staff, offenders and those entities who are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, offenders, or an independent duty owed by the Department of Corrections to either employees, offenders, or third parties. This General Order is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None

## REFERENCES

KSA  75-5210c
KAR  44-15-101 et. seq., 44-5-115
IMPP 10-101, 10-112, 10-113, 10-122
ACI  4-4344
Contract Health Authority's Policies and Procedures

## ATTACHMENTS

Attachment A - Healthcare Request Form
Attachment B - Emergency Services



Attachment A, LCF 13, 102
Effective:  12/23/19

## C☰RIZON™
*Promote a culture of safety*

| FOR MEDICAL USE ONLY<br>Sólo para uso médico | Service Requested<br>Servicio Solicitado | | |
|---|---|---|---|
| Date Received: | ☐ Nurse<br>Enfermera | ☐ Doctor<br>Doctor | ☐ Dental<br>Dental |
| Time Received: | ☐ Mental Health<br>Salud Mental | ☐ Eye Doctor<br>Médico de los ojos | |

### HEALTH SERVICES REQUEST FORM
(Formulario de Solicitud de Servicios de Salud)

Print Name (Imprimir nombre): _____
Date of Request (Fecha de solicitud):_____
ID #: _____ Date of Birth (Fecha de nacimiento): _____
Housing Location (Ubicación de la Vivienda): _____
Nature of problem or request (Naturaleza del problema o solicitud): _____
_____
_____

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to heatlh care staff if it is not a follow-up visit or referral.
(Entiendo que mi solicitud respecto de recibir servicios de salud no necesariamente implica que estoy de acuerdo en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuerdo con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de urgencia, si no se trata de una visita de seguimiento o por una derivación.)

_____
PATIENT SIGNATURE (Paciente Firma)

**PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA (Pon este artículo en la caja médica u otra área designada.)**
**DO NOT WRITE BELOW THIS AREA  (No escriba debajo de esta área.)**

(Original – Medical Record    Yellow Copy- Inmate/Patient   Pink Copy-Business Office)

**(THE AREA BELOW IS NOT TO BE USED FOR EDUCATION, COUNSELING, OR DOCUMENTING A CLINICAL ENCOUNTER)**

Triaged by: _____

Date: _____    Time: _____ am   pm (circle one)

Called Down at: _____ (for urgent issue)

Other: _____

Response Recommendation (to be completed by Medical Staff Only)

| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
|---|---|---|---|---|---|---|
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Fee Charge | ☐ $2.00 | | | | | |

Comments:_____
_____

Staff Signature:_____    Date:_____

NA7141-KS-DOC
Issued 01/06/2013

©2013 Corizon Health, Inc.

OAG000291

Attachment B, Page 1 of 2, LCF 13, 102
Effective: 12/23/19

| General Health Services Policy & Procedure | | C⊘RIZON HEALTH' |
|---|---|---|
| Corizon Health Kansas Regional General Policies | | Reviewed: 7-01-2016 |
| Title:  Access to Care | | Revised: 7-01-2016 |
| NCCHC: Essential | ACA: Mandatory | No: P-A-01.00 |

**POLICY:**

Patients have access to care to meet their serious medical, dental, and behavioral health needs.  The facility's health authority will ensure all patients have unimpeded access to medical, dental and behavioral healthcare.  To ensure that patients confined in the Kansas Department of Corrections facilities be provided access to care in a timely manner, seen by a clinician and provided a professional clinical judgment and receive care that is ordered.

**DEFINITIONS:**

*Access to care* means that, in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered.

*Behavioral health* services are defined broadly to include the sum of all actions taken for the behavioral well-being of the incarcerated population, including a range of diagnostic, treatment, and follow-up services. Behavioral health services include the use of a variety of psychosocial, psychoeducational, and pharmacological therapies, either individual or group, including biological, psychological, and social, to alleviate symptoms, attain appropriate functioning, prevent relapse, and help patients to develop and pursue their personal recovery plans

**PROCEDURE:**

A. All patients will be informed both verbally and in writing about how to access healthcare upon admission to each facility.
   1. Special procedures ensure that patients who have difficulty communicating (e.g., foreign speaking, developmentally disabled, illiterate, mentally ill, deaf) understand how to access healthcare services.
B. All patients will have access to healthcare request forms. (Attachment A)
C. Healthcare request forms will be made available to all offenders by healthcare staff on a daily basis.  If at any time there is a barrier to healthcare for a patient the facility staff are to notify the facility health services administrator or designee to notify them of the barrier.  The health services administration and/or designee will then communicate the concerns with the appropriate party to find a resolution to the barrier.
   1. Unreasonable barriers will be avoided to include but not limited to:
      a) Punishing a patient for seeking care for their serious health needs.
      b) Assessing excessive co-payments that prevent or deter patients

**REFERENCES:**
NCCHC: Standards for Health Services in Prison, 2014, P-A-01
NCCHC: Standards for Mental Health Services in Correctional Facilities 2015, MH-A-01
ACA: Standards for Adult Correctional Institutions 2003, 4-4344
ACA: 2014 Standards Supplement-no revisions

Page 1 of 2

OAG000292

Attachment B, Page 2 of 2, LCF 13, 102
Effective: 12/23/19

| Corizon Health Kansas Regional General Policies | Reviewed: 7-01-2016 |
|---|---|
| | Revised: 7-01-2016 |
| Title: Access to Care | No: P-A-01.00 |

from seeking care and/or deterring patients from seeking care for their healthcare needs, such as holding sick call at 2am when this practice is not reasonably related to the needs of the institution.

D. All healthcare requests will be triaged according to their seriousness and scheduled accordingly.

    1. Patients with serious medical needs will be seen by a qualified healthcare staff immediately.

| APPROVED: | TITLE: | EFFECTIVE DATE: |
|---|---|---|
| *[signatures: Gerald ... Director of Operations; Paul Corbier, MD]* | Senior Director of Operations | Date of Issue: 7-1-2016 |
| | | Revision and Reviewed Dates: |
| | | 3-01-2006 |
| | | 5-30-2007 |
| | | 8-08-2007 |
| | | 5-21-2008 |
| | | 3-01-2009 |
| | | 3-01-2010 |
| | | 3-09-2011 |
| | | 1-05-2012 |
| | | 1-31-2013 |
| | | 5-09-2014 |
| | | 5-19-2015 |
| | | 7-1-2016 |

REFERENCES:
NCCHC: Standards for Health Services in Prison, 2014, P-A-01
NCCHC: Standards for Mental Health Services in Correctional Facilities 2015, MH-A-01
ACA: Standards for Adult Correctional Institutions 2003, 4-4344
ACA: 2014 Standards Supplement-no revisions

OAG000293

 *Exhibit PL #17* 6 pages.

 Kansas **INTERNAL MANAGEMENT POLICY & PROCEDURE**

**Department of Corrections**

**Applicability:** **X** ADULT Operations Only   _ JUVENILE Operations Only   _ DEPARTMENT-WIDE

---

**IMPP #: 20-104A**                                                       **PAGE #: 1 of 6**

**SEGREGATION/RESTRICTIVE HOUSING: Purpose of Administrative Restrictive Housing and Appropriate Placements**

**Original Date Issued: 10-11-21    Replaces IMPP Issued: 10-11-21    CURRENT EFFECTIVE DATE: 05-13-22**

**Approved By:** _____ **, Secretary    Next Scheduled Review:** 06/2024

---

### POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff. Administrative restrictive housing procedures-are to be established for the control of residents necessary for purposes other than punishment. Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise. Only residents who require restrictive housing are to be assigned there. Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control. When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

### DEFINITIONS

 Restrictive Housing: A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

Administrative Restrictive Housing: A form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents; or when a resident's continued presence threatens the secure and orderly operation of the facility.

Disciplinary Restrictive Housing: A form of restrictive housing to which a resident can be sentenced following conviction of a rule violation through disciplinary proceedings.

Short-Term Administrative Restrictive Housing: Restrictive housing placement less than 15 days. For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Disciplinary Restrictive Housing
- Pending Results of an Investigation (PI)
- To prevent further collaboration, intimidation, or disruption
- Pre-Hearing Detention (PHD)
- Communicable Disease
- Critical Monitoring
- Emergency Situations
- Hold Overs
- Refusing to participate in identification procedures

Long-Term Administrative Restrictive Housing: Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general

OAG000276

population setting.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1):  Classification categories include:

- Protective Custody (PC) refer to IMPP 20-108D [Protective Custody]
- Consistent Bad Behavior (CBB)
- Other Security Risk (OSR)
- Capital Punishment

Long-Term Restrictive Housing Committee: A committee comprised of the sending facility Warden, KDOC Risk Manager, KDOC Classification Manager, Enforcement, Apprehension, and Investigations (EAI) Director or designee, and the KDOC Deputy Secretary of Facility Management.

Severe and Persistent Mental Illness (SPMI): A mental health illness that is prolonged and recurrent, impairs activities of daily living and requires long-term treatment.

Single Event: A situation or instance involving a single or series of related actions or behaviors defining a single incident.

## PROCEDURES

I.    **General Procedures**

A.    Residents may be confined in administrative restrictive housing for any of the reasons or conditions articulated within this policy.

1.    Any resident may be held in administrative restrictive housing under any subsection or combination of subsections of this policy simultaneously.

a.    If the resident is held under more than one (1) subsection, that fact is to be stated in the administrative restrictive housing report in accordance with IMPP 20-105A.

B.    Residents with disabilities must be placed in cells that accommodate their disability.

1.    Residents must not be placed in restrictive housing solely due to their disability or due to the lack of available accessible cells.

C.    Juveniles, pregnant women or women who recently gave birth, and residents with a severe and persistent mental illness (SPMI) must be considered for alternative placement in the infirmary, a mental health unit or in a unit on a suicide watch or crisis level placement.

1.    Residents considered to be severely and persistently mentally ill for the purpose of this policy are to be assessed for placement in restrictive housing pursuant to short-term restrictive housing categories only.

II.   **Guidelines for Use of Short-Term Administrative Restrictive Housing**

A.    The time a resident may be placed in any combination of short-term restrictive housing classifications must not exceed 15 days based on a single event.  The Warden/Deputy Secretary of Facility Management must approve any placement considered to be Short Term Restrictive Housing resulting in more than 15 days within a 30-day period.

B.    The conditions of confinement for residents in short-term restrictive housing are to be followed according to IMPP 20-101A.

C.    Restraints are to be utilized during movement that occurs outside a resident's cell and/or unit, unless the use of restraints worsens a resident's condition, or the use of restraints is unwarranted.

1.    Exceptions to the use of restraints is to be granted by the Warden, or Chief of Security in the Warden's absence.

2.    Facility Wardens may establish procedures in General Orders for limited movement without

restraints for residents housed in double-bunked cell assignments, to activities such as showers and recreation.

III.    **Classification Categories and Independent Criteria for Placement in Short-Term Administrative Restrictive Housing**

A.    Pending results of investigation:

1.    Residents may be placed in administrative restrictive housing pending the completion of an investigation to determine whether charges are to be brought.

2.    Any resident held under pending results of an investigation is to be charged or released within three (3) working days, unless a continued holding in administrative restrictive housing under this section is justified in writing and approved by the Warden.

a.    This notice and explanation is to be provided to the resident in writing.

B.    To prevent the following:

1.    Further disruption, if a threat to security and control, including danger to others, continues to exist in the judgment of the Warden.

2.    The possible intimidation of witnesses or accusers; or

3.    Communication and collaboration between residents involving an attempt to improperly or dishonestly coordinate the testimony which might be given.

C.    Pre-hearing detention:

1.    If necessary to maintain security and control, any resident who has been charged with an alleged violation of law, or a class I or II rule violation, may be held in administrative restrictive housing pending a hearing before the facility disciplinary board, or pending a trial by a court.

a.    Time served in restrictive housing under pre-hearing detention is to be credited towards a sanction of disciplinary restrictive housing resulting from a disciplinary conviction.

b.    The resident's status is to be reviewed by the Warden or designee within three (3) working days.

D.    Communicable disease:

1.    Any resident whom a Doctor of Medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any resident who refuses to participate in testing for communicable disease, may be placed in administrative restrictive housing status until any danger of a contagion is past.

E.    Critical monitoring resident:

1.    As applicable administrative restrictive housing may be applied to the following types of residents. In the event such placement is made without a hearing, pursuant to Section I.B. of IMPP 20-105A, the Warden or his/her designee is to review the placement. Residents are to be assessed for application of the Offender Companion Program pursuant to IMPP 10-144A for constant observation.

a.    Any resident accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative restrictive housing.

b.    Any resident with suicidal tendencies may be placed in administrative restrictive

housing under appropriate observation providing the condition is verified by a qualified behavioral mental health professional and a clinical observation is not available.

c.   Any resident exhibiting self-injurious behavior under appropriate observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

d.   Residents with behavioral, mental health, or emotional problems which cause them to be a threat to themselves or others, when that behavioral, mental health or emotional problem has been verified by a psychiatrist or psychologist, may be placed in administrative restrictive housing under appropriate observation when clinical observation is not available.

e.   Residents suspected to be under the influence of an illicit substance may be placed in restrictive housing under appropriate observation when clinical or unit observation is not available and or not appropriate.

F.   Emergency situations:

1.   Any resident, or group of residents, may be placed in administrative restrictive housing or secure confinement in the resident(s) own cell(s) if the resident, or residents, engaged in behavior that threatened the maintenance, security, or control of the facility creating an emergency situation that presents a danger to the resident or others.

a.   A copy of this explanation and justification shall be provided to the Deputy Secretary of Corrections of Facilities Management.

b.   Placement may continue for up to three (3) working days.

2.   Any resident who has been determined by the Warden or, in the Warden's absence, by the Deputy Warden, to be an extreme risk of escape may be placed in administrative restrictive housing.

a.   The reason is to be explained in writing and reference made to the documents or other basis for the placement unless already apparent from the information shown in the resident's record.

b.   When these staff are absent during an emergency, restrictive housing may be authorized by the highest-ranking officer on duty.

(1)   The Warden or the Deputy Warden is to review the placement within 24-hours and must either approve continued placement in administrative restrictive housing or direct other appropriate housing.

