**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**BOBBY BRUCE WHITE,**

**Plaintiff,**

**v.**

**ANDREW PARKS, et al.,**

**Defendants.**

**Case No. 24-3023-DDC-RES**

# MEMORANDUM AND ORDER

Prison officials have a duty to protect the inmates housed in their facilities. Plaintiff Bobby Bruce White, proceeding pro se,[1] alleges that the defendants here violated that duty—and, in turn, the Constitution—after another inmate attacked him in the Lansing, Kansas Correctional Facility. Three of the defendants—Andrew Parks, Evan Meredith, and Bruce Chapman—filed a motion for summary judgment on plaintiff's claims against them. They argue that plaintiff failed to exhaust his administrative remedies before filing his lawsuit, and that they are qualifiedly immune from suit. And they mostly are right. But genuine factual disputes prevent the court from granting summary judgment on one of plaintiff's claims against defendants Parks and Meredith.

There is a flurry of motions pending before the court. This Memorandum and Order decides all outstanding motions bearing on plaintiff's claims against defendants Parks, Meredith,

[1] Plaintiff proceeds pro se. The court construes his filings liberally and holds those filings "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the court doesn't assume the role of advocate for the pro se litigant. *Hall*, 935 F.2d at 1110.

and Chapman. It includes defendants' Motion for Summary Judgment (Doc. 140) and Motion to Seal Documents (Doc. 144), as well as plaintiff's Motion for Summary Judgment (Doc. 139) and Motion for Reconsideration (Doc. 166).[2] For reasons explained in this Order, the court grants defendants' Motion for Summary Judgment (Doc. 140) in part and grants their Motion to Seal (Doc. 144) in full. The court denies each of plaintiff's motions.

## I. Background

The following facts either are uncontroverted or, if controverted, are construed in the light most favorable to plaintiff. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court deems many facts undisputed because plaintiff didn't "specifically controvert[]" them in his Response. D. Kan. Rule 56.1(a); *see Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992) (noting that pro se parties "must follow the same rules of procedure that govern other litigants").

From 2016 to 2023, plaintiff was an inmate at the Lansing Correctional Facility in Lansing, Kansas. Doc. 140-1 at 3 (Ex. A). LCF is operated by the Kansas Department of Corrections. While at LCF, plaintiff was a member of the Brothers in Blue Reentry (BIBR) group, a program designed to help inmates avoid recidivism after they've completed their prison sentences. Doc. 141 at 47 (Ex. B). Inmates who participate in the BIBR group are housed in the same pod, participate in classes together, and, according to plaintiff, get "privileges above and beyond" those afforded to other inmates. *Id.*; *id.* at 76. In 2022, plaintiff had a disagreement with other members of his BIBR group when he expressed his disapproval of drug and tobacco use. *Id.* at 52. That disagreement led to a meeting with a leader of the BIBR program, defendant

[2] The court will address the two motions relating to plaintiff's claims against defendant Gary Spillman—plaintiff's Motion for Summary Judgment (Doc. 132) and defendant Spillman's Motion to Set Aside Clerk's Entry of Default (Doc. 167)—in a separate order.

Spillman. *Id.* at 54. Spillman removed plaintiff from that BIBR group, and plaintiff believed he'd be placed in the next BIBR group. *Id.* at 54–55.

When he wasn't, plaintiff confronted Spillman. *Id.* at 65. In that meeting, plaintiff claims Spillman threatened him, telling him that if he kept speaking out against drug and tobacco use at LCF, he would be "taking [his] own life into [his] own hands." *Id.* at 66. Plaintiff believed that, as a result of his anti-drug stance, he was a "marked man" and that other members in the BIBR group viewed him as a "snitch" and a "rat." *Id.* at 87. And he claims he received threats from other BIBR-group members due to his complaints. *Id.* at 67. Plaintiff also claims that LCF leadership, in response to his complaints, "manufactured" an incident so they could give him a "false disciplinary" report and place him in segregated housing. *Id.* at 68.

Defendant Meredith represented plaintiff in his disciplinary hearing. *Id.* In preparation for that hearing, plaintiff told Meredith that Spillman and prisoners in the BIBR groups threatened him. *Id.* at 69–70. Prison officials ultimately placed plaintiff in segregated housing in March 2023. *Id.* at 43.

In June 2023, prison officials placed plaintiff and a member of his former BIBR group, Joshua Weeks, in the same cell. *Id.* at 70. And on June 9, plaintiff stopped defendant Parks—the unit team manager—and told Parks that placing Weeks in his cell placed him in danger. *Id.* at 72. He told Parks that he needed additional protection from "drug dealers and drug abusers," *id.*, and that he needed "protection from people from BIBR[.]" *Id.* at 85. Parks moved Weeks to a different cell. *Id.* at 72–73. Plaintiff shared his cell with a few other inmates without incident.

Then, in late June or early July, prison officials placed Jeremy Garza in plaintiff's cell. *Id.* at 92–93. Plaintiff claims that the day Garza moved in, Garza started threatening him. *Id.* at 94. According to plaintiff, Garza called him "a snitch and a rat" and accused him of "ruin[ing] a

good thing" by complaining about Spillman. *Id.* Although Garza was a member of a BIBR group, *id.* at 94–95, plaintiff didn't tell any of the defendants that Garza, specifically, was a threat to him. *Id.* at 190.