G.   Holdovers:

1.   The Warden or designee may place residents in administrative restrictive housing who are identified as holdovers.

a.   Holdover residents are those residents who fall into one (1) of the following categories:

(1)   Any newly committed resident awaiting transportation to Topeka or El Dorado Correctional Facility reception and diagnostic unit.

(2)   Any resident who is otherwise being held in a facility temporarily while in transit between one facility and another; or,

(3)   Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility

pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

    b.    A resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility.

H.    Refusal to participate:

    1.    A resident may be placed in administrative restrictive housing when the resident refuses to participate in an identification procedure, including fingerprinting and photographing.

I.    Disciplinary Restrictive Housing

    1.    Placement of any resident in disciplinary restrictive housing requires full compliance with all applicable provisions and requirements of the disciplinary procedures set forth within K.A.R. 44-13-101 *et seq.*

## IV.    Guidelines for Use of Long-Term Restrictive Housing

A.    In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete and submit a long-term restrictive housing referral to the Warden for review and approval.

B.    Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.

    1.    Residents on long-term restrictive housing status are to have the same housing standards, conditions of confinement for short-term restrictive housing, and opportunities for three (3) hours or more a day out of cell time.

    2.    Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

## V.    Classification Categories and Independent Criteria for Placement in Long-Term Administrative Restrictive Housing

A.    Consistent bad behavior:

    1.    Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

        a.    The instances are a substantial threat to the safety and security of the institution or facility; and

        b.    The instances arise from separate fact situations.

    2.    Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B.    Other security risk:

    1.    The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility.

        a.    The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

    5 of 6

(1)    An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

(2)    A copy of this explanation and justification shall be provided to the Secretary of Corrections.

C.    Protective Custody:

1.    Pursuant to IMPP 20-108 [Protective custody] any resident who requests restrictive housing for personal safety, or who the Warden has reason to believe to be in serious and imminent danger, may be placed in administrative restrictive housing if:

a.    Documentation that protective custody is warranted is provided in writing by the Warden and reasonable alternatives are not available.

b.    A denial of protective custody is to be fully documented in the EAI file.

## VI.    Timeframes Related to Administrative Restrictive Housing

A.    For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the Governor.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

None.

## REFERENCES

IMPP 10-110D, 10-144A, 12-120A, 20-105A, 20-108D

## HISTORY

10-11-21 Original
05-13-22 Revision 1

## ATTACHMENTS

None.

6 of 6

OAG000281

Exhibit PL # 16   4 pages

10-122D is now currently 16-107D
10-114D is now currently 16-108D

# KANSAS DEPARTMENT OF CORRECTIONS

| Kansas Department of Corrections | **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | SECTION NUMBER 10-114D | PAGE NUMBER 1 of 4 |
|---|---|---|---|
| | | SUBJECT: PROGRAMS AND SERVICES: Availability of Emergency Medical, Dental and Behavioral Health Services | |
| **Approved By:** *Ray Robert* Secretary of Corrections | | Original Date Issued:    10-06-15 | |
| | | Replaces Version Issued:    N/A | |
| | | **CURRENT VERSION EFFECTIVE:    10-06-15** | |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

Each facility shall develop and maintain a written plan that provides 24-hour emergency medical, dental, and behavioral health services for offenders and staff. The plan shall provide for on-site emergency first aid and crisis intervention, emergency evacuations from the facility, use of emergency medical vehicle, use of designated hospital room(s) or appropriate health facilities, emergency on-call physician, dentist and behavioral health professional services when the emergency health facility is not located nearby, and security procedures providing for the immediate transfer of offenders when appropriate. (ACI 4-4388, 4-4389, 4-JCF-4C-12; NCCHC P-E-08; Y-E-08)

Corrections officers and other designated staff shall be trained to respond to health-related situations within a four-minute response time. (ACI 4-4389)

## DEFINITIONS

Departmental Clinical Health Authority: The physician Regional Medical Director of the agency or organization responsible for the provision of health care services for the KDOC. This position has full clinical autonomy and responsibility for clinical health care issues within the KDOC.

Director of Health Care Services: Acts as the administrative health authority for the Department. This position manages health care systems, directs the health care services model, and has final approval on all policies and procedures in the health care system.

Facility Administrative Health Authority: The Health Services Administrator responsible for the provision of health care services at a facility. The Health Services Administrator works under the direction of the Regional Medical Director and the Regional Vice President or designee administratively.

Facility Clinical Health Authority: The physician Site Medical Director responsible to the Regional Medical Director for all clinical matters and to the Health Services Administrator for all administrative matters.

Health Care Staff: Persons who are registered or licensed with a health care regulating agency to include, but not limited to physicians, nurses, psychiatrists, psychologists, and social workers.

Non-Health trained staff: Persons who are not registered or licensed with a health care regulating agency but who have received training in emergency response procedures, such as CPR, etc.

1 of 4

OAG000259

Regional Psychiatric Director:  Responsible for the clinical supervision of all facility psychiatrists.  The Regional Psychiatrist is supervised clinically by the Regional Medical Director and administratively by the Regional Vice President and or his designee.

## PROCEDURES

I.  **Availability of Emergency Services**

    A.    The facility health authority shall ensure 24-hour availability of consultation, advice and emergency medical, dental and behavioral health services on site at each facility, or through community health care providers. (ACI 4-4389; P-E-08)

        1.    The Departmental Health Authority shall secure a written agreement with a licensed general hospital, clinic or physician to provide both routine medical and emergency services to offenders within all KDOC facilities on a 24-hour-a-day basis. (ACI-4-4389)

    B.    Facilities without emergency medical, dental, and behavioral health resources in a nearby community may arrange for and utilize an on-call physician, dentist, and psychiatrist. (ACI 4-4389)

    C.    All medical, dental, and behavioral health emergencies shall be triaged immediately and any necessary treatment provided.

    D    The facility health authority shall provide a listing by name, address and telephone number, of the medical, dental, and behavioral health hospital and emergency transport resources designated for use by the facility.  This listing shall be posted in the clinic and in the control center's Emergency Response bag at each facility. (ACI 4-4389)

        1.    The listing shall clearly indicate what services are available and shall note the hours and days of availability for each service.

        2.    This list shall be updated as needed and at a minimum of every six (6) months by the facility health authority.

II.  **Training of Facility Personnel in First Aid/Emergency Care**

    A.    Per IMPP 03-104D, the facility health authority, in cooperation with the warden/superintendent and training officer/coordinator, shall establish a program for training all health care staff corrections officers, unit team and other personnel as specified by the warden/superintendent to respond to health related emergencies within a four (4) minute response time. (ACI 3-4351)

        1.    The training program for all personnel designated for the emergency response shall include at least the following:

            a    Recognition of signs and symptoms in potential emergency situations and knowledge of action required for each;

            b.    Administration of first aid and CPR; (ACI 4-4390)

            c.    Signs and symptoms of mental illness, retardation and chemical dependency;

            d    Methods of obtaining assistance;

            e.    Availability and use of emergency medical services (EMS) transport units;

            f.    Security procedures for transfer of offenders to appropriate medical facilities or other health care providers; and, (ACI 4-4389)

            g.    Proper procedures for the location, application, operation, and maintenance of Automated External Defibrillators (AEDs).



OAG000260

B. Training for health care staff shall include the provision for on-site emergency first aid and crisis intervention. (ACI-4-4389)

III. **Plans for Provision of Emergency Health Care** (ACI-4-4389; NCCHC P-E-08)

 A. Each facility shall establish a written plan for the provision of emergency health care. All facility staff shall be trained in the implementation of this written emergency plan in accordance with IMPP 19-101 and relevant Chapter 19 IMPPs. Such plans shall specify:

  1. Types of portable medical emergency equipment and medication available in the facility. (NCCHC P-E-08)

  2. Specific numbers and location(s) of each item;

  3. Staff designated to use the emergency equipment and medications;

  4. Method and route of transporting and evacuating ill or injured persons to either the infirmary or local acute care facility;

  5. Use of emergency on-call physicians and dentists when the emergency health care facility is not located nearby; and,

  6. Arrangements and security procedures for transport by a licensed emergency medical services vehicle on a 24-hour basis. (NCCHC P-A-07)

 B. Each facility shall establish a procedure, which specifies the number and location of first aid kits, their contents, a system for inventory, a schedule for periodic inspections, and replenishment procedures. All first aid equipment and supplies shall be approved by the facility health authority and available at designated areas of the facility based on need. (ACI 4-4390)

 C. The emergency plans for each facility shall have a health component that has been approved by the facility health authority and the warden/superintendent, in accordance with IMPP 19-101 and relevant Chapter 19 IMPPs.

 D. The plan shall be evaluated and drills performed at least annually as outlined in (NCCHC P-A-07)

IV. **Plans for the Provision of Emergency Behavioral Health Services**

 A. The facility health authority shall maintain a written plan for the provision of emergency behavioral health services.

 B. Offenders who present acute symptoms of mental illness, significant emotional distress, and/or other symptoms indicative of risk for self-harm or harm to others shall be referred to the behavioral health professional for assessment.

 C. Members of the facility health authority's crisis intervention team shall conduct a preliminary evaluation of the offender and follow the provisions of the plan in making referrals to on-site or on-call mental health professionals, as appropriate. (NCCHC-P-G-05)

 D. Depending on the assessment by the behavioral health professional(s), the offender may be placed in the clinic or restrictive housing to facilitate monitoring of the offender's behavior by facility health care staff.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards.

Page 4 of 4, IMPP 10-114D
Effective 10-06-15

Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

None.

## REFERENCES

IMPP 03-104D, 19-101
ACI 4-4388, 4-4389, 4-4390, 4-351
JCF 4-JCF-4C-12
NCCHC P-G-05, P-A-07, P-E-08, Y-E-08

## ATTACHMENTS

None.

OAG000262

State of Kansas – Department of Corrections
(Rev. 09-17)

# Position Description

*Exhibit PL#15* 7 pages.

*1 of 7*

Read each heading carefully before proceeding. Make statements simple, brief and complete. Be certain the form is signed. Send the original to the Human Resources Office.

**CHECK AS APPROPRIATE:** ☐ Unclassified  ■ Classified  ☐ Regular  ☐ Temporary

**PART I – To be completed by department head or human resources office.**

| | |
|---|---|
| **1. Agency Name** <br> Lansing Correctional Facility (LCF) | **8. Position Number** <br> K0147550 |
| **2. Division** <br> Operations | **9. Current Title (if existing position)** <br> Corrections Supervisor I |
| **3. Unit/Office** <br> Security | **10. Proposed Title** |
| **4. Name of Incumbent** <br> Bruce Chapman | **11. Working Title** |
| **5. Work Station Location (Subject to Change)** <br> City: Lansing    County: Leavenworth | **12. Allocation** |

**6. Check appropriate time:**  ■ Full Time  ☐ Part Time _____%

**7. Regular Hours of Work**
FROM: 6:00 ■ AM ☐ PM  TO: 2:00 ☐ AM ■ PM
☐ Su ☐ M ☐ Tu ☐ W ☐ Th ☐ F ☐ Sa
OTHER: _____

*For use by Human Resources Department*

| **13. Effective Date** | **14. FLSA Status** <br> Select: |
|---|---|
| **15. By:** | Approved: |

**16. KPERS Designation**
☒ Corrections A  ☐ Corrections B  ☐ Regular

**PART II – To be completed by department head or human resources office or supervisor of the position.**

**17. Describe the mission, goal, and/or purpose of this position. Why does it exist?**

The primary mission of this position is to protect and serve the public members of Kansas, the secondary mission is to foster change in the inmate population thru appropriate behavior modeling, problem solving, communication skills and work ethics. This position serves a critical role in the overall operations of the facility by providing immediate supervision to all levels of the inmate population during a routine shift, and resolving problems or respond to emergencies within the compound in a judicious, expedient manner with the goal of creating a save living and working environment. Ultimately the goal is to modify the incarcerated inmates behavior to acceptable levels so that they may eventually, if judged appropriately by the laws of Kansas, re-enter society and become productive members that no longer prey on others. This position also serves as a first level supervisory position for the facility and as such is tasked with evaluating subordinate staff performance, correcting inappropriate behavior and training staff on performance standards, as well as act as a role model for all staff. This position is tasked with the development of the KDOC's future leaders

**18. Who is the supervisor of this positon (person who assigns work, gives directions, answers questions and is directly in charge)?**

| Name | Title | Position Number |
|---|---|---|
| Subject to Rostering | | |

**19a. Check the statement that best describes the leadership, supervisory or management responsibilities of this position.**

☐ **None.**

☐ **Lead Worker.** Plans and coordinates the work of co-workers, guiding and training them while performing the same kind and level of work a majority of the time.

■ **Supervisor.** Assigns, directs, reviews and evaluates the job performance; has significant input into decisions related to hires, transfers, promotions, demotions, dismissals, and discipline of employees under his or her supervision. The majority of the work is different from that of subordinates.

☐ **Manager.** Integrates and coordinates the activities of several organizational functions or programs and initiates changes through subordinate supervisors or integrates and coordinates the activities of one or more programs having department-wide impact.