On July 12, 2023, Garza and plaintiff got into an argument about plaintiff's television, and Garza told plaintiff he was going to kill him. *Id.* at 97–98. Garza began choking plaintiff. *Id.* at 98. After a few seconds, plaintiff broke free and started banging on his cell door with his cane to alert prison guards. *Id.* Defendants Meredith and Chapman responded to the altercation, and they made plaintiff sign a protective-custody waiver before they would remove him or Garza from the cell. *Id.* at 99.

Plaintiff asked for medical attention because his throat was sore and he could "hardly talk." *Id.* But Meredith and Chapman refused, requiring plaintiff to talk to defendant Parks first. *Id.* at 101. Plaintiff told Parks, "I warned you about this." *Id.* at 102. Parks didn't send plaintiff to medical either; he released him back into LCF's general population. *Id.* Once plaintiff was back in general population, he showed a different guard the bruising on his neck, and she promptly called for medical help. *Id.* at 105. After meeting with a nurse, prison officials called an ambulance, which took plaintiff to a nearby hospital. *Id.* at 106. There, doctors gave plaintiff treatment for his pain, but they found no acute injuries. Doc. 141-2 at 11 (Ex. D). Plaintiff claims that he experienced pain, neck trauma, a sore throat, and trouble swallowing as a result of the attack. Doc. 140-4 at 32–33 (Ex. H).

Two months after that attack, prison officials wrote and issued a disciplinary report to plaintiff for refusing to take a cellmate. Doc. 140-2 at 6 (Ex. F). Plaintiff believes that defendant Parks instructed the officials to issue the report as a way to torture him because he had filed

lawsuits against Parks in state court. Doc. 141 at 121, 142–43 (Ex. B). At a hearing on the disciplinary report, plaintiff was found not guilty. Doc. 140-2 at 8 (Ex. F).

In response to these events, plaintiff filed this action against Spillman, Parks, Meredith, and Chapman. Doc. 8. After the court screened plaintiff's Complaint, defendants Parks, Meredith, and Chapman moved to dismiss it for failing to state a claim. Doc. 50. The court granted that motion in part and denied it in part, Doc. 64, leaving plaintiff with three claims against these defendants. Defendants and plaintiff then filed cross motions for summary judgment. Doc. 139; Doc. 140.

## II. Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the

moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

While a court can treat cross motions for summary judgment separately, and "the denial of one does not require the grant of another[,]" *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979), it properly may address the legal arguments together. *Berges v. Standard Ins.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010). Here, the two motions and their legal arguments overlap—and substantially so. Indeed, each side invokes and incorporates their own

summary-judgment briefing and opposes the other's summary-judgment motion. The court thus exercises its discretion and addresses together the legal arguments in the dueling motions.

## III. Analysis

Plaintiff has three remaining claims against defendants Parks, Meredith, and Chapman under 42 U.S.C. § 1983. The first claims under the Eighth Amendment that defendants failed to provide plaintiff medical care after Garza had attacked him. The second asserts a First Amendment retaliation claim against Parks based on the allegedly false disciplinary report. His third claim alleges defendants failed to protect him when they placed Garza and plaintiff in the same cell, thus violating the Eighth Amendment.

Defendants move for summary judgment against all three claims. They make the same three arguments against each claim: (1) Plaintiff failed to exhaust his administrative remedies; (2) defendants are qualifiedly immune from suit; and (3) even if defendants aren't qualifiedly immune, plaintiff has failed to provide evidence to support his claim for punitive damages. The court addresses each of these arguments in order, below.

### A. Exhaustion

Start with exhaustion. Under the Prison Litigation Reform Act, a prisoner must exhaust all available administrative remedies before he can sue prison officials in federal court. 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007). Because exhaustion is an affirmative defense, defendants bear the burden to show that plaintiff failed to exhaust his administrative remedies. *Jones*, 549 U.S. at 216; *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). If plaintiff failed to exhaust his administrative remedies for a claim, the court must grant summary judgment against that claim. *Gorton v. Williams*, 309 F. App'x 274, 275 (10th Cir. 2009).

But a plaintiff needn't exhaust administrative remedies that are, in practice, "unavailable." *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court has identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is unavailable. *Id.* at 643. *First*, a plaintiff isn't required to exhaust an administrative procedure which operates as a "simple dead end—with officers unable or consistently unwilling to provide relief[.]" *Id.* *Second*, exhaustion doesn't apply to administrative procedures that are "so opaque" that they are "incapable of use." *Id.* *Third*, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation[,]" the grievance process is practically unavailable. *Id.* at 644. Once a defendant has shown that a plaintiff failed to exhaust his remedies, "the onus falls on the plaintiff to show that remedies were unavailable to him[.]" *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011).

To exhaust his administrative remedies properly, "a prisoner must comply with procedural 'rules that are defined not by the PLRA, but by the prison grievance process itself.'" *Williams v. Hill*, 422 F. App'x 682, 684 (quoting *Jones*, 549 U.S. at 218). Because plaintiff here sues staff at LCF, he was required to exhaust the Kansas Department of Corrections grievance process. *See* Kan. Admin. Regs. § 44-15-101 *et seq.* Below, the court outlines the KDOC grievance process, recites plaintiff's relevant grievance history, and then explains why plaintiff failed to exhaust his administrative remedies for two of his claims.