**b. List the names, class titles and position numbers of all persons who are supervised directly by employee in this position:**

| Name | Title | Position Number |
|---|---|---|

RECEIVED
NOV 4 2019
LCF PERSONNEL

RECEIVED
OCT 29 2019
LCF PERSONNEL

OAG000003 Page 1 of 4

KDOC (Rev 04-17) – Position Description                                                                    $2 \circ f 7$

**20. Describe the work of this position using this page or one additional page only. Also note, Essential Function Form is attached.**

Use the following format for describing job duties. What is the action being done (use an action verb); to whom or what is the action directed (object of action); why is the action being done (be brief); how is the action being done (be brief). Number each task and indicate percent of time an incumbent spends or would spend performing each task:

| No. | % | Job Duties |
|---|---|---|
| | 15% | Performs correctional work in maintaining order and supervision of inmates of the Lansing Correctional Facility. Duties and responsibilities involve being assigned as officer in charge of a cell house, dormitory, or a living unit annex; supervision subordinate Correctional Officer(s) and/or inmates; or being assigned to work on any shift or post which may change in accordance with needs of the institution.  Cooperates with other Corrections Officers of all ranks in exchanging information and accomplishing the long and short-range objectives of the Lansing Correctional Facility. |
| | 15% | Ensures that ordered, disciplined, secure, sanitary and safe conditions are established and maintained in cell house, doing their living quarters, at meals, in classrooms, at work sites, activity and program areas, in the hospital, kitchen and bathing areas; while they are segregated for punitive, protective and administrative purposes; while they are on work details (inside and outside) by supervising Corrections Officer I's and/or COII's providing on-the-job training in all facets of their duties and responsibilities including but not limited to: inmate rules and disciplinary procedures, emergency plans and procedures, report writing, shakedowns, inmate counts, post orders, self defense, safety and sanitation, security checks and other duties and responsibilities. |
| | 15% | Engages in or supervises taking and reporting periodic counts of inmates to ensure that all are present and accounted for, searches of inmates at their work, recreation, in the infirmary, while in food service and in their housing units to prevent the secreting of contraband and fabrication of lethal weapons, by physical pat down in either standing or prone position. Applies mechanical restraints when necessary. Controls items of a security nature such as firearms, tools, locks, keys, medical equipment and drugs. Maintains an accurate daily Count Board and Check-In Book to ensure the accountability of all inmates assigned to a cell house, dormitory or living unit that reflects duty assignments, scheduled appointments and the location of each inmate during the day. |
| | 15% | Supervises the daily activity schedules (wake-up call, work call, meal lines, sick call recreation yard scheduling and visiting programs among others).  Ensures that each inmate is aware of his assignment and/or scheduled appointments and that proper shakedown procedures have been conducted prior to the inmate entering or leaving.  Regularly inspects inmates to ensure that each inmate has a current and updated identification card that inmates are in an appropriate uniform when leaving the unit.  Shakes down areas of the facility as directed in order to prevent and control the secreting of contraband in living units, stairways, work areas, recreation areas, etc.  Involves the physical search of premises from floor to ceiling and involves climbing on furniture and ladders to reach high places.  Observes physical facility for deviations from normal, which might indicate drugs or weapons being manufactured, imported or hidden within the facility. |
| | 10% | Attempts to modify for improvement antisocial attitudes in inmates; represents free society by providing a good citizen role model by demonstrating skillful communications, by maintaining a neat and well-groomed appearance and by always presenting a high level of deportment.  May provide basic on-the-job training of inmates while on a variety of work detail assignments including outside grounds and road maintenance, building custodial duties, semi-skilled building maintenance tasks and institution farm chores.  Follows established security procedure in controlling visitors, staff, inmate and vehicular traffic to prevent the admittance or exit of unauthorized persons and the introduction of contraband.  This includes searches and pat downs and may include full shakedown of vehicles. |
| | 10% | Shakes down (or supervises the shakedown of) inmates and conducts (or supervises) searches for contraband materials in cell house, dormitories, living units, shower rooms and any other place where it might be secreted.  Involves the physical search of premises from floor to ceiling and involves climbing on furniture and ladders to reach high places.  Observes physical facility for deviations from normal, which might indicate drugs or weapons being manufactured, imported or hidden within the facility.  Observes inmate activity and interactions in the area of responsibility.  Enforces policies, rules and regulations.  Monitors deviations in inmate behavior.  Reports incidents or behaviors that deviate from the inmate's general profile or that could cause an immediate problem. |
| | 5% | Conducts briefing for all new inmates assigned to a cell house, dormitory or living unit annex providing the inmate with information on the policies and procedures to be followed while assigned to that unit and insuring that the inmate is giving his quarters assignment.  Responds to emergency situations in accord with the appropriate contingency plan.  Proceeds to area where emergency is taking place.  Operates gates and doors mechanically when electric power is shut down.  Physically restrains or subdues inmates when necessary.  Operates firefighting equipment, utilizes firearms, SCBA, riot control devices, etc.  as may be required; administer First aid and/or CPR if necessary. |
| | 10% | Submits reports within a timeframe determined to be appropriate on all irregularities and incidents that could potentially be threatening to the safety of employees, inmates and/or state property.  Performs related duties as assigned and necessary to the operations and sanitation of LCF and the Department of Corrections. |
| | 5% | Conducts inspections of personnel on assigned shift to examine alertness, outward behavior and appearance of staff, noting deficiencies and corrective action needed and/or taken, and provides necessary reports for disciplinary action when deemed appropriate. Advises, counsels and otherwise assists security personnel with occupational and/or personal problems, referring the individual when necessary to the appropriate department for further assistance.  Attempts to resolve grievances and/or provides information to the employee on the procedures to follow for filing a formal grievance. |

'KDOC (Rev 09-17) – Position Description                                                                                                    3 of 7

**21a. How much latitude is allowed the employee in completing the work? b.) What kinds of instructions, methods and guidelines are given to the employee in this position to help do the work? c.) State how and in what detail assignments are made:**

Before entering on duty Corrections Officers receive 200 hours of basic training and then 40 hours of in-service training annually. This training is designed to assist incumbent in performing duties and responsibilities. Written and oral instructions are received from the supervisor and officials. Further guidance is available through regular on-the-job instructions in such areas as federal and state laws, regulations, Departmental procedures, institutional general orders, warden's memoranda, correctional journals, publications and staff meetings. Detailed and specific instructions are provided in the post orders.

**22. What hazards, risks or discomforts exist on the job or in the work environment? Frequency of exposure?**

Work requires moderate physical exertion in making supervisory rounds. Heavy exertion is required in emergencies to respond to alarms, handle emergency equipment and subdue violent inmates. Because this position is in a maximum-security prison, the incumbent works under the condition of a threat of assault, murder, escape, riots and/or other disturbances which could result in the injury or death of the incumbent, other employees or visitors. May be required to work any hours or travel without notice. Incumbent may be subjected to extremes of heat and cold and poor ventilation. Incumbent may be called back or kept over without notice. Inmates in this facility range from minimum to maximum custody and incumbent is in the position of controlling their actions or behavior, which can lead to physical confrontation. Because of the physical structure of the facility and the necessity for staffing flexibility, incumbent may be required to work at above-ground levels, negotiate stairs, catwalks and swinging doors, which require mobility.

KDOC (Rev 09-17) – Position Description                                                                    4 of 7

23. List the minimum amounts of education and experience which you believe to be necessary for an employee to begin employment in this position:

   **Required Minimum Qualifications:**

   Graduation from high school or equivalent. Must possess valid, current drivers license. Must be 21 years of age, free of misdemeanor convictions involving domestic battery as an adult, unless the conviction was for a battery committed prior to July 1, 1997 and has been expunged. Must be free of felony convictions. Must pass KDOC written Corrections Officer test and must take and pass a drug screening test approved by the Division of Personnel Services. Must be able to perform the physical functions deemed essential for this classification.

   See Classification Specifications for additional information.

   **Preferred Skills and/or Qualifications:**

   Certification as a Corrections Officer by the Secretary of Corrections. This certification is only issued upon completion of the Corrections Officer basic training and must be renewed annually as prescribed by the Secretary. Ability to deal effectively with individuals. Knowledge of procedures and practices of supervising inmates confined to an adult maximum correctional institutions. Ability to use physical force as warranted to subdue violent inmates. Limited independent work experience in general corrections. Prefer: Two years' combination of experience in corrections or detention work.

   See Classification Specifications

   **Necessary Special Qualifications, Licenses, Certifications, and/or Registrations:**

   Incumbent must possess good overall physical & mental condition consistent with the unassisted ability to perform, with or without reasonable accommodation, all statutorily defined activities, duties & tasks of a Corrections Officer/Specialist. These activities, duties and tasks are presumed to include the responsibilities as set out in Sections 21, 23, 24, 25, 26 and 27 above.
   A Corrections Officer/Specialist must be able to: Perform the Essential Physical Functions in his/her present condition. See Attachment A. Stand for long periods in all weather conditions; respond quickly to emergencies; use physical force to subdue or restrain violent or combative inmates; maintain qualification and use firearms/First Aid/CPR/chemical agents/batons; rotate to a variety of shifts and post assignments; manually operate gates and control panels; lift/carry/assist with evacuation of unconscious or unwilling inmates; crouch/climb/kneel/crawl as necessary for conducting searches, run/run up and down stairs/run distance(s) and deal effectively with inmates immediately upon arrival; have correctable and peripheral vision adequate to observe activities of inmates and read instructions.

| _____ | 10-22-19 | _____ | 10-29-19 |
|---|---|---|---|
| Signature of Employee | Date | Signature of Human Resources Official | Date |
| _____ | 11/15/19 | _____ | 11-1-19 |
| Signature of Supervisor | Date | Signature of Agency Head or Appointing Authority | Date |

5 of 7

# ESSENTIAL/EVENT DRIVEN FUNCTIONS
## Corrections Officers/Juvenile Corrections Officers/Specialists

This form is a dual use form. It is not intended to screen out applicants. This form may be used after a conditional offer has been made or during employment.

**Essential** - Duties are fundamental to the position based on the function and the results to be achieved, rather than the manner in which they are being performed. Duties are directly related to the reason the position exists and cannot be reassigned without changing the nature of the position. Considered by Occupational Exposure Control (OEC) as a Category I duty due to the **frequency** of performance.

**Event Driven** - Duties may be performed in an emergency, or on an infrequent or occasional basis; but when performed, these duties are necessary to the position and critical to the safety and security of staff, offenders, and/or the public. Considered by OEC as a Category II duty due to the **infrequency** of performance.

| | FUNCTION | Essential OEC I | Event Driven OEC II | Medical Practitioner Use Only, note functions unable to perform |
|---|---|---|---|---|
| | Regular, punctual and predictable attendance. | X | | |
| | Mandatory overtime or compensatory time as required. | X | | |
| PHYSICAL ENVIRONMENT | Work is performed indoors in a controlled environment with few temperature extremes. | | X | |
| | Work is performed indoors in a controlled environment with occasional temperature extremes. | X | | |
| | Work is performed outdoors requiring exposure to extreme heat and/or cold. | X | | |
| | Work is performed in a high-noise environment requiring the worker to shout to be heard. | X | | |
| | Work involves performing repetitive motions with one or more extremity. | X | | |
| | Work involves exposure to conditions that may affect the respiratory system or the skin, such as chemicals, paint, cleaning agents, other fumes or odors. | | X | |
| | Work involves exposure to vibrating movements of the extremities or whole body. | | X | |
| | Exposure to bodily fluids. Exposure may include obtaining urine specimens; touching blood, body fluids with visible blood, tissue, semen, vaginal secretions, breast milk, cerebrospinal fluid, synovial fluid, pleural fluid, peritoneal fluid and/or amniotic fluid; cleaning and disinfecting environmental surfaces with blood, body fluids and/or tissue/ and touching non-intact skin and mucous membranes. | X | | |
| | Exposure to chemicals, including cleaning products, maintenance materials (such as paint). | | X | |
| PHYSICAL ACTIVITY | Walking or otherwise moving about on foot at a normal pace for just a few minutes at a time. | X | | |
| | Walking or otherwise moving about for extended periods of time, up to 6 hours per day. | X | | |
| | Running: Moving quickly on the feet in continued and sustained motion over short distances. | X | | |
| | Bending at the Waist: Bending body downward and forward by bending the spine at the waist. | X | | |
| | Kneeling: Bending the legs at the knee to come to rest on the knee or knees. | X | | |
| | Crouching: Bending the body downward and forward by bending the legs and spine. | X | | |
| | Crawling: Moving about on the hands and knees or hands and feet. | | X | |
| | Climbing: Ascending or descending ladders, stairs, ramps, and the like, using the feet and legs and/or hands and arms. | X | | |
| | Balancing: Maintaining body equilibrium to prevent falling when walking, standing, crouching on narrow, slippery, or erratically moving surfaces. Exceeds that needed for ordinary maintenance of body equilibrium. | | X | |
| | Lifting: Raising or lowering an object from one level to another. | X | | |
| | Carrying: Transporting an object, using the hands, arms, and/or shoulders. | X | | |
| | Pushing: Using upper extremities to press against with steady force in order to thrust forward, downward, or outward. | X | | |
| | Pulling: Using upper extremities to exert force in order to draw, haul, drag, or tug objects in a sustained motion. | X | | |
| | Reaching: Extending the hands and arms in any direction. | X | | |
| | Handling: Seizing, holding, grasping, turning, or otherwise working with the hands and wrists. | X | | |
| | Finger Dexterity: Picking, pinching, or otherwise working primarily with finger(s). | | | |
| | Sitting for long periods of time. | X | | |
| | Standing for long periods of time. | X | | |
| | Talking: Expressing or exchanging ideas by means of the spoken word. | X | | |
| | Conveying Information: Communicating work-related information to others. | X | | |
| | Conveying Information: Testifying in court or other official proceedings. | | X | |
| | Hearing: Perceiving the nature of sounds by the ear with or without correction. | X | | |
| | Seeing: Seeing with close, distance, and peripheral vision, depth perception, and the ability to adjust focus. Obtain impressions through the eyes of the shape, size, distance, motion, color, or other characteristics of objects. | X | | |
| | Clarity of vision at 20 feet or more; | X | | |
| | Clarity of vision at 20 inches or less | | X | |
| | Ability to identify and distinguish colors | | X | |

06/12/15

OAG000007  5

| | FUNCTION | Essential OEC I | Event Driven OEC II | Medical Practitioner Use Only: Note functions unable to perform |
|---|---|---|---|---|
| **PHYSICAL STRENGTH** | Sedentary Work: Lifting/carrying/moving up to 10 pounds occasionally | X | | |
| | Light Work: Lifting/carrying/moving 11 to 20 pounds occasionally and/or up to 10 pounds frequently. | X | | |
| | Medium Work: Lifting/carrying/moving 21-50 pounds occasionally and/or 11-20 pounds frequently. | X | | |
| | Heavy Work: Lifting/carrying/moving 51-100 pounds occasionally and/or 21-50 pounds frequently (40 lb. average for JCO). | | X | |
| | Very Heavy Work: Lifting/carrying/moving 100 pounds occasionally and/or in excess of 50 pounds frequently. | | X | |
| **OTHER ACTIVITIES** | Comprehending verbal instructions. | X | | |
| | Reading and comprehending written instructions. | X | | |
| | Composing simple sentences. | X | | |
| | Observing and recalling details of incidents. | X | | |
| | Recalling a series of numbers and/or names. | X | | |
| | Performing CPR and other emergency first aid procedures. | X | | |
| | Remaining calm under stress or in emergency situations. | X | | |
| | Operating a motor vehicle. | | X | |
| | Operating heavy equipment. | | X | |
| | Using safety or emergency equipment. | | X | |
| | Qualify on firearms annually. (Applies only to ECF,EDCF, HCF, LCF, LCMHF,NCF,TCF,WCF) | X | | |
| | Qualify in Self-Defense training annually. | X | | |

*This form accurately describes the essential functions that apply to my position.*

Signature of Employee _____    Date 10-22.19    Signature of Supervisor _____    Date _____

### Completed by Health Care Provider

It is my opinion that _____
Name of Employee/Patient/Client

(  ) is currently able to perform all of the essential/critical functions of his/her position; or

(  ) is **not** currently able to perform all of the essential/critical functions of his/her position as noted (degree of restriction, if applicable):

(  ) will be able to perform all of the essential/critical functions of his/her position with the following accommodations: *(Add additional pages if more space is needed.)*

Signature of Health Care Provider _____    Date _____

Printed Health Care Provider Information _____

Health Specialty _____

06/12/15

OAG000008    6

7 of 7
H, R.