**1. KDOC Grievance Process**

An inmate must take four steps to exhaust the KDOC grievance process: (1) seek a documented, informal resolution with unit team members, *id.* § 44-15-101(b); (2) file a grievance report "to an appropriate unit team member," *id.* § 44-15-101(d)(1); (3) submit the grievance report to the warden of the facility, *id.* § 44-15-101(d)(2); and (4) submit the grievance to the

Kansas Secretary of Corrections, *id.* § 44-15-101(d)(3). Once an inmate discovers the event giving rise to his grievance, he must file the grievance within 15 days, excluding weekends and holidays. *Id.* § 44-15-101b. Each grievance form must contain, among other details, a "specific complaint that states what or who is the subject of the complaint[.]" *Id.* § 44-15-102(b)(1)(A).

The KDOC grievance process also contains procedures for special circumstances. For example, if an inmate doesn't receive a timely response at any point in the four-step process, he "may move to the next stage of the grievance procedure" without awaiting a response. *Id.* § 44-15-101b. And in "emergency situations the inmate may bypass the prerequisite of informal resolution" by marking his grievance as an "emergency grievance." *Id.* § 44-15-106. Prison staff that receive emergency grievances must forward them "immediately, without substantive review, to the level at which corrective action can be taken." *Id.* But "the person at the corrective action level" remains free to decide that the grievance doesn't qualify as an emergency and process it as a regular grievance "from that point on[.]" *Id.*

**2. Plaintiff's Grievance History**

Here, defendants claim that they provided the court with all plaintiff's arguably relevant grievances. Doc. 140 at 19–20. To support this claim, defendants provide a signed declaration from Darcie Halthus, a corrections manager at KDOC with "access to records of inmate grievances, personal-injury claims, and property-loss claims." Doc. 30-6 at 1. Plaintiff has provided the court with a handwritten copy of one additional grievance he claims he submitted multiple times. Doc. 152 at 29–30. Plaintiff also asserts that many of defendants' submissions aren't "relevant to this lawsuit for any purpose[,] including exhaustion of administrative remedies[.]" *Id.* at 33. Defendants agree, Doc. 157 at 12, so the court doesn't consider those

unrelated grievances. All in, plaintiff submitted seven arguably relevant grievances, and the court recounts them, next, chronologically.[3]

Plaintiff submitted his first grievance on October 5, 2022. Doc. 30-2 at 8–9. In it, plaintiff complains that defendant Spillman removed him from the BIBR group. *Id.* This grievance never refers to the other defendants, nor does it mention any of plaintiff's protective-custody or retaliation concerns. *See id.* Plaintiff appealed this grievance through KDOC's entire grievance process, including sending it to the Secretary of Corrections. *Id.* at 2. The Secretary denied plaintiff relief. *Id.* at 1.

Plaintiff's second grievance is dated April 25, 2023. Doc. 30-6 at 17. In it, plaintiff complains defendant Spillman retaliated against him by refusing to place plaintiff in a new BIBR group. *Id.* at 17, 20–21. Plaintiff asserts he submitted this grievance at each required level but, because he didn't receive a response, he submitted it to the Secretary of Corrections without a response from the warden. *Id.* at 18. In that submission, plaintiff adds complaints that defendants Parks and Meredith weren't responding to his grievances correctly. *Id.* The Secretary returned the grievance to the LCF warden, describing it as an "informal letter" with "no evidence" that plaintiff had presented the issue to staff at the facility. *Id.* at 15.

Plaintiff's third grievance consists of a letter to the Secretary of Corrections dated May 5, 2023. *Id.* at 12. In that letter, plaintiff complains about (1) defendant Spillman removing him from the BIBR group, (2) defendant Parks failing to respond to plaintiff's grievances, and (3) many LCF officials' alleged failure to provide plaintiff care for his disabilities. *Id.* at 12–13. The secretary forwarded the grievance to the warden at LCF for his response and "noted that there is no evidence that [plaintiff] has sought assistance from staff at the facility." *Id.* at 8.

[3] Because some of the grievance reports don't have a unique serial number, the court refers to each grievance by the date when plaintiff submitted it.

Plaintiff's fourth grievance asserted an emergency grievance he sent directly to the Secretary of Corrections on June 9, 2023. *Id.* at 26. In this grievance, plaintiff complains that defendants Parks and Meredith were "rotating drug and tobacco users, . . . who [plaintiff] requested protection from, into [his] cell." *Id.* at 26–27. The secretary denied this grievance as "invalid" because it was "clearly about the classification decision making process," which falls outside the scope of the grievance process. *Id.* at 25 (citing Kan. Admin. Regs. § 44-15-101(a)(d)(2) ("The grievance procedure shall not be used in any way as a substitute for, or as part of, . . . the classification decision making process[.]")).

Plaintiff's fifth grievance, dated July 14, 2023, is the subject of some dispute. In the hand-copied version of this grievance submitted to the court, plaintiff recounts events surrounding Garza's attack. Doc. 140-4 at 9 (Ex. H). This grievance names defendants Parks, Meredith, and Chapman, and explains two of plaintiff's claims in this case in detail—that defendants failed to provide him with medical care and failed to protect him from dangerous inmates. *Id.* at 9–12. Plaintiff claims he submitted many versions of this grievance without ever receiving a response. Doc. 152 at 29–30. But KDOC has no record of receiving or processing this grievance. *See* Doc. 30-6 at 7.