## KANSAS DEPARTMENT OF CORRECTIONS

### POSITION REVIEW FORM

POSITION TITLE: CSI B. Chapman

POSITION NUMBER: K0 147550

SPECIFIC WORK UNIT: Open 6-2

AGENCY: Lansing Correctional Facility (LCF)

POSITION SUPERVISOR & TITLE: CSII D. East

DATE OF LAST UPDATE: 2019

RECEIVED
OCT 23 2019
LCF PERSONNEL

A review of the position has been completed, and:

☑ The position description is accurate and up-to-date.

☐ The position description is in need of revision. A revised description will be forwarded to the Human Resources Office within thirty (30) calendar days of the date this form is signed.

☐ The duties and responsibilities or qualifications of this position have changed significantly since the last review. A revised position description is attached and it is requested that the duties or qualifications be reviewed for reallocation to a more appropriate classification.

☐ The essential functions associated with the position are appropriate.

☐ The essential functions currently associated with the position are not appropriate for the duties. Recommended changes are attached for review by the Human Resources Office.

SIGNATURE OF SUPERVISOR CSII Van Frost    DATE: 10-22-19

SIGNATURE OF INCUMBENT _____    DATE: 10-22-19

THIS FORM IS TO BE COMPLETED at the time of the employee's performance review and is to be returned to the Human Resources Office along with the appropriate performance review forms. Questions regarding the use and/or completion of this form are to be directed to the agency's Human Resources Office.

Form #02-105-001 (Rev 3-02)

OAG000009

*1 of 6*

State of Kansas -- Department of Corrections
(Rev. 09-17)

# Position Description

Exhibit PL # 14    6 pages

Read each heading carefully before proceeding. Make statements simple, brief and complete. Be certain the form is signed. Send the original to the Human Resources Office.

**CHECK AS APPROPRIATE:**    ☐ **Unclassified**    ■ **Classified**    ☐ **Regular**    ☐ **Temporary**

**PART I – To be completed by department head or human resources office.**

| | |
|---|---|
| **1. Agency Name**<br>Lansing Correctional Facility (LCF) | **8. Position Number**<br>K0148262 |
| **2. Division**<br>Programs | **9. Current Title (if existing position)**<br>Unit Team Manager |
| **3. Unit/Office**<br>Classifications/Records | **10. Proposed Title** |
| **4. Name of Incumbent**<br>Andrew Parks | **11. Working Title** |

| | | |
|---|---|---|
| **5. Work Station Location (Subject to Change)**<br>City: Lansing    County: Leavenworth | | **12. Allocation** |
| **6. Check appropriate time:**<br>■ Full Time    ☐ Part Time _____ % | **For use by Human Resources Department** | **13. Effective Date**     **14. FLSA Status**<br>            Select: |
| **7. Regular Hours of Work**<br>FROM: 7:30 ■ AM ☐ PM TO: 4:00 ☐ AM ■ PM<br>☐ Su ■ M ■ Tu ■ W ■ Th ■ F ☐ Sa<br>OTHER: _____ | | **15. By:**          **Approved:**<br><br>**16. KPERS Designation**<br>☐ Corrections A  ☐ Corrections B  ☐ Regular |

**PART II – To be completed by department head or human resources office or supervisor of the position.**

**17. Describe the mission, goal, and/or purpose of this position. Why does it exist?**

This position is responsible for supervising the effective delivery of services to inmates in the assigned housing unit(s) and to ensure that the overall unit is maintained in a safe, secure, and humane manner. The Unit Team Manager is expected to ensure that Internal Management Policy and Procedure, Facility General Orders, Kansas Administrative Regulations, Kansas Statutes Annotated, Custody Classification Manual, and other administrative rules and regulations are followed in the delivery of services. The unit team work involves evaluating risk factors in order to make decisions regarding facility/cell or work assignments, referrals to services, and the level/type of supervision, and to develop comprehensive release plans for inmates who are within one year of release. The work of this position requires ongoing proactive communications and interaction with staff, inmates, community partners, and inmates' family that will ensure an organizational culture that supports the attainment of reduced negative behaviors by offenders.

**18. Who is the supervisor of this positon (person who assigns work, gives directions, answers questions and is directly in charge)?**

| Name | Title | Position Number |
|---|---|---|
| Rob Arnold | Corrections Manager II | K0148263 |

**19a. Check the statement that best describes the leadership, supervisory or management responsibilities of this position.**

☐ **None.**

☐ **Lead Worker.** Plans and coordinates the work of co-workers, guiding and training them while performing the same kind and level of work a majority of the time.

☐ **Supervisor.** Assigns, directs, reviews and evaluates the job performance; has significant input into decisions related to hires, transfers, promotions, demotions, dismissals, and discipline of employees under his or her supervision. The majority of the work is different from that of subordinates.

☐ **Manager.** Integrates and coordinates the activities of several organizational functions or programs and initiates changes through subordinate supervisors or integrates and coordinates the activities of one or more programs having department-wide impact.

**b. List all persons who are supervised directly by employee in this position:**

KDOC (Rev 04-17) – Position Description

**20. Describe the work of this position using this page or one additional page only. Also note, Essential Function Form is attached.**

Use the following format for describing job duties. What is the action being done (use an action verb); to whom or what is the action directed (object of action); why is the action being done (be brief); how is the action being done (be brief). Number each task and indicate percent of time an incumbent spends or would spend performing each task:

| No. | % | Job Duties |
|---|---|---|
| | 30% | • Assigns, supervises, and evaluates the work of unit team staff comprised of uniformed and non-uniformed staff assigned to the living unit, which includes but is not limited to: Total Offender Activity Documentation System (TOADS) chronological entries, Offender Management Information System (OMIS) data entry, incentive level, visiting applications, good time awards, use of the LSI-R, custody classification, inmate reviews, transfer requests, and program assignment. Ensure that a case management/risk reduction philosophy is employed and that security related functions and other operational elements are performed that support the policies, procedures, and mission of the Kansas Department of Corrections. Utilizes both informal feedback and employee annual reviews to provide a measure to staff regarding their work performance strengths and areas needing improvement. |
| | 20% | • Reviews Reentry Plans submitted by counselors to ensure that each plan addresses criminogenic need areas. Ensures that risk reduction, reentry, case management and release planning efforts are coordinated and that release planning is incorporated into all aspects of case management. In addition, oversees the quality and content of release planning efforts. Works closely with all areas of operation in the facility and with Parole and Reentry staff in the community; and engaged in ongoing review of the release planning process to ensure it is well coordinated. Oversees the release planning process, supports that effort, and participates in that work as needed. Obtains and maintains certification in Level of Services Inventory – Revised (LSI-R) and any other designated assessment tools. Conducts LSI-R interviews and makes accurate documentation and scoring entries. |
| | 15% | • Demonstrates knowledge of evidenced-based practices in corrections and proficiency in risk reduction skills including motivational interviewing and cognitive strategies. Provides assistance, direction, and case management guidance to unit team counselors and serves as a role model in the use of risk reduction and risk containment techniques. Makes decisions regarding internal classification, custody classification, referrals to jobs, programs and services, and to assist in the development comprehensive release plans for inmates based on an assessment of inmate risk factors. Meets regularly with administrative staff and unit team staff to disseminate relevant information and discuss issues and solutions. Encourages staff to make suggestions for resource allocation and process re-engineering. Provides feedback to Classification Administrator regarding the policies and procedures of both the facility and Department of Corrections and the resources needed to meet the goals and objectives that have been developed for the team. |
| | 10% | • Performs daily inspections of the living unit to ensure all posts are properly staffed, overall security, maintenance and cleanliness is maintained, and that the department and facility's policies and procedures are being adhered to within the living unit. |
| | 20% | • Conduct training session/instruction in case management, Reentry issues, Community Crew Supervisors Training, and Private Industries Supervisors training.<br>Liaison for Private Industries and Community Crew. Represent facility at various functions-meetings-conferences-gatherings. In the absence of the Classification/Unit Administrators complete necessary tasks assigned to the area to insure continual operation of the unit. |
| | 5% | • Other duties as assigned to insure continual operation of the facilities. |

*3 of 6*

KDOC (Rev 09-17) – Position Description

**21a. How much latitude is allowed the employee in completing the work? b.) What kinds of instructions, methods and guidelines are given to the employee in this position to help do the work? c.) State how and in what detail assignments are made:**

The incumbent in this position will work with a considerable amount of latitude within established risk management, transitional planning, and reentry procedures and programs. The incumbent will apply established criminogenic profile evaluation tools that measure dynamic risk factors, static risk factors, and elements of the Level of Service Inventory – Revised (LSI-R) and will participate as a member of a team that provides a continuum of case management services for inmates from incarceration to post release. Work will be evaluated through conferences, effectiveness of interactions with inmates, and results achieved by the assigned unit team.

**22. What hazards, risks or discomforts exist on the job or in the work environment? Frequency of exposure?**

Because this position is in a maximum-security adult correctional institution, incumbent works under conditions of the threat of assault, murder, escape, fire, riots and/or other disturbances which could result in the injury or death of the incumbent. Incumbent may be called back or kept over without notice. Inmates in this facility range from minimum to maximum custody and incumbent is in the position of controlling their actions or behavior which can lead to physical confrontation. Because of the physical structure of the facility and the necessity for staffing flexibility, incumbent is required to negotiate stairs and swinging doors which require mobility.

4 of 6

KDOC (Rev 09-17) -- Position Description

**PART III -- To be completed by department head or human resources office.**

23. List the <u>minimum</u> amounts of education and experience which you believe to be necessary for an employee to begin employment in this position:

**Required Minimum Qualifications:**

Graduation from an accredited four year college or university with major coursework in corrections, criminal administration, psychology, sociology or a related field. See Classification Specifications.

**Preferred Skills and/or Qualifications:**

Independent work experience in corrections counseling/case management. 60 semester college hours college credit, with 12 hours in corrections or related field and five years in corrections; or, a four-year degree in corrections or related field and three years work in corrections.

**Necessary Special Qualifications, Licenses, Certifications, and/or Registrations:**

See Classification Specifications.

\*\*Must possess a valid driver's license.

| | | | |
|---|---|---|---|
| Signature of Employee | Date | Signature of Human Resources Official | Date |
| Signature of Supervisor | Date | Signature of Agency Head or Appointing Authority | Date |

5 of 6

# ESSENTIAL/EVENT DRIVEN FUNCTIONS
## Unit Team Manager, Corrections Counselor I and II

This form is a dual use form. It is not intended to screen out applicants. May be used after conditional offer has been made or during employment.

**X** **Essential** - Duties are fundamental to the position based on the function and the results to be achieved, rather than the manner in which they are being performed. Duties are directly related to the reason the position exists and that cannot be reassigned without changing the nature of the position. Considered by Occupational Exposure Control (OEC) as a Category I duty due to the **frequency** of performance.