Plaintiff submitted his sixth grievance on September 27, 2023. Doc. 30-4 at 5. In it, he complains that prison staff weren't handling his library requests properly. *Id.* He appealed this grievance through the entire process. *Id.* at 1. The Secretary concluded that the staff response to plaintiff's grievance was appropriate. *Id.*

Plaintiff submitted his seventh grievance on October 1, 2023. Doc. 30-3 at 6. In its original form, this grievance complained about other inmates playing loud noises through air vents into plaintiff's cell. *Id.* The warden didn't return plaintiff's grievance for four months. *Id.*

at 5. After receiving the grievance back, plaintiff appealed to the Secretary and, for the first time, included complaints about Garza's attack. *Id.* at 3. The Secretary again concluded the staff response to plaintiff's grievance was appropriate. *Id.* at 1.

**3. Exhaustion of Plaintiff's Claims**

Plaintiff's grievance history indicates he didn't fully exhaust administrative remedies for his First Amendment retaliation claim against defendant Parks, who allegedly orchestrated a false disciplinary report against plaintiff for filing a lawsuit. No grievance mentions defendant Parks subjecting plaintiff to disciplinary proceedings. Therefore, defendants deserve summary judgment in full against plaintiff's retaliation claim. *See Jones*, 549 U.S. at 211. Plaintiff's other two claims—that defendants Parks, Meredith, and Chapman failed to protect him and failed to provide him with medical care—aren't as clean cut.

Most of plaintiff's grievance reports fail to demonstrate plaintiff properly exhausted his claims. Each of plaintiff's first, second, third, and sixth grievances either fail to name these defendants or complain about actions unrelated to the two remaining claims. And while plaintiff's seventh grievance mentions details of the July 12 strangulation, plaintiff only included those details in his final appeal to the Secretary of Corrections. *See* Doc. 30-3 at 3. That won't suffice. To exhaust administrative remedies, plaintiff must process the specific complaint all the way through all four steps of KDOC's grievance process. *See* Kan. Admin. Regs. § 44-15-101. He didn't.

These conclusions leave just two grievances at issue here: his grievance dated July 14, 2023 and his grievance dated June 9, 2023. Below, the court trains its attention on these two grievances.

**a. July 14, 2023 Grievance**

Start with the grievance report dated July 14, 2023. This grievance recounts the attack in plaintiff's cell. Although defendants dispute that plaintiff ever filed this grievance,[4] they concede that it addresses plaintiff's failure-to-protect claim adequately. Doc. 140 at 24. It also would address plaintiff's claim that defendants failed to provide him with medical care. *See* Doc. 140-4 at 9 (Ex. H). But that's irrelevant, defendants argue, because plaintiff didn't appeal the grievance to the Secretary of Corrections. Doc. 140 at 24. The court agrees.

To exhaust a claim properly, KDOC's grievance procedures require inmates to appeal grievance decisions to the Secretary of Corrections. *See* Kan. Admin. Regs. § 44-15-101(d)(3). Darci Halthus's uncontroverted declaration demonstrates no record exists of this grievance ever reaching the Secretary of Corrections. Doc. 30-6 at 7. Given this undisputed fact, there's no basis for a reasonable jury to find (or infer) that plaintiff so appealed. And, in turn, there's no basis for finding (or inferring) that plaintiff exhausted. Therefore, plaintiff's July 14, 2023 grievance fails to exhaust his claims, even if the court finds a genuine dispute on whether he submitted the grievance to his unit team and the warden in the first instance.

All plaintiff's arguments to the contrary fail. He first argues that he submitted the grievance multiple times without receiving a response. Doc. 152 at 29. Even assuming that's true, KDOC's grievance procedures provide that an "inmate may move to the next stage of the grievance procedure if a timely response is not received at any step in the grievance process." Kan. Admin. Regs. § 44-15-101b. So even if plaintiff submitted this grievance and didn't receive a response, that couldn't excuse his failure to appeal it to the Secretary.

---

[4] On summary judgment, the court can't resolve this factual dispute—whether plaintiff ever filed this grievance. So, resolving all factual disputes in plaintiff's favor, the court's analysis proceeds by assuming plaintiff submitted the grievance to staff members.

Plaintiff also argues the court should consider the grievance "appealed as and when it was submitted" because he labeled it as an emergency grievance. Doc. 152 at 38. To be sure, KDOC's grievance procedures require KDOC staff to forward emergency grievances "to the level at which corrective action can be taken." Kan. Admin. Regs. § 44-15-106. But this duty doesn't mean plaintiff adequately exhausted his administrative remedies. There is no evidence that "the level at which corrective action [could] be taken"—as it applies to plaintiff's grievance here—was the Secretary of Corrections' office. *See id.* Indeed, plaintiff's grievance seeks relief from LCF's warden. Doc. 140-4 at 12. So, even if the court considers the grievance "appealed as and when it was submitted" based on plaintiff's theory, Doc. 152 at 38, it would only consider the grievance appealed to the warden. Plaintiff still had an obligation to forward the grievance to the Secretary—an obligation he failed to satisfy. *See* Kan. Admin. Regs. § 44-15-101b; Doc. 30-6 at 7.