**X** **Event Driven** - Duties may be performed in an emergency, or on an infrequent or occasional basis; but when performed these duties are necessary to the position and critical to the safety and security of staff, offenders and/or the public. Considered by OEC as a Category II duty due to the **infrequency** of performance.

| FUNCTION | | Essential OEC I | Event Driven OEC II | Medical Practitioner Use Only: Note functions unable to perform |
|---|---|:---:|:---:|:---:|
| PHYSICAL STRENGTH | Sedentary Work: Lifting up to 10 pounds occasionally | X | | |
| | Light Work: Lifting 11 to 20 pounds occasionally and/or up to 10 pounds frequently. | | X | |
| | Medium Work: Lifting 21-50 pounds occasionally and/or 11-20 pounds frequently. | | | |
| | Heavy Work: Lifting 51-100 pounds occasionally and/or 21-50 pounds frequently. | | | |
| | Very Heavy Work: Lifting 100 pounds occasionally and/or in excess of 50 pounds frequently. | | | |
| | Regular, punctual and predictable attendance. | X | | |
| | Mandatory over-time as required. | | | |
| PHYSICAL ENVIRONMENT | Work is performed indoors in a controlled environment with few temperature extremes. | X | | |
| | Work is performed indoors in a controlled environment with occasional temperature extremes. | | X | |
| | Work is performed out of doors requiring exposure to extreme heat and/or cold. | | | |
| | Work is performed in a high noise environment requiring the worker to shout to be heard. | | | |
| | Work involves performing repetitive motions with one or more extremity. | | X | |
| | Work involves exposure to conditions that may affect the respiratory system or the skin, such as chemicals, paint, cleaning agents, other fumes or odors. | | | |
| | Work involves exposure to vibrating movements of the extremities or whole body. | | | |
| | Exposure to bodily fluids. Exposure may include obtaining urine specimens; touching blood, body fluids with visible blood, tissue, semen, vaginal secretions, breast milk, cerebrospinal fluid, synovial fluid, pleural fluid, peritoneal fluid and/or amniotic fluid; cleaning and disinfecting environmental surfaces with blood, body fluids and/or tissue/ and touching non-intact skin and mucous membranes. | | X | |
| PHYSICAL ACTIVITY | Running: Moving quickly on the feet in continued and sustained motion over short distances. | | X | |
| | Walking: Moving about on foot at a normal pace. | | X | |
| | Bending at the Waist: Bending body downward and forward by bending the spine at the waist. | | X | |
| | Kneeling: Bending the legs at the knee to come to rest on the knee or knees. | | | |
| | Crouching: Bending the body downward and forward by bending the legs and spine. | | | |
| | Crawling: Moving about on the hands and knees or hands and feet. | | | |
| | Climbing: Ascending or descending ladders, stairs, ramps, and the like, using the feet and legs and/or hands and arms. | | X | |
| | Balancing: Maintaining body equilibrium to prevent falling when walking, standing, crouching on narrow, slippery, or erratically moving surfaces. Exceeds that needed for ordinary maintenance of body equilibrium. | | | |
| | Lifting: Raising or lowering an object from one level to another. | X | | |
| | Carrying: Transporting an object, using the hands, arms, and/or shoulders. | | X | |
| | Pushing: Using upper extremities to press against with steady force in order to thrust forward, downward, or outward. | | | |
| | Pulling: Using upper extremities to exert force in order to draw, haul, drag, or tug objects in a sustained motion. | | | |
| | Reaching: Extending the hands and arms in any direction. | X | | |
| | Handling: Seizing, holding, grasping, turning, or otherwise working with the hand or hands. | X | | |
| | Finger Dexterity: Picking, pinching, or otherwise working primarily with finger(s). | X | | |
| | Sitting for long periods of time. | | X | |

OAG000147

5

6086

| FUNCTION | Essential OEC I | Event Driven OEC II | Medical Practitioner Use Only: Note functions unable to perform |
|---|---|---|---|
| Standing for long periods of time. | | X | |
| Talking: Expressing or exchanging ideas by means of the spoken word. | X | | |
| Conveying Information: Testifying in court or other official proceedings. Communicating work related information to others. | X | | |
| Hearing: Perceiving the nature of sounds by the ear with or without correction. | X | | |
| Seeing: Obtaining impressions through the eyes of the shape, size, distance, motion, color, or other characteristics of objects. | X | | |
| Clarity of vision at 20 feet or more; | | X | |
| Clarity of vision at 20 inches or less | X | | |
| Ability to identify and distinguish colors | | X | |
| **OTHER ACTIVITIES** Comprehend verbal instructions. | X | | |
| Read and comprehend written instructions. | X | | |
| Write simple sentences. | X | | |
| Observe and recall details of incidents. | | X | |
| Recall a series of numbers and/or names. | X | | |
| Perform CPR and other emergency first aid procedures. | | X | |
| Remain calm in emergency situations. | X | | |
| Operate a motor vehicle. | | | |
| Operate heavy equipment. | | | |

This form accurately describes the essential functions that apply to my position.

_____     _____     _____     _____
Signature of Employee           Date           Signature of Supervisor          Date

### Completed by Health Care Provider

It is my opinion that _____
                                    Name of Employee/Patient/Client

(  ) is currently able to perform all of the essential/critical functions of his/her position; or

(  ) is not currently able to perform all of the essential/critical functions of his/her position as noted (Degree of restriction if applicable):

(  ) will be able to perform all of the essential/critical functions of his/her position with the following accommodations:  (Add additional pages if more space is needed.)

_____     _____
Signature of Health Care Provider                Date

_____
Printed Health Care Provider Information

_____
Health Specialty

OAG000148

EXHIBIT PL #13  20 pages

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

BOBBY BRUCE WHITE,                      )
                                        )
       Plaintiff,                       )
                                        )
v.                                      )     Case No. 24-3023-DDC-RES
                                        )
ANDREW PARKS, *et al.,*                 )
                                        )
       Defendants.                      )
_____)

## DEFENDANTS' RESPONSES TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Under Federal Rule of Civil Procedure 34, Defendants Andrew Parks, Bruce Chapman,

and Evan Meredith ("Defendants") provide the following responses:

1. Any and all grievances, complaints, EAI investigation reports, correspondence/letters direct to the Lansing Correctional Facility Warden; and Kansas Department of Corrections Secretary of Corrections, Jeff Zmuda, concerning:

   (a) mistreatment of inmates by KDOC personel/officers; and specificly relating to defendants Andrew Parks, Eran Meredith and Bruce Chapman; and

   (b) failure to protect/requests for protection, from prisoners/staff, from gang activity, and drug and tobacco user/dealers, and

   (c) mistreatment/torture in Lansing segregation/restrictive housing by KDOC staff/personel, specificly and including by the defendants, Parks, Meredith and Chapman; and any memoranda, investigation, files or other documents created in response to the complaints, since January 1, 2020 to date of the response to this request.

   **OBJECTION. The scope of this request includes confidential information. Other inmates' grievances, complaints, and correspondence/letters are confidential. Investigation reports completed by Enforcement, Apprehensions & Investigations (EAI) are also confidential for safety and security reasons. Additionally, the request is not reasonably limited in time or scope, is overly broad, and is unduly burdensome. KDOC houses nearly ten thousand inmates and receives innumerable handwritten grievances, complaints, and correspondence/letters from inmates alleging mistreatment by KDOC employees. Defendants cannot feasibly search through all of those documents to**

1 of 20

**identify and find the documents requested.**

2. Any and all policies, directives, or instructions to KDOC personel concerning controling and preventing gangs, drug users/dealers activity in Kansas prisons.

   **OBJECTION. The scope of this request includes confidential information. Specifically, Internal Management Policy & Procedure (IMPP) 09-108D (Fentanyl Exposure and Search Kits) and 12-105D (Security Threat Groups Identification and Management) are "staff read only" for safety and security reasons and cannot be provided. *See* Ct.'s Order, *Dudley v. Warren*, No. 22-3188- JWL (D. Kan. Jan. 24, 2023) (Doc. 30) (sealing a security-related prison policy and not allowing the plaintiff to view or possess it); *see also Leek v. Peterson*, 360 P.3d 491 (Table), 2015 WL 7434671, at \*3 (Kan. Ct. App. Nov. 20, 2023) (noting that KDOC does not have a duty to disclose policies pertaining to emergency or security procedures under K.S.A. 75-5256(b)). Lansing Correctional Facility (LCF) General Order (GO) 9-128 (Fentanyl Exposure and Search Kit) is also "staff read only" for safety and security reasons and cannot be provided.**

   **Without waiving any objection, the following non-confidential policies are attached as OAG000010-OAG000024, OAG000032-OAG000058, OAG000075- OAG000091, and OAG000149-OAG000152: IMPP 02-110D, 02-127D, 09-107D, 10-104D, 12-124D, and LCF GO 03-105.**

3. Any and all policies, directives, or instructions to KDOC personel concerning the humane treatment of prisoners, held in segregation/restrictive housing for protective custody, administrative and disciplinary hold.

   **The following policies are attached as OAG000116-OAG000142 and OAG000153-OAG000156: IMPP 20-101A, 20-104A, 20-105A, 20-108D, and 20- 111A, along with LCF GO 10-101.**

4. Any and all policies, directives, or instructions to KDOC personel concerning the need to provide; protection to prisoners, from staff abuse and violence by other prisoners, to also specificly as it applies to the prevention of elder abuse.

   **The following responsive policy is attached as OAG000059-OAG000074: IMPP 10-103D.**

5. Any and all policies, directives, or instructions to KDOC personel concerning the requirement for prisoners to sign a (PC) Protective Custody Waiver before they could/would be released from segregation/restrictive housing. Also, the Plaintiff/White requests a copy of the PC Waiver, the Plaintiff signed on 7-12-2023 at Lansing Correctional Facility.

   **The requested PC waiver is attached as OAG000002. Other policies regarding**

**protective custody and restrictive housing have been provided in Defendants' response to Plaintiff's Request for Production #3.**

6. All sick calls and medical intervention reports, made at all KDOC prison facilities, because of prisoner drug and tobacco use/misuse, to include all related deaths and hospitalizations of prisoners because of drug and tobacco use/misuse, for the past 10 years, up to the date of the response to this request.

   **OBJECTION. Under the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), Defendants cannot provide the confidential medical records of other inmates to Plaintiff. *See Warren v. Corcoran*, No. 9:09-CV-1146, 2011 WL 5599587, at \*7 (N.D.N.Y. Oct. 20, 2011) (describing HIPAA as applying to correctional employees); Robinson v. Holmes, No. 21-2602-DDC, 2022 WL 17569954, at \*1 & n.6 (D. Kan. Nov. 1, 2022) (recognizing that an inmate has a significant privacy interest in medical records). Additionally, Plaintiff's request is not reasonably limited in time or scope, is overly broad, and is unduly burdensome. KDOC houses nearly ten thousand inmates. An inmates' medical record is often hundreds or thousands of pages long. So responding to this request would require searching through the medical records of nearly ten thousand inmates, which would require searching through millions of pages of medical records. The tangential relevance to this case of any records responsive to this request does not outweigh the outsized burden it would require to produce such records. Further, revealing sensitive information to an inmate about other inmates may pose a safety and security risk by providing a convicted felon with medical secrets about other inmates that could be potentially used as leverage for blackmail or other nefarious purposes.**

7. Any and all policies, directives, or instructions to KDOC personel concerning the double bunking of prisoner in segregation/restrictive housing and specificly to include prisoners under protective custody and/or prisoners who have requested protective custody.

   **The following policy has been attached as OAG000122-OAG000127: IMPP 20-104A. Other policies regarding protective custody and restrictive housing have been provided in Defendants' response to Plaintiff's Request for Production #3.**

8. Any and all documents/reports of EAI investigation at Lansing Correctional Facility since January 1, 2020 up to the date of the response to this request to: specificly include White's questioning by EAI Officer Tomilson on 10-2-2023 – after White's strangulation and hospitalization for the injuries.

   **OBJECTION. The scope of this request includes confidential information. Specifically, EAI investigatory files are confidential for safety and security reasons. *See Martinez v. True*, 128 F. App'x 714, 716 (10th Cir. 2005) (affirming**

3 of 20

judgment based on an in-camera review of "confidential prison materials").

**Without waiving any objection, supervised listening will be arranged for Plaintiff to listen to the audio recording of his interview with EAI Tomilson.**

9. Any and all medical records, x-rays, injury photo's taken at the KII Hospital and reports made by the; (a) LCF Medical Clinic, Lansing Correctional Facility; (b) Leavenworth County EMS, 500 Eisenhower Rd., #100, Leavenworth, Kansas 66048; and (c) The University of Kansas Hospital, University of Kansas Health System; Attention: Medical Records Custodian, 4000 Cambridge St.; MS9345, Kansas City, KS 66160; and (d) Kansas Department of Corrections, Lansing Correctional Facility; regarding:

On 7-12-2023, the Plaintiff/White was transported by ambulance from the (LCF) Lansing Correctional Facility – Medical Clinic (after being x-rayed for physical injuries), to the KU Hospital, for the treatment of injuries due to strangulation, by prisoner Jeremey Garza. At the KU Hospital, photos were taken of the injuries to White's throat, neck, treated and monitored for any additional swelling.

**OBJECTION. Defendants and KDOC do not have possession of all of Plaintiff's medical records from the specified locations; however, supervised viewing will be arranged for Plaintiff to view his medical records in KDOC's possession.**

10. Any and all names of all attending KDOC staff/officers and medical personnel as well as all attending ambulance and KU Hospital attending medical staff and physicians, who provided care, to the Plaintiff, because of and after the 7-12-2023 strangulation.

**OBJECTION. No such document exists. Defendants are not required to create for their response documents that do not currently exist. This request was submitted as a request for documents under Federal Rule of Civil Procedure 34, not as an interrogatory under Federal Rule of Civil Procedure 33. Further, counting subparts, White has already reached the limit defined in the scheduling order for interrogatories, so Defendants are not required to respond to additional interrogatories. *See* Doc. 66 at 4.**

**Without waiving any objection, as described in Defendants' response to Request for Production #9, supervised viewing will be arranged for Plaintiff's medical records in KDOC's possession. So Plaintiff will be able to examine any relevant medical records in KDOC's possession. *See also* Fed. R. Civ. P. 33(d).**

11. Any all records/ reports, investigations, to include all disciplinary and/or criminal charges made or filed against the attacker, Jeremey Garza, to include the Plaintiff's request to press charges; (a) made in connection to the strangulation of the Plaintiff

on 7-12-2023; (b) to include the reason why Jeremey Garza was being held in segregation, in the same cell as the Plaintiff; (c) To include any other previous allegations or reports; investigations of other acts of drug/tobacco user/dealer and strangulation by Jeremey Garza, and/or violent acts by Mr. Garza.

**OBJECTION. The scope of this request includes confidential information. *See Martinez v. True*, 128 F. App'x at 716. EAI investigatory files are confidential for safety and security reasons. The classification status of other inmates in restrictive housing is confidential for safety and security reasons. (Some of them are in protective custody, for instance, which is confidential.) Criminal charges and convictions of other inmates are also kept confidential within the prison for safety and security reasons. (Some types of criminal charges or convictions may lead to violence against that inmate if discovered by other inmates. So criminal charges and convictions are kept confidential within the prison.) Grievances of other inmates and disciplinary reports against other inmates are also kept confidential within the prison for safety and security reasons.**

**Without waiving any objection, KDOC does not have any written documentation of Plaintiff's request to press charges; however, it appears that Plaintiff made an oral request to press charges. Plaintiff appears to have made that oral request in the EAI interview described in the response to Request for Production #8. As discussed in that response, supervised listening will be arranged for Plaintiff to listen to an audio recording of that interview. The Defendants and KDOC do not have any documentation regarding the reasons for cellmate assignments in general, including in this particular instance.**

12. The plaintiffs complete medical and mental health records in White's KDOC medical file, since the date of White's incarceration, up to the date of your response to this request.

    **As stated in Defendants' response to Request for Production #9, supervised viewing will be arranged for Plaintiff's medical records in KDOC's possession.**

13. Any and all policies, directives, or instructions to KDOC personel concerning the necessity or when required to call: (a) medical for medical care to an injured prisoner; (b) making a trouble call; after the attack and violent interaction of prisoners in segregation/restrictive housing and in general population (if there is a difference).