Plaintiff next argues that defendants thwarted his attempts to file grievances. Doc. 152 at 37. But plaintiff fails to identify any admissible evidence that prison officials used "machination, misrepresentation, or intimidation" to prevent him from filing his July 14 grievance. *See Ross*, 578 U.S. at 632. Instead, he directs the court to his May 5, 2023 letter to the secretary—where he complains that unit staff didn't process his grievances correctly—to demonstrate prison officials thwarted his efforts. *See* Doc. 30-6 at 18–20. But the letter's allegations don't provide a basis for a reasonable jury to find that the grievance process was unavailable. In the letter, plaintiff merely alleges that prison staff waited too long to collect his grievances—a far cry from the "variety of instances in which officials misled or threatened individual inmates" that *Ross*'s third exception aims to address. 578 U.S. at 644. Nor can the letter—dated May 5, 2023—support a reasonable finding that prison staff mishandled plaintiff's

grievance two months later in July. *See* Doc. 30-6 at 18. Therefore, even when given the benefit of all reasonable inferences, plaintiff fails to shoulder his summary-judgment burden to adduce evidence supporting a finding of unavailability. *See Tuckel*, 660 F.3d at 1254.

Finally, plaintiff argues that the Supreme Court's decision in *Perrtu v. Richards*, 605 U.S. 460 (2025), requires that a jury decide if he properly exhausted his remedies. Doc. 152 at 33–34. Not so. In *Perrtu*, the plaintiff alleged that a prison official sexually abused him and unconstitutionally retaliated against him for filing grievances. 605 U.S. at 465. The plaintiff tried to excuse his failure to exhaust by arguing the prison official had intercepted and destroyed the grievances. *Id.* But the Magistrate Judge there determined that the plaintiff's account wasn't credible, so the district court granted the defendant's motion to dismiss on exhaustion. *Id.* at 466. The Supreme Court held that was error. *Id.* at 479. Because the plaintiff's retaliation claim alleged the defendant had violated his right to file grievances, exhaustion was so "intertwined with the merits" of his claim that the PLRA guaranteed him a jury trial on the exhaustion issue. *Id.* at 468.

Here, exhaustion is not "intertwined with the merits" of plaintiff's claims. *See id.* Plaintiff's Complaint doesn't allege that defendants violated the Constitution by mishandling his grievances. *See* Doc. 8. Instead, he merely raises the argument as an explanation why there's no record he exhausted the claims in his Complaint. *See* Doc. 152 at 37. So, *Perrtu* doesn't require a jury trial on the exhaustion issue. *See* 605 U.S. at 479; *see also id.* at 489 (Barrett, J. dissenting) (arguing that, under the majority's rule, the PLRA wouldn't guarantee the plaintiff a jury trial if he hadn't raised the retaliation claim). Thus, plaintiff's July 14, 2023 grievance failed to exhaust his claims.

**b. June 9, 2023 Grievance**

On to the other surviving grievance. As a threshold matter, this grievance doesn't mention defendant Chapman, so the court grants his motion for summary judgment against this claim. *See generally* Doc. 30-6 at 26–29; Kan. Admin. Regs. § 44-15-102(b)(1)(A) (requiring grievances contain "a specific complaint that states what or who is the subject of the complaint"). The other defendants don't fare as well, however.

Plaintiff's June 9, 2023 emergency grievance exhausted his failure-to-protect claim against defendants Parks and Meredith. *See* Doc. 30-6 at 26. The grievance contains "a specific complaint that states what or who is the subject of the complaint," Kan. Admin. Regs. § 44-15-102(b)(1)(A), by complaining that defendants Parks and Meredith "keep rotating drug and tobacco users, . . . who [plaintiff] requested protection from, into [his] cell." Doc. 30-6 at 26–27. This grievance also mentions plaintiff's dispute with BIBR. *Id.* at 27. But Parks and Meredith fail to demonstrate plaintiff's June 9, 2023 grievance violated KDOC's emergency-grievance process. They make two arguments, neither of which persuade the court.

Defendants argue that plaintiff's emergency grievance didn't "go through the proper grievance steps." Doc. 140 at 24. They quote KDOC's regulations as stating "'If the person at the corrective action level determines that the grievance is not an emergency . . . [t]he grievance may then be processed from that point on as a regular grievance.'" *Id.* (quoting Kan. Admin. Regs. § 44-15-106) (alterations in original). According to defendants, this means that plaintiff, because the Secretary determined his grievance wasn't an emergency, had to resubmit the grievance to exhaust the KDOC grievance procedures. *See id.* But defendants wholly omit two parts of KDOC's emergency-grievance provision, and these omitted parts defeat their argument. The full paragraph defendants cite—with the parts they omit in bold text—states:

> If the person at the corrective action level determines that the grievance is not an emergency, **that fact shall be included on the grievance form and the form shall be signed by the person who made that determination.** The grievance may then be processed from that point on as a regular grievance. **If necessary for a proper response the grievance may be sent for processing at a lower level.**

Kan. Admin. Regs. § 44-15-106 (emphasis added).

The Secretary's letter denying plaintiff's grievance never asserts that plaintiff's grievance wasn't an emergency, *see* Doc. 30-6 at 25, so it wasn't "included on the grievance form," and the court won't conclude the Secretary made such a determination. *See* Kan. Admin. Regs. § 44-15-106. And even if the Secretary adequately had determined the grievance wasn't an emergency, the grievance wasn't "sent for processing at a lower level" in the grievance process. *See id.*; Doc. 30-6 at 25. So, the grievance reached the end of the process—a response from the Secretary of Corrections—leaving nothing more for plaintiff to do "from that point on[.]" *See* Kan. Admin. Regs. § 44-15-106.