    **OBJECTION. The scope of this request includes confidential information. Specifically, IMPP 12-122D (Departmental Communication System) is "staff read only" for safety and security reasons and cannot be provided. *See* Ct.'s Order, *Dudley*, No. 22-3188-JWL (Doc. 30); *see also Leek*, 2015 WL 7434671, at \*3.**

5 of 20

6 of 20

Without waiving any objection, the following non-confidential policies are attached as OAG000092-OAG000112 and OAG000157-OAG000158: IMPP 16-107D, 16-108D, and LCF GO 13-102. Other, non-confidential policies regarding restrictive housing have been provided in Defendants' response to Plaintiff's Request for Production #3.

6 of 20

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

7 of 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BOBBY BRUCE WHITE, )
)
Plaintiff, )
)
v. ) Case No. 24-3023-DDC-RES
)
ANDREW PARKS, *et al.*, )
)
Defendants. )
)

## DEFENDANTS' ANSWERS TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Under Federal Rules of Civil Procedure 33 and 34, Defendants Andrew Parks, Bruce

Chapman, and Evan Meredith ("Defendants") provide the following answers:

1.  State the duties of defendants; (a) Andrew Parks; (b) Evan Meredith, and (c) Bruce Chapman. If the duties are set forth in any job description or other document, produce the documents.

    **OBJECTION. The scope of this request includes confidential documents. Specifically, the post orders for these officers are "staff read only" for safety and security reasons. *See* Ct.'s Order, *Dudley v. Warren*, No. 22-3188-JWL (D. Kan. Jan. 24, 2023) (Doc. 30) (sealing a security-related prison policy and not allowing the plaintiff to view or possess it); *see also Leek v. Peterson*, 360 P.3d 491 (Table), 2015 WL 7434671, at \*3 (Kan. Ct. App. Nov. 20, 2023) (noting that KDOC does not have a duty to disclose policies pertaining to emergency or security procedures under K.S.A. 75-5256(b)).**

    **Without waiving any objection, Andrew Parks serves as a Unit Team Manager. Evan Meredith is no longer employed with KDOC. Bruce Chapman serves as a Corrections Supervisor I. The current job description for Andrew Parks is attached as OAG000143-OAG000148. The current job description for Bruce Chapman is attached as OAG000003-OAG000009.**

2.  State the specific duties of the defendants, Parks, Meredith and Chapman and as it may apply to all other KDOC employee's/staff (to include Wardens and Deputy Wardens); in-so-far as it pertains to: (a) providing protection to prisoners; and (b) medical care to prisoners; and (c) for receiving medical care at the prison facility; and out of the prison facility, specificly after an incident of violence against a prisoner, in

8 of 20

segregation/restrictive housing and general population. If these duties are set forth in any job description or other document; produce the documents.

> **See response to Interrogatory #1. Additionally, the following applicable policies are attached as OAG000092-OAG000112 and OAG000157-OAG000158: IMPP 16-107D, 16-108D, and LCF GO 13-102.**

3. State the names, titles, and duties of all Lansing Correctional Facility employees/officers/staff, who have the responsibility for ensuring that inmate's/prisoners request for medical attention are responded to. If those duties are set forth in any job description or other documents, produce the documents.

> **OBJECTION. The names of correctional employees not involved in the current lawsuit are confidential for safety and security reasons and will not be provided. See Castillon v. Corr. Corp. of Am., Inc., No. 1:12-cv-559, 2015 WL 3948459, at \*3 (D. Idaho June 29, 2015) (allowing redaction of the first names of non-party correctional employees). Here, the answer would broadly encompass every correctional officer, and a list of *every* correctional officer – even with first names redacted – would be inappropriate to provide to an inmate for safety and security reasons.**
>
> **Without waiving any objection, Lansing Correctional Facility (LCF) expects every correctional officer to connect inmates with medical personnel when requested and appropriate. The titles and duties of Defendants Andrew Parks, Bruce Chapman, and Evan Meredith are provided in Defendants' response to Interrogatory #1.**

4. State the names, titles, and duties of all employees/officers/staff members at Lansing Correctional Facility (LCF) who have responsibility for responding to, investigating or deciding inmate grievances. If those duties are set forth in any job description; policy, directive; or other document; produce the documents.

> **OBJECTION. The names of correctional employees not involved in the current lawsuit are confidential for safety and security reasons and will not be provided. See Castillon, 2015 WL 3948459, at \*3. Here, if a list of names was provided, the list would broadly encompass numerous correctional employees who have any involvement with the grievance procedure. Such a large list of correctional employees – even with first names redacted – would be inappropriate to provide to an inmate for safety and security reasons.**
>
> **Without waiving any objection, the persons responsible for the grievance procedure at each level are outlined in K.A.R. 44-15-101 *et seq. See also* Fed. R. Civ. P. 33(d).**

5. State the procedure in effect during January 2020, through the date of your response; for

responding to; investigating; and deciding inmate grievances; to include emergency grievances, and need for protective custody. If the procedure for handling grievances, are based on: (a) medical complaints; (b) protective custody needs, and (c) complaints about staff; and (d) drug and tobacco complaints are different from the procedure for handling other kinds of grievances; state all the procedures. If these procedures are set forth in any directive, manual, rule, law or other documents, produce the documents.

> **The grievance procedure is outlined in K.A.R. 44-15-101 *et seq*. While protective custody classifications cannot be grieved through that grievance procedure (K.A.R. 44-15-101a(d)(2)), Internal Management Policy & Procedure (IMPP) 20-108D addresses requests for protective custody and is attached as OAG000135-OAG000138.**

6. State the rules; laws, policy and directive regarding, what constitutes an Emergency as it applies to: (a) the protection of prisoners (health/safety); (b) submission of grievances; and (c) providing medical care to prisoners. If these duties/requirements are set forth in any statute, rule, directive or other document, produce the documents.

> **OBJECTION. With regard to the "laws" governing what would constitute an emergency under the law for subparts (a) and (c), Plaintiff is asking for legal advice regarding the legal definition of "emergency." But the Defendants cannot provide Plaintiff with legal advice. With regard to the "rules . . . policy and directive" governing what would constitute an emergency for subparts (a) and (c), some of the applicable policies are confidential for safety and security reasons. *See Dudley*, No. 22-3188-JWL (Doc. 30); *see also Leek*, 2015 WL 7434671, at \*3. Specifically, the following policies designated as "Major Emergency Response Plans" are confidential for safety and security reasons: IMPP 19-101D (Development, Content, Training, Review, and Distribution of Facility Emergency Plans), -102D (Emergency Staff Services), -103A (Emergency Preparedness for Parole Offices), -104A (Hostage Situations in Field Service Offices), -105A (Fire/Smoke/Explosion in Field Service Offices), -106A (Evacuation Procedures), -107A (Bomb Threats in Field Service Offices), -108A (Severe Weather and Natural Disasters), -109A (Hazardous Materials and Occupational Exposures), -111A (Building Damage, Safety Hazards and Civil Disturbances), -113A (Medical Emergencies in Field Service Offices), -121D (Evacuation of Correctional Facilities), and -130D (Participation in the State Emergency Operations Plan).**
>
> **Without waiving any objection, Defendant responds to the remaining parts of this question as follows. With regard to "rules . . . policy and directive" for subparts (a) and (c), the following non-confidential policies apply and are attached as OAG000108-OAG000115: IMPP 16-108D, 19-120D. With regard to subpart (b), K.A.R. 44-15-106 governs emergency grievances.**

7. State the method of enforcement of #6 above /and or the consequences to any KDOC personell and for who's duty it is to investigate: non-compliance of individuals, who violate the rules, laws, policy and/or directive regarding the: (a) failure to protect prisoners; (b) grievance steps of due process (to include time requirements); and c) failure to provide emergency medical care. If these duties/requirements are set forth in any statute, rule, policy or directive or other document, produce the documents.

> **OBJECTION. Disciplinary actions taken with particular correctional employees constitute confidential personnel matters. For safety and security reasons, such information cannot be provided to inmates.** *See Martinez v. True,* **128 F. App'x 714, 716 (10th Cir. 2005) (affirming judgment based on an in-camera review of "confidential prison materials").**

> **Without waiving any objection, IMPP 02-120D outlines employee disciplinary procedures and is attached as OAG000025-OAG000031. Employee discipline is handled on a case-by-case basis. The persons responsible for investigating apparent or reported misbehavior by correctional employees may differ from circumstance to circumstance.**

8. State the procedure and by who?, (a) regarding a prisoners right to know specificly why he is being held in segregation/restrictive housing and the allowable maximum time of holds for: (b) protective custody, (c) administrative segregation and, (d) disciplinary times; regarding (e.) prisoners hold times personal reviews/evaluations; and give the difference of the conditions of incarceration; between protective custody hold, disciplinary and administrative segregation holds; and (f) who? (identify responsible personell) who's duty it is to see that the prisoner is properly and humanely treated. If the responsible personell duties are set forth in any job description or other document, produce the documents, and; If these procedures and conditions of restrictive housing are set forth in any directive, manual, rule, law or other documents, produce the documents.

> **With regard to subparts (a) through (d), IMPP 20-104A applies and is attached as OAG000122-OAG000127. With regard to subpart (e), see documents responsive to request for production #3. With regard to subpart (f), all KDOC employees that interact with prisoners are expected to treat prisoners properly and humanely.**

9. State the names of the KDOC/State of Kansas employees/personell who's duty it is to assure a prisoners rights to programs and services for a comprehensive prison record toward rehabilitation required by K.S.A. 75-5210 and the procedure to assure compliance. If those duty are set forth in any job description or other document, produce the document. If the procedures are set forth in any directive, manual, rule or law or other document, produce the documents.

> **OBJECTION. While K.S.A. 75-5210 directs the Secretary of Corrections to**

establish programs and services, it does not create a right for a prisoner to participate in any particular program or service.

10. State the names of the KDOC/State of Kansas employees/personell, and the procedure, who's duty and responsibility it is, to assure that the grievance resolution, given by the Unit Team, Warden and Secretary of Corrections; is carried out, as to it's given relief. (Specificly see: Grievance resolution of #AA2023056). If the duty and procedure of a grievance resolution compliance is set forth in any directive, manual, statute or rule, or other document, produce the document.

**The persons responsible for the grievance procedure at each level are outlined in K.A.R. 44-15-101 *et seq.***

11. The Plaintiff/White respectfully requests the State of Kansas, to provide the Plaintiff, a copy of the "mandate"; from the State Appellate Court companion to this habeas corpus – In the Court of Appeals of the State of Kansas, Case No: 128,298, filed on August 1, 2025; by Chief Judge Sarah E. Warner; and give the Plaintiff his Constitutional right, per due process, to who or what court or entity currently has jurisdiction of that habeas corpus civil action.

**OBJECTION. With regard to identifying which court or entity has jurisdiction of a legal matter, the Defendants cannot provide the Plaintiff with legal advice.**

**Without waiving any objection, although the mandate described was not filed by Chief Judge Sarah E. Warner, the requested mandate is attached as OAG000001.**

12. Per the Unit Team response dated; 7-10-2025 by Amy L. Simmons, H.S.A. (for grievance #IA003455), who cited on: "3/28/2023 Resident BH classification was updated at Lansing to BH treatment level 4, requiring special needs monitoring due to Bi-polar Diagnosis." The plaintiff requests; (a) the identity and title of the individual/KDOC personel, who? updated/changed Whites' mental health classification and the justification/reason for the change done on 3/28/2023; and (b) the identify and medical/pschiatric title of the individual/Doctor, who? examined and diagnosed White on 3/28/2023, and the justification/reason for the Bi-Polar diagnosis for the change of mental health classification change done on 3/28/2023 at Lansing Correctional Facility.

**Plaintiff will be able to examine any relevant medical records in KDOC's possession. Supervised viewing will be arranged for Plaintiff's medical records in KDOC's possession. *See* Fed. R. Civ. P. 33(d).**

13. Who's job is it? specificly to enforce Kansas laws, such as K.S.A. 19-1919; K.S.A. 75-5210; K.S.A. 21-5417; K.S.A. 21-5416 and K.S.A. 22-3504 relating to the humane treatment and protection of state prisoners and elder abuse.

2 of 20

**OBJECTION. Plaintiff is asking for legal advice. Specifically, Plaintiff is asking how to interpret certain Kansas statutes. The Defendants cannot provide the Plaintiff with legal advice.**

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

#13 of 20

## VERIFICATION

STATE OF KANSAS              )
                                  )

COUNTY OF _LV_____     )

_Andrew Sparks_, Defendant, being duly sworn under oath, states that they have read the foregoing interrogatories and answers, and the answers given are true and correct to the best of their knowledge and belief.

_____
Name

The foregoing answers to interrogatories were subscribed and sworn to before me this _12_ day of _December_ , ~~2024~~ 2025

_____
Notary Public

My Commission Expires:

_7/14/2029_

HANNAH E. HAGEDORN
Notary Public - State of Kansas
My Appt. Expires 7/14/29

#140520

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BOBBY BRUCE WHITE,           )
                             )
        Plaintiff,           )
                             )
v.                           )          Case No. 24-3023-DDC-RES
                             )
ANDREW PARKS, *et al.,*      )
                             )
        Defendants.          )
_____)

### DEFENDANTS' RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Under Federal Rule of Civil Procedure 36, Defendants Andrew Parks, Bruce Chapman,

and Evan Meredith ("Defendants") provide the following responses:

### Section I

1. As stated in Grievance No: 2023056; dated 11-3-2022; the Conclusions Made by Secretary of Corrections – Darcie Holthaus (Designee) states: "… take the time to discuss your concerns with the program leads when you attend the new sessions; discuss what you are hoping to get out of the program…" This then implies, as the Unit Team response by Ms. Potter UTM, dated 10-6-2022, also clearly states: "You were not removed from BIBR …"

   **Admitted. But to avoid any ambiguity, Defendants clarify that Darcie Holthaus was the Secretary of Corrections' designee, not the Secretary of Corrections.**

2. The plaintiff/White was a vested member and program participant of the BIBR/KDOC inmate program since May of 2022, having successfully completing his 1st quarter of the program and was half way through his 2nd quarter, when he was denied access to the program (group participation) by Mr. Gary Spillman, and was removed officially from the program and Pod B5 on March 2023.