Defendants also argue that plaintiff's grievance couldn't have exhausted his administrative remedies because the Secretary denied it "as an 'invalid' use of the grievance procedure[.]" Doc. 140 at 24. True enough, the Secretary denied the grievance because it was "clearly about the classification decision making process" and explained that a regulation "prohibits use of the grievance procedure to address this concern." *Id.* But, as plaintiff points out, that simply makes it more likely administrative remedies for his failure-to-protect claim were "'unavailable' as [the term] applies to the PLRA exhaustion requirement." Doc. 152 at 37. If the Secretary understood plaintiff's grievance to raise protective-custody concerns and concluded plaintiff wasn't allowed to file grievances over those concerns, then the grievance procedure served as nothing more than a "dead end" for plaintiff's failure-to-protect claim.[5] *See*

---

5 In their Reply, defendants argue—for the first time—that plaintiff's claims don't implicate "being in protective custody or not being in protective custody[,]" so plaintiff still had administrative remedies

*Ross*, 578 U.S. at 643; *accord Hughes v. Geither*, 545 P.3d 1059, 2024 WL 1232013, at *3 (Kan. Ct. App. 2024) ("Because the decision to classify an inmate into protective custody is within the broad discretion of prison staffs and is insulated from the ordinary grievance procedure[,] . . . filing a grievance would have served no purpose."). Put simply, if there's no administrative procedure that can process plaintiff's complaints, he isn't required to exhaust.

In sum, plaintiff's emergency grievance informed the Secretary that he faced threats based on his dispute with BIBR, and the Secretary rejected the grievance because grievance procedures weren't available for plaintiff's specific accusation. The Secretary didn't advise that plaintiff needed to raise this grievance through a different channel. Therefore, the court concludes, plaintiff exhausted his failure-to-protect claim against defendants Parks and Meredith adequately and, next, the court addresses that claim on the merits.

### B. Failure to Protect

In his exhausted failure-to-protect claim, plaintiff argues that defendants Parks and Meredith violated the Eighth Amendment by housing him in the same cell as Garza. He claims that he put defendants on notice that he was in danger from members of BIBR, but that they ignored that risk. In response, defendants argue the court should grant them summary judgment because they are qualifiedly immune from plaintiff's lawsuit. But factual disputes preclude summary judgment on this claim. Before explaining why that's so, the court recites the qualified-immunity standard and the law governing failure-to-protect claims.

available to him. Doc. 157 at 13. But that argument directly contradicts the Secretary's letter denying plaintiff's June 9 grievance, which informed plaintiff he couldn't raise the complaints underlying his failure-to-protect claim using the grievance procedure. Doc. 30-6 at 25. Defendants want to have their cake and eat it, too. They can't. If a prisoner is told he has no administrative remedies, then his administrative remedies are unavailable.

State officials deserve qualified immunity for § 1983 claims unless (1) they violated a plaintiff's constitutional right, and (2) that right was "clearly established" at the time of the violation. *Cox v. Glanz*, 800 F.3d 1231, 1246 (10th Cir. 2015) (quotation cleaned up). The plaintiff bears the burden of establishing both prongs when, as here, the defendant raises the qualified-immunity defense. *Id.* at 1245.

A constitutional right is clearly established when existing law has "placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In our Circuit, "for a right to be clearly established, 'there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (en banc) (quoting *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). And the court should consider all relevant precedent, even if neither party cites the particular cases on point. *See Baca v. Cosper*, 128 F.4th 1319, 1327 n.5 (10th Cir. 2025) ("[W]e conduct our clearly established analysis with full knowledge of settled case law.").

Here, plaintiff has met his burden on both prongs of this standard. Start with the constitutional-violation prong.

**1. Constitutional Violation**

The Eighth Amendment requires prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation cleaned up). But not all inmate attacks subject prison officials to liability. To establish a failure-to-protect claim, a plaintiff must meet a deliberate-indifference standard. *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008). This standard "has both an objective and subjective component" that a plaintiff must satisfy. *Castillo v. Day*, 790 F.3d 1013, 1020 (10th Cir. 2015).

"In cases involving a failure to prevent harm," the objective component requires a plaintiff to "show that the conditions of his incarceration present an objective 'substantial risk of serious harm.'" *Howard*, 534 F.3d at 1236 (quoting *Farmer*, 511 U.S. at 834). "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (quotation cleaned up). "In other words, an official 'must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Howard*, 534 F.3d at 1236 (quoting *Farmer*, 511 U.S. at 837). Here, sufficient evidence exists that a reasonable jury could find for plaintiff on both components.

**a. Objective Component**

Take the objective component. Drawing all disputed factual inferences in plaintiff's favor, a jury could conclude the conditions of plaintiff's incarceration presented a substantial risk of harm. In his deposition, plaintiff testified that, because of his outspoken opposition to drug use, he was seen as a "snitch" and a "rat," which made him a "marked man." Doc. 141 at 87 (Ex. B). According to plaintiff, members of the BIBR group were particularly likely to attack him because his complaints endangered their extra privileges. *Id.* at 76, 94. And plaintiff testified that Garza, a BIBR member, threatened him for this reason on the first day the two were housed together. *Id.* at 94. Combining this testimony with the undisputed reality that Garza indeed attacked plaintiff—a "serious harm" for Eighth Amendment purposes—suffices to preclude summary judgment on the objective component. *See Miller v. Kastelic*, 601 F. App'x 660, 663 (10th Cir. 2015) (finding factual issues precluded summary judgment on the objective component where the plaintiff received credible threats of physical assault and was later assaulted).