   **Neither admitted nor denied. Defendants made reasonable inquiry under Rule 36 to the director of BIBR but have not yet received a response, so – based on the information Defendants know or can readily obtain – Defendants lack sufficient knowledge or information at this time to admit or deny most of this request for admission. (Defendants will supplement this response if they later obtain sufficient information to admit or deny.)**

   **However, Defendants have sufficient knowledge to and do admit that Plaintiff**

15 of 20

**was in the BIBR program starting in May 2022.**

3. White cited on 10-22-2022, Grievance #2023056, Appeal to Secretary of Corrections, page 2; (1st para.); "… This punishment and group program denial is nothing other than religious discrimination of doctrine belief by Gary Spillman, forcing his own personal opinion and condoning group discussion promoting legalization of drug use and manufacturing during the drug addiction group class…" "…(d)This is a security issue as drug use is rampant here at LCF…"; (5th para) "… and they have the right to proselytizing their religious faith and belief on White by discriminating against him, by the denial to participation to group sessions and its program privileges and benefits, by not seriously investigating and determining the BIBR as a "security threat group."

**Denied. Plaintiff's appeal to the Secretary of Corrections was not submitted on October 22, 2022. Further, Defendants do not interpret this request for admission to be about the substance of the quotes, but to the extent that Defendants are being requested to admit the substance of the quotes, the substance of the quotes are denied.**

4. On 11-2-2023 and 11-3-2023, White documented by Form 9's (informal resolution attempt) to Unit Team, included with grievance #AA2023056 on Appeal to Secretary of Correction (Courts Exhibit C (pages 1 and 2)); "On 11-2-2022, I had a meeting with Mr. CJ Hughes, Mr. Dave Johnson and Mr. Gary Spillman regarding my BIBR membership Rule 3.5 Appeal and recently sent grievance appeal to Secretary of Corrections, at the end of this meeting Mr. Hughes state he was going to see me in court and have me removed from pod B5…"

**Denied. While the quoted language is accurate, the year was 2022. Further, the quote was only in the November 2, 2022, Form 9, which was not attached in the appeal to the Secretary. The November 3, 2022, Form 9 was also not attached in the appeal to the Secretary. Lastly, Defendants do not interpret this request for admission to be about the substance of the quotes, but to the extent that Defendants are being requested to admit the substance of the quotes, the substance of the quotes are denied.**

5. Mr. Gary Spillman has a criminal conviction for the manufacturing of methamphetamine, which can be confirmed through; State v. Spillman 2005 Kan. Lexis 5391, 280 Kan. 990, District Case No: 02CR317BR; State v. Spillman 110 P.3d 447, 2005 Kan. App. Lexis 405 (Kan. Ct. App. 2005)

**Denied. The "State v. Spillman 2005 Kan. Lexis 5391, 280 Kan. 990, District Case No. 02CR317BR" Kansas Reports and Lexis citations are incorrect and are thus denied. Admitted that the cited Kansas Court of Appeals case discussed a Gary Lee Spillman's past conviction for manufacturing methamphetamine.**



### Section II

1. On 3-28-2023, Administrative Restrictive Housing Report Number 01-23-1875, White was moved from cell B5-103 to Restrictive cell A2-206. citing as Facts: "Inmate White #76983 is being placed in restrictive housing for refusing to move to B8. Inmate previously tried going PC from staff..."

   **Admitted.**

2. Pursuant to: "KAR 44-15-101a(f) A procedure shall be established by the warden for investigating the allegations and establishing the facts of each grievance. An inmate or employee who appears to be involved in the matter shall not participate in any capacity in the resolution of the grievance."

   **Admitted.**

3. Pursuant to "KAR 44-15-101a(e) The remedies available to the inmate may include action by the warden of the facility to correct the problem or action by the secretary of corrections to cause the problem to be corrected. Relief may include an agreement by facility officials to remedy an objectionable condition within a reasonable, specific time, or to change a facility policy or practice."

   **Denied. The word "specific" in the quote should be "specified."**

4. The plaintiff/White, in Doc. 8, of this case No: 24-3023-JWC, filed 5-28-2024, B. Nature of the Case: "White asserts, over 4 years he has complained to LSF/KDOC officials and State Court (LVCO 20CV243/22CV323) about the drug/tobacco smoke problem at LCF. White was assaulted by gangs/unit officer when he complained, received no relief by grievance or state court,, who just dismissed 20CV243 without addressing problem. White asserts he had his BIBR program membership revoked for same reason (needed for parole consideration), without due process, in retaliation, moved to cell with smokers/drug addicts, in retaliation for submitting grievance and court action. White protested his health/safety was in danger, requesting Protective Custody, was denied..."

   **Denied. Inaccurate quote, "officer" should be "officers." It is admitted that White wrote this quote in this specified document. Defendants do not interpret this request for admission to be about the substance of the quote, but to the extent that Defendants are being requested to admit the substance of the quote, the substance of the quote is denied.**

5. In White's first habeas corpus, legal action, in the States District Court, for these issues of this case, which was Appealed to the Appellate Court of Kansas Case No: 128298, a mandate was filed on 8-1-2025 by Chief Judge Sarah E. Warner. (Note: White has not been served a copy of mandate)

#17 of 20

**Denied. The referenced case is not Plaintiff's first habeas corpus action in Kansas courts. The referenced legal action did not involve the same issues as the present matter. Specifically, it did not involve Counts II or III or Defendants Parks, Chapman, or Meredith. The referenced mandate was not filed by Chief Judge Sarah E. Warner. After a reasonable inquiry, the information known or that could be readily obtained is insufficient to enable Defendants to admit or deny Plaintiff's last sentence.**

6. On 6-5-2023 White was moved from Restrictive housing cell A1-117 to cell A1-119.

**Admitted.**

7. Cell A-119 on 6-5-2023 also held prisoner Joshua Week.

**Denied. But correcting the cell number to A1-119, it is admitted. (But "Week" should be spelled "Weeks.")**

8. Joshua Weeks had a criminal drug conviction.

**Admitted.**

9. Joshua Weeks was a BIBR program member and was a participant/member and same group 65, as did White.

**Neither admitted nor denied. Defendants made reasonable inquiry under Rule 36 to the director of BIBR but have not yet received a response, so – based on the information Defendants know or can readily obtain – Defendants lack sufficient knowledge or information at this time to admit or deny this request for admission. (Defendants will supplement this response if they later obtain sufficient information to admit or deny this request for admission.)**

10. On 6-9-2023 the Plaintiff/White personally confronted Mr. Parks UTM., that he was putting White's life in danger.

**Denied.**

11. The interaction with Mr. Parks UTM was documented in an "Emergency" grievance, submitted 6-15-2023, direct to LCF Warden Geither and Ms. Chmidling, civil rights manager pursuant to KAR 44-15-106 Emergency grievance procedure.

**Denied.**

12. This grievance was also sent to the Leavenworth County District Court for Case No: LVCO22CV323/PN 24CV009/Appellate Court Case No: 128298) filed 6-22-2023, as Correspondence Emergency Grievance (Court Exhibit Copy): with legal service to S.O.C. Jeff Zmuda; LCF Warden Geither, and Ms. Chmidling – LCF Civil Rights

18 of 20

Manager. White also sent a copy to KAKE-TV, Wichita, KS. (by certified mail) for my own personal protection and for the record.

**Neither admitted nor denied. Defendants have no way to verify what Plaintiff mailed out. So based on the information Defendants know or can readily obtain after all reasonable inquiry, Defendants lack sufficient knowledge or information to admit or deny this request for admission.**

13. In the body of this "Emergency" grievance; (on page 1) White states: "But, my most important and dangerous issue is that the A1 Unit Team; Mr. Parks UTM, Ms. Hall UTS, and Mr. Meredith CC Keep rotating drug and tobacco users, drug addicts and dealers, who I've requested Protection From, into my cell. I recently on 6-9-2023, had to raise a fuss, because I was threatened by one individual, they did put in the cell with me…"

**Admitted. The quoted text is in the referenced grievance. Defendants do not interpret this request for admission to be about the substance of the quote, but to the extent that Defendants are being requested to admit the substance of the quote, the substance of the quote is denied.**

## Section III

1. On 7-12-2023, the plaintiff/White was strangled by Jeremey Garza, who had been placed in the same cell, with White, cell A1-119.

**Denied.**

2. Jeremey Garza is a convicted drug record inmate.

**Admitted. But "Jeremey Garza" should be spelled "Jeremy Garza."**

3. Jeremey Garza was a BIBR program participant/member.

**Neither admitted nor denied. Defendants made reasonable inquiry under Rule 36 to the director of BIBR but have not yet received a response, so – based on the information Defendants know or can readily obtain – Defendants lack sufficient knowledge or information at this time to admit or deny this request for admission. (Defendants will supplement this response if they later obtain sufficient information to admit or deny this request for admission.)**

4. Jeremey Garza had been moved to segregation/restrictive housing to cell A1-119 From BIBR Pod B5.

**Neither admitted nor denied. Defendants made reasonable inquiry under Rule 36 to the director of BIBR but have not yet received a response, so – based on the**

19 of 20

information Defendants know or can readily obtain – Defendants lack sufficient knowledge or information at this time to admit or deny part of this request for admission. (Defendants will supplement this response if they later obtain sufficient information to admit or deny.)

However, Defendants have sufficient knowledge to and do admit all of this sentence except the word "BIBR" at this time. (But "Jeremey Garza" should be spelled "Jeremy Garza.")

5. The plaintiff/White was made to sign a PC Waiver, before being allowed to be separated From Jeremey Garza, by defendants Chapman and Meredith.

**Denied.**

6. No trouble call, by the segregation officers was ever made after the strangulation of White on 7-12-2023.

**Denied.**

7. Medical was not called, to give medical care to White for the injuries to Whites throat/neck, from strangulation, by any segregation/restrictive housing personel/officers on 7-12-2023.

**Denied.**

**OBJECTION TO THE REMAINING REQUESTS FOR ADMISSION. The Scheduling Order limited Plaintiff to 25 requests for admission. (Doc. 66 at 4.) Plaintiff did not receive leave of court to submit additional requests for admission, so requests for admission III(8)-V(5) are invalid and improper. Defendants are not required to respond to them.**

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for Defendants*


Exhibit PL#12
(4 pages)




**Kansas**
Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:** _ ADULT Operations Only   _ JUVENILE Operations Only   X DEPARTMENT-WIDE

**IMPP #:  20-108D**                                                                   **PAGE #: 1 of 3**

**SEGREGATION/ RESTRICTIVE HOUSING: Protective Custody**

**Original Date Issued: 07-01-22     Replaces IMPP Issued: N/A     CURRENT EFFECTIVE DATE: 07-01-22**

**Approved By:** _____, **Secretary        Next Scheduled Review: 02/2025**

## POLICY

Protective Custody (PC) is a housing assignment that separates an individual from the general population for that individual's safety. An incarcerated individuals' situation, circumstances, or behaviors may contribute to the need for protection. Most can correct such behaviors and successfully return to the general population. In most cases, the goal is to integrate the individual back into general population when it is reasonable and safe to do so.

The KDOC provides those in protective custody, to the extent possible, the same access to education, treatment, recreation, and amenities as those of the same custody level.

As such, each facility must operate a protective custody program as an adjunct to the facility's administrative restrictive housing unit.

## DEFINITIONS

**Modified Operational Unit:** A term used to describe housing which modifies operations to allow limited engagement with general population residents; however, to the extent possible allows the same access to education, treatment, recreation, and amenities as those of the same custody level.

**Protective Custody:** Housing in administrative restrictive housing or modified operational units for residents requiring protection from others until reintegration into a general population environment is facilitated.

**Restrictive Housing:** A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

## PROCEDURES

I.      **Protective Custody**

      A.      Admission to Administrative Restrictive Housing classified as protective custody is to be made only when there is documentation that protective custody is warranted and that a reasonable alternative is not available.

          1.      For juvenile services, the request is to be reviewed and approved by the Superintendent or designee.

          2.      The restrictive housing review board is to review protective custody cases with a goal of reintegration to general population as soon as possible.

      B.      The resident is to sign a consent form.

OAG000247

1.     **JUVENILE:**   Protective Custody Request form (Attachment A), agreeing to protective custody when the resident requests the placement.

      a.     The resident's treatment team is to develop a special management plan to assure safety and continuous services and programming.   Continued confinement after 72 hours is approved by the Superintendent.

      b.     If the resident does not consent to the protective custody placement, a hearing is to be held according to IMPP 20-105J.

2.     **ADULT:**   The Warden or shift supervisor, at their discretion, can order immediate restrictive housing status when it is necessary to protect the resident or others.   The status is to be reviewed within 72 hours by the Classification Administrator.

C.     The reasons for protective custody must be documented.

D.     Protective custody is to be for as short a time period as possible under the circumstances.

    1.     Long-term protective custody is to be documented and monitored.

E.     Each denial of protective custody is to be documented showing the reason justifying the denial.

    1.     Such denial and the reason justifying shall be the basis for the Restrictive Housing Review Board to look at an appropriate reintegration plan to include placement into a modified operational unit.   Case management engagement with the resident to include an individualized reintegration plan shall be completed to assist in discharge from Restrictive Housing as appropriate.

F.     Each protective custody resident who is involuntarily released is to be informed of the reasons for release.

    1.     **ADULT:** This notification is to be documented by the unit team manager or designee.

    2.     **JUVENILE:** This notification shall be documented by the Corrections Counselor II or designee.

**NOTE:**  The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents, and residents and those entities that are contractually bound to adhere to them.  They are not intended to establish State created liberty interests for employees, residents, residents, or an independent duty owed by the Department of Corrections to employees, residents, residents, or third parties.  Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards.   Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None.