Trying to resist this conclusion, defendants make three. *First*, they cite *Grimsley v. MacKay*, 93 F.3d 676 (10th Cir. 1996), for the proposition that a plaintiff can't satisfy the objective component by pointing to injury alone. Doc. 140 at 32. This legal proposition is a sound one. *See Grimsley*, 93 F.3d at 682. But, as explained above, plaintiff identifies admissible evidence showing there was a substantial risk of harm *before* Garza attacked him. And *Grimsley* doesn't require a different conclusion. In *Grimsley*, our Circuit found that a plaintiff, "securely locked by himself in a maximum security cell, was not confined under conditions posing a substantial risk of serious harm" from another inmate, even if "an inmate located outside the cell succeeded in inflicting injury upon him." *Id.* But that's a far cry from the summary judgment facts here. *See id.* Plaintiff has adduced evidence that he was locked in a cell *with* an inmate who had threatened him. Doc 141 at 94.

*Second*, defendants argue there was no objective risk because they housed plaintiff with other drug users and BIBR group members before Garza, and none of his former cellmates had attacked him. Doc. 140 at 33. True enough, and a jury might seize on this fact to conclude plaintiff wasn't objectively in danger. But this fact isn't enough to mandate summary judgment for defendants. *See Miller*, 601 F. App'x at 663 (finding plaintiff's attacker lacked a violent history "[a]t most . . . creates a dispute of fact; it does not establish that there was no objective risk of harm" as a matter of law where plaintiff told prison officials that his cellmate and his cellmate's gang had threatened him).

*Third*, defendants invoke statements from plaintiff's deposition, claiming they show that not even plaintiff took all Garza's threats seriously. Doc. 140 at 33. Again, this argument might convince a jury to find for defendants on the question after a trial. But the objective component doesn't ask whether plaintiff subjectively believed every threat he received; it asks whether

there's enough evidence for a jury to find an "objective 'substantial risk of serious harm.'" *Howard*, 534 F.3d at 1236 (quoting *Farmer*, 511 U.S. at 834). Plaintiff has satisfied that standard because he has adduced evidence sufficient for a reasonable jury to find that plaintiff was in danger from BIBR-group members.

**b. Subjective Component**

Plaintiff also has satisfied the subjective component for summary judgment purposes. Plaintiff testified in his deposition—and defendants don't dispute—that he asked Parks for additional protection a month before Garza attacked him. Doc. 141 at 72–73 (Ex. B). Specifically, plaintiff told Parks it was dangerous to place him in the same cell as "drug dealers and drug abusers." *Id.* Plaintiff also testified he asked Parks for "protection from people from BIBR[.]" *Id.* at 85. A reasonable jury could find from this testimony that Parks knew plaintiff "faced a substantial risk of harm" from BIBR group members "and disregarded that risk[.]" *See Callahan*, 471 F.3d at 1159 (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1293 (10th Cir. 2006)). That's all that is required to survive summary judgment.

So too with defendant Meredith. Plaintiff testified that Meredith represented him in a disciplinary hearing after he refused to stay in a cell "that had smokers and drug dealers in" it. Doc. 141 at 63 (Ex. B). In his preparation for that hearing, plaintiff explained the threats he had received from members in the BIBR group. *Id.* at 68. Plaintiff testified that he told Meredith he needed to be protected due to the threats by Spillman "and the other prisoners" in the BIBR group. *Id.* at 69–70. Although the court evaluates this evidence as tenuous, it can't say that no reasonable jury could conclude that this conversation gave Meredith subjective knowledge that plaintiff was in danger. *See Callahan*, 471 F.3d at 1159.

Defendants argue that this testimony doesn't support defendants "having subjective knowledge of Garza being a legitimate threat to Plaintiff." Doc. 140 at 34. By their telling,

summary judgment is warranted unless plaintiff mentioned Garza by name when he asked for protection. *See id.* But our Circuit's deliberate-indifference cases don't abide defendants' argument for this level of particularity. Instead, a plaintiff can satisfy his burden for the subjective component by showing that he asked for protection from an identifiable group, and that a member of that group attacked him. *See Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018) (finding plaintiff stated a valid claim when he alleged he had requested protection from the "Native American callout" and was later attacked by one of its members); *Wilson v. Falk*, 877 F.3d 1204, 1210–11 (10th Cir. 2017) (finding factual dispute where plaintiff testified he had told defendants prison gang was going to attack him and was later attacked by members of that prison gang); *Miller*, 601 F. App'x at 663 (same). Plaintiff has met this mark. He testified that he asked Parks and Meredith for protection against members of the BIBR group because he had threatened their special privileges. Doc. 141 at 85–86 (Ex. B). And he's testified that Garza was a member of the BIBR group. *Id.* at 94. A jury could thus conclude that defendants Parks and Meredith knew Garza posed a risk to plaintiff and that they were deliberately indifferent to that risk.

**2. Clearly Established Law**

Because plaintiff has satisfied the constitutional-violation prong against defendants Parks and Meredith, the court next turns to the clearly established requirement. *Cox*, 800 F.3d at 1246. As the court explained in its earlier Memorandum and Order, it's clearly established that prison "guards aren't free to ignore substantial threats to inmate safety when they know about those threats." Doc. 64 at 22. Multiple cases from our Circuit put defendants on notice of that obligation. *See, e.g.*, *Wright v. Collison*, 651 F. App'x 745, 750 (10th Cir. 2016) ("At the time of Mr. Wright's beating, the law was clearly settled that prison authorities had a constitutional

obligation to act to protect a prisoner who had been plausibly threatened with serious harm by fellow inmates." (citing *Howard*, 534 F.3d at 1235–37)).