**REFERENCES**

IMPP 20-105J

**HISTORY**

07-01-22 Original

OAG000248



Page 3 of 3, IMPP 20-108D
Effective 07-01-22

## ATTACHMENTS

| Attachment | Title of Attachment | Page Total |
|------------|--------------------|-----------| 
| A | Protective Custody Request – Juvenile Services | 1 page |

OAG000249



Attachment A, IMPP 20-108D
Effective 07-01-22

**JUVENILE SERVICES**
**KANSAS DEPARTMENT OF CORRECTIONS**
**PROTECTIVE CUSTODY REQUEST**

Resident's Name: _____    KDOC Number: _____

**DATE/TIME OF REQUEST:** _____

**TYPE OF REQUEST:** (*check one*)

      □ **REQUEST FOR ADMISSION TO PROTECTIVE CUSTODY**

      □ **REQUEST FOR RELEASE FROM PROTECTIVE CUSTODY**

**REASON FOR REQUEST:**

_____

_____

_____

_____

□ I **CONSENT** to protective custody placement.    □ I **WAIVE** protective custody and request release.

_____    _____

Resident's Signature                          Date

_____    _____

Shift Supervisor's Signature                    Date

**SUPERINTENDENT'S REVIEW/DECISION**

□ Concur with resident's request for **admission to** protective custody for the following reasons:

_____

_____

_____

_____

□ Concur with resident's request for **release from** protective custody for the following reasons:

_____

_____

_____

□ Protective custody **denied / discontinued** (*circle one)* for the following reasons:

_____

_____

_____

_____

_____

_____    _____    _____

Superintendent's Name               Signature                 Date

Date/Time Resident Released from Restrictive Housing: _____ Unit Transferred to: _____

Date/Time Copy Given to Resident: _____ Name of Officer Delivering Results: _____

OAG000250

Exhibit PL#11
(7 pages)



**K**ansas

Department of Corrections   **I**NTERNAL **M**ANAGEMENT **P**OLICY & **P**ROCEDURE

---

Applicability: __X__ ADULT Operations Only_ JUVENILE Operations Only _ DEPARTMENT-WIDE

---

IMPP #: 20-105A                                                     PAGE #: 1 of 5

RESTRICTIVE HOUSING: Basic Operations of Administrative Restrictive Housing

Original Date Issued: 03-10-21    Replaces IMPP Issued: 04-09-21    CURRENT EFFECTIVE DATE: 05-13-22

Approved By: _____, Secretary        Next Scheduled Review: 06/2025

---

### POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff. Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment. Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise. Only residents who require restrictive housing are to be assigned there. Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control. When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

All basic operations of an administrative restrictive housing unit, including the placement of residents, filing of reports, notification of residents, enforcement of resident privileges and rights, transfer to more restricted areas, and administration of discipline are to be carried out in accordance with the provisions of this IMPP.

In each facility there is to be an administrative restrictive housing review board (RHRB) appointed by the Warden.

### DEFINITIONS

Restrictive Housing Review Board (RHRB): A board consisting of one person from security staff, one person from the site behavioral health staff, and one person from the classification staff.

### PROCEDURES

I.    **Placement Within Administrative Restrictive Housing; Notification Requirements; Hearing**

    A.    In all cases in which residents are placed in administrative restrictive housing, a shift supervisor or the restrictive housing unit manager must approve the placement.

        1.    The shift supervisor is to forward a written report to the warden before the end of that particular shift.

        2.    No resident may be placed in administrative restrictive housing without receiving a medical/ mental health evaluation by qualified medical/mental health staff prior to placement or as soon as possible after placement.

OAG000240

a.    In addition to the health services restrictive housing screening evaluation, a checklist of possible self-harm indicators (Attachment A) must be completed for each resident placed in a KDOC administrative restrictive housing unit.

    (1)    This checklist must be completed by the restrictive housing unit OIC, unit team counselor, or shift supervisor.

    (2)    The checklist must be completed prior to placement or immediately upon placement in restrictive housing and must be as a result of direct contact between the affected resident and the security, unit team or medical staff completing the checklist.

    (3)    Subsequent to the completion of the checklist, appropriate referrals are to be made as indicated internally on the checklist form (Attachment A).

    (4)    Residents placed on administrative restrictive housing status, but actually housed in county jails, are to be exempt from the completion of the checklist and are subject to the jail's admissions policies and practices.

B.    Except as provided in Section I.C., residents placed in administrative restrictive housing are to be provided with a hearing prior to placement in order to provide them with an opportunity to present objections, explanations, or reasons why such a placement cannot be effected.

    1.    This hearing is to be held by the warden's designee who can consider alternative housing that may be available to meet the separation needs.

C.    A hearing prior to placement is not required if an emergency situation exists.

    1.    The shift supervisor or restrictive housing unit manager may order immediate placement in administrative restrictive housing when necessary:

    a.    To protect the residents or others;

    b.    To prevent escape; or,

    c.    To maintain control of the correctional facility.

    2.    This action must be reviewed by the warden or designee within 24 hours.

## II.    Administrative Restrictive Housing Report

A.    An administrative restrictive housing report (Attachment B) must be completed in all cases of administrative restrictive housing.

    1.    The report (Attachment B) must indicate, specifically, the reason for placing the resident in administrative restrictive housing.

    a.    The administrative restrictive housing report (Attachment B) may be used as the written report of the shift supervisor to the warden as required by Section II.A.1. ofthis IMPP.

    b.    A copy of the report (Attachment B) may be used as the written notice to the resident required by Section III.A.1. of this IMPP.

## III.    Notice and Explanation to Resident

A.    Written notice of the reasons for placement in administrative restrictive housing, stated in sufficient detail to allow the resident to understand the reasons and make a response to them, must be provided to the resident before the resident is placed in administrative restrictive housing unless a serious emergency or major disturbance exists.

OAG000241

1.     If a serious emergency or major disturbance involves a substantial number of residents, or a clear and present danger thereof, notice and is to be given; not more than three (3) working days after placement in administrative restrictive housing, or sooner, if the nature of the emergency has been resolved.

    a.     The serious emergency or major disturbance is to be described briefly, in writing, by the officer and made part of the record. In all cases, the notice must be given to the resident before the hearing so the resident knows the reason for the placement.

## IV. Procedure for the RHRB Upon Initial Placement

A.     Within 24 hours, of a resident's initial placement, Monday-Friday, and the next working day following a weekend/holiday, the administrative RHRB must hold an initial hearing to review the placement decision.

B.     The resident is to be given the opportunity to present the resident's case.

C.     When necessary, the RHRB is to obtain clarifying information from the officer and staff involved in the placement.

D.     If the RHRB determines the resident to be disruptive or a danger to self or others, the RHRB may exclude the resident from the review.

    1.     In this situation, the RHRB is to, if possible, interview the resident at the cell or obtain a written statement from the resident in response to the placement.

## V. Regular Review and Monitoring by the RHRB

A.     The administrative restrictive housing review board is to review the status of each resident confined in administrative restrictive housing once per week for the first four weeks, and at least once per month thereafter.

B.     The RHRB may recommend the following:

    1.     That the resident be retained in administrative restrictive housing.

        a.     This recommendation must be a unanimous vote of the RHRB; and

        b.     Become the final action in the case for that particular review period and does not require approval by the facility Warden.

        c.     The RHRB must document in detail what is required for the resident to be returned to general population.

    2.     That the resident be returned to general population.

        a.     This recommendation must be a unanimous vote of the RHRB; and

        b.     Become the final action in the case for that particular review period and does not require approval by the facility Warden.

    3.     The RHRB may recommend that the resident be transferred to another Kansas facility or to another institution in another state or to a federal institution.

        a.     Unless released from administrative restrictive housing status by the warden of the sending facility prior to transfer, the resident is to be held on that same status at the receiving facility pending the resident's next regularly scheduled review.

        b.     These transfers are not to require issuance and service of an administrative

OAG000242

restrictive housing report or an initial appearance before the administrative restrictive housing review board of the receiving facility unless those procedures were not employed at the sending facility due to a serious emergency or major disturbance.

 c. In appropriate cases, a recommendation that a resident's status be changed prior to the resident's next regularly scheduled review may be made to the Warden of the receiving facility by that facility's administrative review board.

4. The following exceptions apply and must be forwarded to the facility Warden (or designee in the absence of the Warden) for approval:

 a. If the RHRB is not unanimous;

 b. Removing the resident from Long Term Restrictive Housing status;

 c. Specific circumstances that could affect the safety and security of the facility if the resident is returned to general population;

 d. If on a case-by-case basis, the RHRB determines the Warden's approval is necessary.

C. The resident may submit written requests for release to the RHRB using a Form-9.

## VI. Privileges and Rights in Administrative Restrictive Housing

A. When privileges, property, and/or programs are restricted beyond what is allowed by restrictive housing policy, the following shall be documented:

1. the opportunities that have been limited;

2. the reason for the limitation; and

3. the duration of the limitation.

B. Administrative restrictive housing must not be used or considered as punishment.

## VII. Transfer to More Restricted Area in Special Cases

A. A narrative is to be prepared to document any instance or incident leading to more restrictive confinement within the restrictive housing unit.

B. Transfers to more restrictive confinement may be permitted only for administrative security and control and must not constitute or be used as punishment.

1. Each such transfer to a more restrictive confinement is to be authorized and approved by the restrictive housing unit team manager or designee, or in that person's absence, by the shift commander or designee.

## VIII. Regular Review and Monitoring by the Program Management Committee

A. The Program Management Committee of each facility housing restrictive housing residents shall review those residents maintained continuously in administrative restrictive housing at least every 180 days.

## IX. Reports by Warden on Residents Continuously Housed in Administrative Restrictive Housing for Over One (1) Year

A. The Warden of each facility housing restrictive housing residents is to submit a monthly report to the

OAG000243

Deputy Secretary for Facilities Management for all residents continuously held in administrative restrictive housing for six (6) months, a year or longer, and on each anniversary thereafter.

1.      The report is to include, at a minimum, information justifying the continued placement in RHU.

a.      If the Warden and RHRB cannot articulate reason(s) for continuing the placement, then the placement is to end.

## X.      Discipline While in Administrative Restrictive Housing

C.      All applicable provisions and requirements of the disciplinary procedure set forth within K.A.R. 44-13-101, *et seq.*, apply to resident housed in a restrictive housing unit.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended toestablish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the FederalGovernment and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

| Name/Type of Report | By Whom/To Whom | Due |
|---|---|---|
| Residents Continuously Housed in Administrative Restrictive Housing | Wardens to DSOFM | Monthly |

## REFERENCES

K.A.R. 44-13-101, *et seq.*

## HISTORY

03-10-21 Original

04-09-21 Revision 1

05-13-22 Revision 2

## ATTACHMENTS

| Attachments | Title of Attachments | Page Total |
|---|---|---|
| A | Checklist of Possible Self-Harm Indicators | 1 page |
| B | Administrative Restrictive Housing Report | 1 page |

OAG000244

Attachment A, IMPP 20-105A
Effective 05-13-22

## Checklist of Possible Self-Harm Indicators

Resident Name:_____DOC Number:_____

Reporting Officer:_____Date:_____Time: _____

YES    NO

01. Escorting officer has information that resident may be a suicide risk.

02. Resident is expressing suicidal thoughts/making threats to harm self.

03. Resident shows signs of depression (crying, withdrawn, passive).

04. Resident is acting/talking in a strange manner (hearing/seeing things that are not there, statements do not make sense).

05. Resident appears to be under the influence of drugs/alcohol.

06. Resident has had a recent family change (death/divorce).

07. Resident brought to restrictive housing due to serious infraction that could lead to criminal charges (assault/battery, drugs/contraband).

08. Resident states he/she is taking psychotropic medication.

09. Resident is normally housed in the Behavioral Health Unit.

10. Resident has been assaulted (physically or sexually) by another resident.

11. Resident shows anger, hostility, and makes threats.

12. Resident displays signs of self-neglect or abuse (poor hygiene, cuts, bruises).

13. Resident states this is his/her first placement in restrictive housing.

14. Resident has recent legal status change (parole violation, new charges).

**IF ANY ITEM ABOVE IS CHECKED "YES", THE RESTRICTIVE HOUSING OIC MUST IMMEDIATELY TELEPHONE/CONTACT THE CHARGE NURSE, WHO MUST IMMEDIATELY NOTIFY A BEHAVIORAL HEALTH PROFESSIONAL.**

Responding BH staff:_____Date:_____

INSTRUCTIONS: The restrictive housing OIC on shift is to ensure that this form is completed for all residents placed in restrictive housing. The escorting officer must be asked why the resident is being brought in, and whether there is any indication that he/she might engage in self-harm. The resident must be asked if there are any issues of which staff need to be aware, and if he/she takes medications. The officer must note whether or not the resident was uncooperative. Any notes, letters or other documents obtained from the resident that appears to indicate the resident's state of mind must be attached to this report and made available to the behavioral health professional for review.

COMMENTS_____

_____

_____

cc:    Clinic, Behavioral Health, Unit Team Manager

OAG000245

*7*

Attachment B, IMPP 20-105A
Effective 05-13-22

## Kansas Department of Corrections
## Administrative Restrictive Housing Report

TO:_____    Report Number: _____

FROM: _____

Date This Report Filed __/__/_____    Time Report Filed ____:____m

Date of Restrictive Housing placement __/__/_____    Time of Placement ____:____m

Resident Name:_____#_____Reason(S) For Restrictive Housing (Including Rule No. and Title)

Moved from Cell #:_____to Restrictive Housing Cell #: _____    _____

_____

[ ] Pre-Restrictive Housing hearing conducted

[ ] Pre-Restrictive Housing hearing NOT conducted (Explain) _____

Facts:_____

_____

_____

_____

_____

[ ] This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two (2) sections)What is the

basis for the facility's concern for the resident's safety?

_____

_____

_____

_____

_____

What is the reason no alternative means of separation can be arranged?

_____

_____

_____

_____

_____

Approved By:

_____ Date__/__/____    _____Date__/__/____

Signature and Title of Reporting Officer    Shift Supervisor or RH Unit Mgr.

_____Date__/__/____

Warden Authorization (If Needed)

************************************************************************************************************************** RESIDENT
ACKNOWLEDGMENT:

I received a copy of this report on:   Date__/__/____   Time:   :_____m

_____ # _____    _____

Resident Signature and Number    Staff Witness and Title

Record this Document in ImagingOriginal
to Master File
Copy to: Warden
         Resident

OAG000246