Defendants also argue that "it was not clearly established that placing an inmate opposed to drugs in a cell together with drug dealers or users" violates the Constitution. Doc. 140 at 34. This argument, for starters, mischaracterizes plaintiff's claim: Though plaintiff asked for protection from drug users, he also requested protection from BIBR members, specifically. *See* Doc. 141 at 85–86 (Ex. B). But more fundamentally, defendants, once again, would have the court adopt a standard much stricter than the one our Circuit has adopted. The court understands it can't "define clearly established law at a high level of generality." *Al-Kidd*, 563 U.S. at 742. But "this does not mean that there must be a published case involving identical facts[.]" *York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008). And our Circuit has struck that balance in other failure-to-protect cases: It has defined clearly established law as requiring prison staff to "protect a prisoner who had been plausibly threatened with serious harm by fellow inmates." *Wright*, 651 F. App'x at 750. Because the court adopts the same level of generality here, defendants' argument is unpersuasive. *See id.* Plaintiff has carried his burden on qualified immunity, so the court denies defendants' Motion for Summary Judgment for plaintiff's failure-to-protect claim against defendants Parks and Meredith.

### C. Punitive Damages

Defendants' last argument contends that they deserve summary judgment against plaintiff's claims for punitive damages. The court disagrees. Punitive damages are available in § 1983 litigation when a plaintiff shows that a defendant's conduct either is "motivated by evil motive or intent" or "involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Plaintiff hasn't identified any evidence that defendants' failure to protect him was "motivated by evil motive or intent." *See id.* But the

summary judgment facts leave room for a reasonable jury to find defendants acted with "reckless or callous indifference." *See id.*

As other courts in our Circuit have noted, the subjective component of an Eighth Amendment failure-to-protect claim also uses a reckless-indifference standard. *See Al-Turki v. Ballard*, 2013 WL 589174, at *15 (D. Colo. Feb. 14, 2023) ("The intent requirement for a deliberate indifference claim under the Eighth Amendment is equivalent to the subjective recklessness standard required under criminal law or in a defamation action." (citing *Farmer*, 511 U.S. at 839–40). This principle means that the evidence precluding summary judgment against the subjective component of plaintiff's failure-to-protect claim also precludes summary judgment against his claim for punitive damages. *See id.* The court thus denies defendants' motion to the extent it seeks summary judgment against plaintiff's request for punitive damages.

## IV. Other Motions

Three other motions warrant brief discussion. *First*, the court grants defendants' Motion to Seal or Redact (Doc. 144). Defendants ask the court to seal certain exhibits containing plaintiff's confidential medical records and redact parts of another exhibit. Doc. 144 at 1. Although there is a presumption against sealing court documents, *McWilliams v. Dinapoli*, 40 F.4th 1118, 1130 (10th Cir. 2022), plaintiff has significant privacy interests in his medical records. The court grants this motion and directs defendants to file a redacted version of Doc. 141 within 14 days of this Order.

*Second*, the court denies plaintiff's Motion for Summary Judgment (Doc. 139). As already explained, defendants are entitled to summary judgment on most of plaintiff's claims. Because the only remaining claim is plaintiff's failure-to-protect claim, the court need only determine whether, drawing all reasonable inferences in defendants' favor, plaintiff is entitled to summary judgment on that claim. *See Nahno-Lopez*, 625 F.3d at 1283. He isn't. Defendants

identify ample evidence—such as the fact plaintiff was housed with multiple alleged drug users without incident—that a reasonable jury could use to conclude defendants weren't deliberately indifferent to a "substantial risk of serious harm[.]" *See Farmer*, 511 U.S. at 837. The court denies plaintiff's Motion for Summary Judgment.

*Third*, the court denies plaintiff's Motion for Reconsideration (Doc. 166). Plaintiff asks the court to reconsider its Memorandum and Order setting Topeka, Kansas as the place of trial (Doc. 164). To support that request, plaintiff essentially restates all the reasons accompanying his original motion. *See* Doc. 166; Doc. 93. But "a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). It's not a chance to ask for a do-over. Plaintiff hasn't identified any facts that the court misapprehended; and he hasn't identified *any* misunderstood positions or mistakes of law. Therefore, for the reasons given in the court's earlier Memorandum and Order (Doc. 164), the court denies plaintiff's Motion for Reconsideration.

## V. Conclusion

Plaintiff failed to exhaust many of his claims against defendants Parks, Meredith, and Chapman. But he did exhaust his failure-to-protect claim against defendants Parks and Meredith. And triable issues of fact preclude summary judgment on that claim's merits. The court thus grants in part and denies in part defendants' Motion for Summary Judgment as explained in this order. The court also denies plaintiff's Motion for Summary Judgment in full.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendants' Motion for Summary Judgment (Doc. 140) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** Defendants' Motion to Seal (Doc. 144) is granted. The Clerk is directed to remove the provisional designation from the following

documents, which will remain under seal permanently: Doc. 141; Doc. 141-1; Doc. 141-2; Doc. 141-3. Defendants are directed to file a redacted version of Doc. 141 within 14 days of this Order.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Summary Judgment (Doc. 139) is denied.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Reconsideration (Doc. 166) is denied.

**IT IS SO ORDERED.**

**Dated this 16th day of November, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**